UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., JUDGE

_____
                                          :
BASF CORPORATION,                         :
                                          :
                    Plaintiff,            :
                                          :
            v.                            :      Consol. Court No. 13-00318
                                          :
UNITED STATES,                            :
                                          :
                    Defendant.            :
_____:

## **PROPOSED ORDER**

Upon considering Plaintiff's Motion for Summary Judgment, and upon consideration of other papers and proceedings had herein, it is hereby

**ORDERED** that Plaintiff' Motion for Summary Judgment be, and hereby is granted; and it is further

**ORDERED** that Defendant shall reliquidate all entries of Omevital® 3322 EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, Omevital® 3426 EE and PronovaPure® 150:500 EE under subheading 1603.00.90, HTSUS; and it is further

**ORDERED** that Defendant shall refund all excess duties collected on the imported merchandise, with interest as provided for by law.


                              _____
                              Joseph A. Laroski, Jr., Judge


Dated: _____
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., JUDGE
_____
                                          :
BASF CORPORATION,                         :
                                          :
                          Plaintiff,      :
                                          :
            v.                            :     Consol. Court No. 13-00318
                                          :
UNITED STATES,                            :
                                          :
                          Defendant.      :
_____:

## **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BASF Corporation, plaintiff, pursuant to Rule 56 of the rules of the United States Court of International Trade, respectfully moves this Court for summary judgment in its favor and against the defendant, the United States. Summary Judgment in favor of the plaintiff is appropriate because there are no genuine issues of material fact, and plaintiff is entitled to judgment in its favor as a matter of law, as supported by plaintiff's Memorandum of Law and accompanying documents in support of this motion for summary judgment.

Plaintiff moves for summary judgment in its favor because, as a matter of law, the proper tariff classification for the imported merchandise is subheading 1603.00.90 and not under either headings 3824 or 2106. Plaintiff further moves this court for an order directing defendant to reliquidate the involved entries, to refund the excess duties collected by defendant, with interest as provided by law, and for all other relief the Court deems just and proper.

WHEREFORE, Plaintiff respectfully requests that its motion for summary judgment be granted.

Respectfully submitted,

 /s/Frederic D. Van Arnam, Jr.
Frederic D. Van Arnam, Jr.
Ashley J. Bodden
BARNES, RICHARDSON & COLBURN, LLP
100 William Street, Suite 305
New York, New York 10038

Tel: (212) 725-0200, ex. 126
rvanarnam@barnesrichardson.com
*Attorneys for Plaintiff*

Dated:      April 30, 2024
            New York, New York

2

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., JUDGE
_____
                                   :

BASF CORPORATION,                 :
                                   :
                     Plaintiff,    :
                                   :
                   v.           :       Consol. Court No. 13-00318
                                   :
UNITED STATES,                  :
                                   :
                     Defendant. :
_____:

**PLAINTIFF'S MEMORANDUM OF LAW IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
BARNES, RICHARDSON & COLBURN, LLP
100 William Street, Suite 305
New York, New York 10038

Tel: (212) 725-0200, ex. 126
rvanarnam@barnesrichardson.com
*Attorneys for Plaintiff*

Dated:      April 30, 2024
             New York, New York

TABLE OF CONTENTS

Page

TABLE OF CONTENTS......................................................................................i-iii

TABLE OF AUTHORITIES ........................................................................... iv-vii

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ...............................................................................1

INTRODUCTION ....................................................................................................2

RELEVANT PORTIONS OF THE TARIFF SCHEDULE ....................................3

    1.    Subheadings Under Which the Imported Merchandise
        was Liquidated .......................................................................... 3

    2.    Subheading Under Which BASF Claims Classification ............ 4

    3.    Subheadings Under Which the United States Counterclaims
        Classification ……………………………………………………… 4

    4.    Other Relevant Tariff Provisions …………………………… 4-5

QUESTION PRESENTED FOR DECISION............................................................5

    1.    Whether the imported merchandise should be classified
        as an extract of fish under 1603.00.90, HTSUS? ................. 5

    2.    Whether defendant's counterclaim for classification as an
        "other food preparation" under 2106.90.98 or 2106.90.99,
        HTSUS, depending on the year of entry, can be sustained
        as a matter of law in a tariff classification case under
        28 U.S.C. § 1583 and 19 U.S.C. § 1202, et. seq? ........................ 5

STATEMENT OF FACTS .......................................................................................5

    I.    The Formulation and Concentration Processes of the
        Imported Merchandise.........................................................6

    II.    The EPA and DHA Ethyl Ester
        Composition of the Imported Merchandise ........................... 13

SUMMARY OF ARGUMENT ................................................................. 15

JURISDICTION AND STANDARD OF REVIEW ................................... 17

ARGUMENT ..................................................................................... 19

I.  This Court Is to Apply a Two-Step
    Analysis in a Classification Dispute ................................ 19

II. The Imported Merchandise is Properly
    Classified in Heading 1603 Pursuant to GRI 1 ........................ 21

    A.  "Extracts" of Heading 1603 are Preparations Containing
        the Essence of the Substance from Which They Were
        Derived ................................................................... 21

    B.  The Imported Merchandise Contains the Essence
        of Fish Oil ............................................................... 25

        1.  The EPA and the DHA Fatty Acids in the Imported
            Products Is the Same EPA and DHA Fatty Acids
            Severed from the Fish Oil .......................................... 26

        2.  Other Physical Characteristics of the Ethyl
            Esters Reflect the Essence of the Fish Oil
            Starting Material ..................................................... 33

    C.  Defendant's Counterclaim Cannot be Sustained
        As a Matter of Law Under 28 U.S.C. § 1583
        or 19 U.S.C. § 1202, et. seq ....................................... 38

        1.  Defendant Cannot Raise an Alternative
            Tariff Classification via Counterclaim
            In a Classification Case ............................................. 38

        3.  Even if the Counterclaim is Recharacterized a
            Defense, Heading 2106 Does Not Provide
            For the Imported Products ......................................... 41

ii

CONCLUSION.................................................................................................45

CERTIFICATE OF COMPLIANCE.........................................................46

TABLE OF AUTHORITIES

Page

CASES

Alcan Food Packaging (Shelbyville) v. United States, 771 F.3d 1364
(Fed. Cir. 2014) ................................................................................. 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................ 17, 18

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). ............................................ 18

Am. Net. & Twine Co. v. Worthington, 141 U.S. 468 (1891) ............................ 18

Anhydrides & Chems., Inc. v. United States, 130 F.3d 1481 (Fed. Cir.1997)  18

Bausch & Lomb, Inc., 148 F. 3d 1363 (Fed. Cir. 1998) .................................... 19

Cyber Power Sys. (USA) Inc. v. United States,
586 F. Supp. 3d 1325 (CIT 2022) ..................................................... 38,39,40,41

Dependable Packaging Solutions, Inc. v. United States, 757 F.3d 1374
(Fed. Cir. 2014) ................................................................................. 20

EM Indus., Inc. v. United States, 22 CIT 156, 999 F. Supp. 1473 (1998).. 20

Jarvis Clark Co. v. United States, 733 F.2d 873 (Fed. Cir. 1984) ...................... 41

Jedwards Int'l, Inc. v. United States, 161 F. Supp. 3d 1354
(CIT 2016) .................................................................................... *passim*

Kahrs Int'l, Inc. v. United States, 713 F.3d 640 (Fed. Cir. 2013) ............. 19

Marcor Development Corp. v. United States, 20 CIT 538,
  926 F. Supp. 1124 (1996) ........................................................... *passim*

Maple Leaf Mktg, Inc. United States,
639 F. Supp. 3d 1363 (CIT 2023) ..................................................... 38,39,40,41

Orlando Food Corp. v. United States, 140 F.3d 1437 (Fed. Cir. 1998) ........ 19

Rocknel Fastener, Inc. v. United States, 267 F.3d 1354 (Fed.Cir. 2001) ..... 21

iv

Rollerblade, Inc. v. United States, 282 F.3d 1349
(Fed. Cir. 2014) ...................................................................................20,42

Rosenstein Bros. v. United States, 4 Cust. Court Appls. 401 (1913) ...........24

Second Nature Designs, Ltd. v. United States,
586 F. Supp. 3d 1334 (CIT 2022) ......................................................38,39,40,41

Second Nature Designs, Ltd. v. United States,
654 F. Supp. 3d 1301 (CIT 2023) ......................................................38,39,40,41

United States v. Carnegie, 8 C.C.P.A. 377 (1918) ......................................24

## STATUTES AND REGULATIONS

19 U.S.C. § 1202 ......................................................................2, 5, 38

19 U.S.C. § 1503 ....................................................................... 40

19 U.S.C. § 1505(b) ................................................................... 40

19 U.S.C. § 1514(a) .................................................................... 40

19 U.S.C. § 1515 ........................................................................ 17

19 U.S.C. § 1515(b) ................................................................... 14

28 U.S.C. § 1581(a) .................................................................... 17

28 U.S.C § 1583 ....................................................................2,5,38,39

28 U.S.C § 2643(b) ..................................................................... 40

USCIT Rule 56 ......................................................................1, 17

USCIT Rule 8(d)(2) .................................................................... 41

General Rule of Interpretation Rule 1 .........................................4,15,19,20,21

Heading 1603 ..........................................................................passim

Subheading 1603.00.90 ..............................................................passim

Chapter 21 Note l(e) ..............................................................5,24,42,43,44

Heading 2106 ...................................................................................*passim*

Subheading 2106.90.98 ............................................................... 1,4,5,38

Subheading 2106.90.99.......................................................... 1,4,5,38

Heading 3824 ...................................................................................*passim*

Subheading 3824.90.40 ..................................................................1,2,3

Subheading 3824.90.41 ..................................................................1,2,3

Subheading 3824.99.41 ..................................................................1,2,3

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 100-576, 100th Cong., 2d Sess. 549 (1988),
reprinted in 1988 U.S.C.C.A.N. 1547, 1582 ........................................ 21

Explanatory Notes to the Harmonized Commodity Description and Coding
System................................................................................................ 27, 35

The American Heritage Dictionary of the English Language,
(5th ed. 2005) ........................................................................................ 26

Oxford Dictionary of Biochemistry and Molecular Biology (2nd. ed. 2006) ....... 28

New Oxford American Dictionary, (2nd ed. 2005)........................................ 26, 33

"Chemistry of Healthy Hearts," *BASF Corporation*, Aug 7, 2023
(https://www.basf.com/us/en/media/smart-scientists/hearthealth.html)........... 27

"Fish Oil Handling/Processing" *Technical Evaluation Report
compiled for USDA National Organic Program*, (Mar. 5, 2015)........................ 26

Ciriminna, Meneguzzo, Delisi, Pagliaro, "Enhancing and
improving the extraction of Omega-3 from fish oil" (2017),
*Sustainable Chemistry and Pharmacy* 5 (2017) ................................ 28

Rizvi, Chao and Liaw, "Concentration of Omega-3 Fatty Acids from Fish Oil Using Supercritical Carbon Dioxide," in *Supercritical Fluid Extraction and Chromatography Techniques and Applications*, Charpentier and Sevenants, Eds., ASC Symposium Series 366, pg. 89, 90, American Chemical Society, Washington DC 1988..........................27

Swanson, Block, Mousa, "Omega-3 Fatty Acids EPA and DHA Health Benefits Throughout Life," (2012) 3(1) *Adv. Nutr.*..............................................27

USCBP Ruling N066891 (July 10, 2009)............................................................27

USCBP Ruling N298125 (July 11, 2018)............................................................27

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., JUDGE

_____
                                  :

BASF CORPORATION,           :
                                  :
                   Plaintiff,    :
                                  :
                  v.          :     Consol. Court No. 13-00318
                                  :
UNITED STATES,             :
                                  :
                  Defendant.  :
_____:

## PLAINTIFF'S MEMORANDUM OF LAW IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

This memorandum is submitted pursuant to Rule 56(a) of the Rules of the United States Court of International Trade in support of Plaintiff's Motion for Summary Judgment. Plaintiff BASF Corporation ("BASF" or "plaintiff") moves for judgment in its favor because, as a matter of law, the proper tariff classification of the imported merchandise is subheading 1603.00.90, Harmonized Tariff Schedule of the United State (HTSUS 2011, 2012, or 2018), depending on the date of entry and not under subheadings 3824.90.40 (HTSUS 2011), 3824.90.41 (HTSUS 2012) or 3824.99.41 (HTSUS 2018) depending on the date of entry as liquidated by U.S. Customs and Border Protection ("Customs" or "CBP") or under subheadings 2106.90.99, HTSUS (2011 or 2012) or 2106.90.98 (2018), depending on the date of entry, as alleged in defendant's ("United States" or "defendant") counterclaim.

## INTRODUCTION

This case concerns the tariff classification of fish oil ethyl ester concentrates imported by BASF under the tradenames Omevital® 3322 EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, Omevital® 3426 EE and PronovaPure® 150:500 EE (the "imported merchandise" or "imported products").   The imported products are oils rich in omega-3 fatty acids, particularly the polyunsaturated omega-3 fatty acids known as eicosapentaenoic acid ("EPA") and docosahexaenoic acid ("DHA"). BASF imports the merchandise in bulk form, after which BASF sells it to companies that use it to manufacture human dietary supplements. Customs classified the imported merchandise upon liquidation under subheading 3824.90.40, 3824.90.41, or 3824.99.41 depending on the year of entry, as "[o]ther:  fatty substances of animal or vegetable origin and mixtures there."

BASF believes there to be no material factual disputes regarding the imported products, or the jurisdiction of this Court to decide BASF's claim.  Instead, the dispute at issue concerns questions of law as to how the imported merchandise is to be classified under the HTSUS, and whether defendant can maintain its counterclaim under 28 U.S.C § 1583 and 19 U.S.C § 1202.  Therefore, the matter may be decided by summary judgment and BASF respectfully submits that subheading 1603.00.90 is the legally sustainable classification for the imported merchandise.

2

**RELEVANT PORTIONS OF THE TARIFF SCHEDULE**

   1.  <u>Subheadings Under Which the Imported Merchandise was Liquidated</u>

**3824 (HTSUS 2011)** Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included:

3824.90                 Other:

3824.90.40              Fatty substances of animal or vegetable origin and mixtures thereof.

**3824 (HTSUS 2012)** Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included:

3824.90                 Other:

3824.90.41              Fatty substances of animal or vegetable origin and mixtures thereof.

**3824 (HTSUS 2018)** Prepared binders for foundry molds or cores; chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included:

3824.99                 Other:

3824.99.41              Fatty substances of animal or vegetable origin and mixtures thereof.

   For each year, these subheadings were dutiable at 4.6 percent, *ad valorem*.

2.    <u>Subheading Under Which BASF Claims Classification</u>

**1603 (HTSUS 2011,**          Extracts and juices of meat, fish or crustaceans, molluscs
**2012 and 2018)**              or other aquatic invertebrates:

1603.00.90                                         Other.


For each year, this subheading was duty-free.


3.    <u>Subheading Under Which the United States Counterclaims Classification</u>

**2106 (HTSUS 2011,**          Food preparations not elsewhere specified or included:
**2012)**

2106.90                        Other:

2106.90.99                                      Other.

**2106 (HTSUS 2018)**          Food preparations not elsewhere specified or included:


2106.90                        Other:

2106.90.98                     Other

For each year, these subheadings were dutiable at 6.4 percent, *ad valorem*.


4.    <u>Other Relevant Tariff Provisions</u>


**General Rule of Interpretation 1 (HTSUS 2011, 2012, 2018)**

1. The table of contents, alphabetical index, and titles of sections, chapters
and sub-chapters are provided for ease of reference only; for legal purposes,
classification shall be determined according to the terms of the headings and
any relative section or chapter notes and, provided such headings or notes do
not otherwise require, according to the following provisions . . . .

**Chapter 21, Note 1(e) (HTSUS 2011, 2012, 2018)**

    1. This chapter does not cover:

      *        *        *        *        *

    (e) Food preparations, other than the products described in heading 2103 or 2104, containing more than 20 percent by weight of sausage, meat, meat offal, blood, insects, fish or crustaceans, molluscs or other aquatic invertebrates, or any combination thereof (chapter 16) . . ..

## QUESTION PRESENTED FOR DECISION

    1.    Whether the imported merchandise should be classified as an extract of fish under 1603.00.90, HTSUS as alleged in BASF's consolidated complaint?

    2.    Whether defendant's counterclaim for classification as an "other food preparation" under 2106.90.98 or 2106.90.99, HTSUS, depending on the year of entry, can be sustained as a matter of law in a tariff classification case under 28 U.S.C. § 1583 and 28 U.S.C. § 1202 *et. seq.*?

## STATEMENT OF FACTS

    The imported merchandise is fish oil ethyl ester concentrates that are rich in the omega-3 fatty acids EPA and DHA.  Statement of Undisputed Material Facts (SUMF) at ¶10.  Fish oil ethyl ester concentrates are created when triglyceride-based crude fish oil is purified and then transesterified, whereby the fatty acids present in the crude fish oil, including EPA and DHA, are freed via chemical reaction from the glycerol backbone of the triglyceride esters that make up crude fish oil.  *Id.* at ¶¶17-19.  An ethanol molecule then attaches to each of the free fatty

acids, resulting in the creation of three fatty acid ethyl esters molecules. *Id*. at ¶19. Typically, one of these three free fatty acid ethyl esters contains an omega-3 fatty acid, including EPA or DHA fatty acids.[1] *Id*. at ¶20

Thus, the transesterification process frees the three fatty acids from the glycerol matrix of the triglyceride and attaches them individually to an ethanol molecule, creating ethyl esters. *Id*. These resulting fatty acid ethyl esters are then concentrated to maximize the desired omega-3 fatty acid ethyl esters – the ones that contain the EPA and DHA fatty acids originally present in the crude fish oil. *Id*. at ¶¶20, 34. Companies want to isolate and concentrate these polyunsaturated omega-3 fatty acids because these fatty acids have demonstrated effectiveness in promoting human health. *Id*. at ¶20. This includes lowering the risk of heart attacks by lowering triglycerides in human blood, promoting fetal development and healthy aging. Plaintiff's Statement of Additional Undisputed Material Facts (Pl's AUMF) at ¶2.

## I.     The Formulation and Concentration Processes of the Imported Merchandise

BASF purchases crude fish oil, typically derived from anchovies, sardines, and mackerel, as the starting material for the imported merchandise. SUMF at ¶11. Crude fish oil is produced from ungutted whole fish by separating the oil in

---

[1]     The family of omega-3 fatty acids also includes alpha-linolenic acid and docosapentaenoic acid, among others. *See* Plaintiff's Exhibit ("Pl. Ex.) 1, Gierke, J., "Omega-3 Product Training Processing", ("Omega-3 Product") BASF Corp. (Aug. 2014) at p. 3 of 19.

the fish from the fish solids. *Id*. at ¶12. Crude fish oil is predominately composed of triglycerides. *Id*. at ¶13. Triglycerides are esters of glycerol having a structure of three fatty acids bound to a glycerol backbone. *Id*. at ¶14. Of the three fatty acids making up the triglyceride ester, typically one is an omega-3 polyunsaturated fatty acid such as an EPA fatty acid or a DHA fatty acid.[2] *Id*. at ¶15.



*See* Pl. Ex. 1, Omega-3 Product at p. 12 of 19.

Typically, crude fish oil is not ready for human consumption and needs to undergo some initial processing steps. *See* Pl. Ex 2, Manufacturing Flow Charts. First, at its Norway facility, BASF subjects the crude fish oil to a deacidification process to lower its acid value. SUMF at ¶18. Then the crude fish oil is subject to a stripping process, which removes environmental impurities and substances present from the decomposition of proteins and lipids found in the oil. *Id*. At this point, the resulting product is a semi-finished, neutralized triglyceride fish oil. *Id*.

---

[2]        EPA and DHA fatty acids enter the food chain when microalgae, which produce these fatty acids, are eaten by small aquatic organisms such as zooplankton, which in turn are eaten by fish. SUMF at ¶16. Thus, fish accumulate omega-3 fatty acids in their tissue over time.

The next step is the ethyl transesterification of the semi-finished fish oil, whereby BASF mixes the oil in its triglyceride state with ethanol and a chemical catalyst. *Id*. at ¶19. A chemical reaction occurs, whereby the three fatty acids attached to the glycerol backbone of the triglycerides are severed from that backbone, resulting in three separate fatty acids and one glycerol molecule. *Id*. During the reaction, the three now separated fatty acids individually bond with an ethanol molecule, forming three discrete fatty acid ethyl ester molecules. *Id*. The remaining glycerol molecule from the triglyceride is removed, but the fatty acids remain unchanged, albeit now in ethyl ester form rather than triglyceride ester form. *Id*. at ¶¶19, 34.



*See* Pl. Ex. 1, Omega-3 Product at p. 13 of 19.

Typically, of the three fatty acid ethyl esters resulting from the ethyl transesterification process, two are made up of saturated or monosaturated fatty acids, while the third is made up of a polyunsaturated omega-3 fatty acid such as EPA or DHA.  SUMF at ¶20.  Severing the glycerol backbone and freeing the fatty acids from the triglyceride form is necessary because the omega-3 EPA and DHA fatty acids cannot be concentrated at levels necessary for commercial use while in a triglyceride structure. Pl's AUMF at ¶3.  Thus, freeing the fatty acids from the glycerol molecule is a necessary first step to creating omega-3 fatty acid concentrated products. SUMF at ¶17.

The resulting product is then distilled to separate and concentrate the omega-3 polyunsaturated fatty acid ethyl esters from those ethyl esters made up of the saturated and the monounsaturated fatty acids.  *Id*. at ¶21.  This is done by passing the oil through a distillation column via a thin film, under low pressure and high temperature, as the polyunsaturated fatty acids ethyl esters have a higher boiling point than do the saturated or monosaturated fatty acid ethyl esters.  Pl's AUMF at ¶4.  After distillation, the ethyl esters at the lower boiling point are separated and removed, resulting in an oil with a higher concentration of the desired omega-3 fatty acids.  Pl's AUMF at ¶5.



*See* Pl. Ex. 1, Omega-3 Product at p. 13 of 19.

The concentrated product then undergoes further purification steps. These final purification processes remove remaining environmental pollutants, oxidized fatty acids and other impurities. SUMF at ¶17.

The production of the PronovaPure® 150:500 EE requires additional complexing and distillation, resulting in a product with even higher omega-3 polyunsaturated fatty acid content and more EPA and DHA than found in the Omevital® 3322 EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, or Omevital® 3426 EE products. *Id.* at ¶22. In this step, PronovaPure® 150:500 EE undergoes a urea complexation step, where the fatty acid ethyl ester oil is mixed with urea. Pl's AUMF at ¶6.



*See* Pl. Ex. 1, Omega-3 Product at p. 14 of 19.  The urea binds with the saturated and monosaturated fatty acid ethyl esters, which are then removed via filtration. Pl's AUMF at ¶6.  This process further concentrates the desired polyunsaturated ethyl esters in the PronovaPure® 150:500 EE.



*See* Pl. Ex. 1, Omega-3 Product at p. 14 of 19.

Lastly, the imported merchandise undergoes blending and mixing. During this step, a maximum of 0.2 percent of natural tocopherol, a form of vitamin E in soybean oil, is added to PronovaPure® 150:500 EE as an antioxidant. Likewise, a maximum of 1 percent of natural tocopherol is added as an antioxidant to the Omevital® 3322 EE, Omevital® 400200 EE Mix Toc; Omevital® 4510 EE, Omevital® 3426 EE products to prevent oxidation. SUMF at ¶23. The antioxidant protects the finished product from oxidation, which would cause rancidity.

The products are now omega-3 ethyl ester oils high in EPA and DHA fatty acids that BASF markets as fish oil ethyl ester concentrates. Like the triglyceride-based fish oil from which the imported products are directly derived, the BASF products are oily, viscous, lipidic substances that are referred to as oils in the omega-3 industry. Pl's AUMF at ¶1. They are light yellow in color, with a slight

12

fish taste and smell, though not as fishy as the crude fish oil starting material, and having undergone deacidification, stripping and other stages of purification processing, lighter in color than crude fish oil.  SUMF at ¶¶29, 30, 31.  BASF then drums the oils and flushes them with nitrogen to remove oxygen from the unfilled portion of the drum.  BASF imports the drums in bulk, after which they are sold to companies that manufacture human dietary supplements, such as omega-3 concentrates in gelatin soft capsules. *Id*. at ¶9.

## II.  The EPA and DHA Ethyl Ester Composition of the Imported Merchandise

The amount of fatty acid ethyl esters, and in particular the EPA and DHA fatty acid ethyl esters, found in the various formulations at issue in this case vary.  For example, Omevital® 3322 EE is at least 93 percent ethyl esters rich in omega-3 fatty acids.  SUMF at ¶24.  It also consists of less than seven percent partial glycerides, oligomers, and triglycerides, with a maximum of 1 percent tocopherol added as an antioxidant. *Id*.

Of the product's total fatty acid ethyl ester content, EPA ethyl esters constitute approximately 33 percent and DHA ethyl esters constitute approximately 22 percent,[3] with the remaining ethyl esters made up of fatty acids other than EPA or DHA.  *Id*.  The EPA and DHA content is approximately 600 mg/g.  *Id*.

---

[3]    The EPA and DHA ethyl ester content in each formulation can be derived from the name.  For example, Omevital® 3322 EE is 33 percent EPA ethyl

Similarly, Omevital® 400200 EE Mix Toc is at least 93 percent ethyl esters, but with an EPA ethyl ester and DHA ethyl ester content of approximately 680 mg/g. *Id.* at ¶25. In terms of percentage of total fatty acid ethyl ester content, this product constitutes approximately 40 percent EPA ethyl esters and approximately 20 percent DHA ethyl esters. *Id.* The remaining ethyl esters are made up of fatty acids other than EPA or DHA. *Id.* Omevital® 400200 EE Mix Toc also contains less than seven percent partial glycerides, oligomers, and triglycerides, with a maximum of 1 percent tocopherol added as an antioxidant. *Id.*

Omevital® 4510 EE is at least 93 percent ethyl esters, with an EPA ethyl ester and DHA ethyl ester content of approximately 550 mg/g and EPA constituting approximately 45 percent and DHA approximately 10 percent. *Id.* at ¶26. Omevital® 4510 EE also contains less than seven percent partial glycerides, oligomers, and triglycerides, with a maximum of 1 percent tocopherol added as an antioxidant. *Id.*

Like the other Omevital® products, Omevital® 3426 EE is at least 93 percent ethyl esters. *Id.* at ¶27. It has an EPA and DHA content of approximately 620 mg/g. *Id.* It is 34 percent EPA and 26 percent DHA ethyl esters. *Id.* It also contains less than seven percent partial glycerides, oligomers, and triglycerides, with a maximum of 1 percent tocopherol added as an antioxidant. *Id.*

---

esters and 22 percent DHA ethyl esters. PronovaPure® 150:500 EE, on the other hand, is 15 percent EPA ethyl esters and 50 percent DHA ethyl esters.

PronovaPure® 150:500 EE, on the other hand, is at least 97 percent ethyl esters[4], with an EPA and DHA content of approximately 650 mg/g.  *Id*. at ¶27.  Of the product's total ethyl ester content, EPA constitutes approximately 15 percent and DHA constitutes approximately 50 percent.  *Id*.  The remaining ethyl esters are made up of fatty acids other than EPA or DHA.  *Id*.  PronovaPure® 150:500 EE also contains less than three percent partial glycerides, oligomers, and triglycerides, with a maximum of 0.2 percent tocopherol added as an antioxidant. *Id*.

As mentioned above, each of the formulations of the imported merchandise contains some residual glycerides, oligomers, and triglycerides, ranging from a maximum of three percent for the PronovaPure® 150:500 EE product to seven percent for various Omevital® products. These substances were not removed via the manufacturing process and occur naturally in crude fish oil.  *Id*. at ¶36.

## SUMMARY OF ARGUMENT

The tariff classification of the Omevital® 3322 EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, Omevital® 3426 EE and PronovaPure® 150:500 EE fish oil ethyl ester concentrates is subheading 1603.00.90, HTSUS.  General Rule of Interpretation ("GRI") 1 of the HTSUS provides that classification is according to the terms of the headings and any relative section or chapter notes.  The tariff term "[e]xtracts . . . of . . . fish" in heading 1603 covers preparations that contain the "essence" of the fish from which they were derived, with any part of the fish's flesh

---

[4]    The ethyl ester content is typically closer to 99 percent.

or organic structure, including its oil, constituting "fish." Because the EPA and DHA omega-3 fatty acids found in the imported product are the same EPA and DHA fatty acids severed from the triglyceride-based fish oil via transesterification, the essence of the fish oil from the organic structure of the fish carries forward into the imported merchandise. Therefore, the imported products are "[e]xtracts . . . of . . . fish" provided for in heading 1603. In turn, this means that the imported products are "elsewhere specified or included" in a more specific tariff provision than either the liquidated heading 3824 or the counterclaimed heading 2106.

Defendant's counterclaim arguing for an alternative tariff classification and higher duty rate under heading 2106 cannot be legally sustained. The U.S. Court of International Trade has issued at least four decisions holding that no statutory authority exists establishing a cause of action raised via counterclaim seeking a new classification with a higher rate of duty. In these situations, counterclaims have been recast as defenses. In which case, classification of the imported merchandise under heading 2106 fails for two reasons. First, as a residual, catch all provision, heading 2106 is less specific than is heading 1603, and must yield to heading 1603 because the imported product is an "extract . . . of . . . fish . . ." and thus is "elsewhere specified or included" under heading 1603. Second, classification of the imported merchandise under heading 2106 is prevented via application of Chapter 21, Note 1(e).

## JURISDICTION AND STANDARD OF REVIEW

BASF brings this action pursuant to 19 U.S.C. § 1515 and this court has jurisdiction pursuant to 28 U.S.C. § 1581(a).  SUMF at ¶1.  The protests at issue in this case were denied by CBP on June 17, 2013, August 5, 2013, August 6, 2013, or August 7, 2013, or were deemed denied by operation of law pursuant to 19 U.S.C. § 1515(b) on September 26, 2019.  Thereafter, BASF filed timely summons on August 29, 2013, and October 19, 2019, which were assigned court numbers 13-00318 and 19-00195.  *See BASF Corporation v. United States*, court no. 13-00318, ECF No. 1; *BASF Corporation v. United States*, court no. 19-00195, ECF No.1.  All liquidated duties, taxes and fees owed on the entries had been paid prior to filing the summonses. SUMF at ¶2.  Court of International Trade court nos.13-00318 and 19-00195 were consolidated into consolidated case no. 13-00318 on January 19, 2022.  *See BASF Corporation v. United States*, court no. 13-00318, ECF No. 27; *BASF Corporation v. United States*, court no. 19-00195, ECF No. 14.  Thereafter, on March 27, 2024, consolidated court no. 13-00318 was reassigned from the Honorable Leo. M. Gordon to the Honorable Joseph A. Laroski, Jr.  *BASF Corporation v. United States*, consolidated court no. 13-00318, ECF No. 62.

Summary judgment is appropriate under Rule 56 when "there is no genuine issue as to any material fact . . .." USCIT R. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  This standard does not require that no facts be in dispute. *Liberty Lobby*, 477 U.S. at 248.  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Id.* To determine whether material facts are in dispute, the evidence must be considered in a light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). Furthermore, ambiguity in classification cases is resolved "in favor of the importer, since the intention of Congress to impose a higher duty should be expressed in clear and unambiguous language." *Am. Net. & Twine Co. v. Worthington*, 141 U.S. 468, 474 (1891); *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997) ("[R]evenue statutes, which are neither remedial nor in implementation of public policy, are in doubtful cases construed in favor of the citizen, lest burdens be imposed beyond the statutory revenue-producing purpose").

The primary issue before this Court is whether the imported products are classifiable as extracts of fish under subheading 1603.00.90. If the Court finds that the imported products are extracts of fish, then as a matter of law a decision must enter for BASF, as the United States' entered classification and counterclaimed classification are residual, catch-all provisions that only apply when the merchandise is "not elsewhere specified or included." This is a legal question that can be resolved without trial. Furthermore, the United States' counterclaim cannot be maintained as a matter of law in a tariff classification case. Because no genuine issues of material fact exist in this case, and because the questions for this court involve the legal construction of the tariff and other statutes, therefore summary judgment is appropriate.

# ARGUMENT

I. **This Court Is to Apply a Two-Step Analysis in a Classification Dispute**

The court employs a two-step process when analyzing classification issues. "[F]irst, [it] construe[s] the relevant classification headings; and second [it] determine[s] under which of the properly construed tariff terms the merchandise at issue falls." *Bausch & Lomb, Inc.*, 148 F. 3d 1363, 1365 (Fed. Cir. 1998) (citing *Universal Elects., Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997). The first step in this analysis is a question of law, while the second is one of fact.

Because no genuine issue exists as to what the imported merchandise is, this case raises the question of law of which tariff classification is correct. Merchandise entered into the United States is classified under the HTSUS. *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). "The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *Alcan Food Packaging (Shelbyville) v. United States*, 771 F.3d 1364, 1366 (Fed. Cir. 2014) (citations and quotations omitted).

The principles set forth in the GRIs provide the framework for tariff classification. *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644 (Fed. Cir. 2013). The court's review starts with GRI 1, which provides that "for legal purposes classification shall be determined according to the terms of the headings and any

19

relative section or chapter notes." The GRIs are applied sequentially, so if the proper heading can be determined via application of GRI 1, then "the court is not to look to the subsequent GRIs." *Dependable Packaging Solutions, Inc. v. United States*, 757 F. 3d 1374, 1377-78 (Fed. Cir. 2014).

Furthermore, the heading under which the imported goods were classified, heading 3824, and the heading under which the United States has counterclaimed, heading 2106, are "basket" provisions applicable to goods "not elsewhere specified or included." The classification of imported merchandise in a basket provision "is only appropriate when there is no tariff category that covers the merchandise more specifically." *EM Indus., Inc. v. United States*, 22 CIT 156, 999 F. Supp. 1473, 1480 (1998). That is because basket provisions are construed as broad, catch-all provisions that capture articles for which more specific headings do not exist elsewhere in the tariff. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002), *citing EM Indus., Inc.*

For the following reasons, if the Court concludes, as it should, that the imported merchandise is properly classified pursuant to GRI 1 under heading 1603, then as a matter of law that classification is more specific than either headings 3824 or 2106. Judgment must enter for BASF, classifying the merchandise under 1603.00.90.

## II.    The Imported Merchandise is Properly Classified in Heading 1603 Pursuant to GRI 1.

### A.    *"Extracts" of Heading 1603 are Preparations Containing the Essence of the Substance from Which They Were Derived.*

The fundamental issue in this case is the legal meaning of the tariff term "[e]xtracts . . . of . . . fish" for purposes of classification in heading 1603.  The tariff, however, does not define the term "extracts."

When a tariff term is not defined in either the HTSUS or its legislative history, then "'the term's correct meaning is its common meaning'" and the "common meaning of a term is presumed to be the same as its commercial meaning."  S*ee Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001).  When ascertaining the common meaning of a term, "a court may consult 'dictionaries, scientific authorities, and other reliable information sources,' and 'lexicographic and other materials.'"  *Id.* at 1356-57 (citations omitted).  The *Explanatory Notes to the Harmonized Commodity Description and Coding System*, ("ENs") are another aid to understanding the meaning of a tariff term; however, "the Explanatory Notes . . . are not legally binding . . .." H.R. Conf.Rep. No. 100-576, 100th Cong., 2d Sess. 549 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582.

While the tariff does not define the tariff term "extracts" of fish, that term has been construed by the CIT, first in *Marcor Development Corp. v. United States*, 20 CIT 538, 926 F. Supp. 1124 (1996), and more recently in *Jedwards Int'l, Inc. v. United States*, 161 F. Supp. 3d 1354 (CIT 2016).  *Jedwards* is particularly apt as that decision involved the classification of krill oil rich in EPA and DHA; krill being

small, shrimp-like sea crustaceans.  The krill oil consisted of 53 percent the omega-3

polyunsaturated fatty acids EPA and DHA in their phospholipid form, 23 percent

triglycerides, 8 percent free fatty acids, 3 percent mono and diglycerides, 7 percent

water, 1.7 percent sodium chloride, and astaxanthin.[5]

After concluding that the krill oil could not be classified under Chapter 15 of

the HTSUS,[6] the CIT then turned to heading 1603 to see if krill oil was within the

statutory meaning of that heading.  This presented that court with the same issue

as before this Court -- what constitutes an "extract" for purposes of heading 1603.

The *Jedwards* court held that an extract was "'**a preparation containing the**

**essence of the substance from which it is derived**.'"  *Id.* at 1358, *quoting*

*Marcor Development Corp. v. United States,* 926 F. Supp. 1124, 1132-33 (CIT 1996)

(emphasis added).   Having now determined the legal meaning of the relevant tariff

term in heading 1603, the *Jedwards* court found that krill oil contained the essence

of the crustacean from which it was derived, as the oil was a preparation of EPA

and DHA in phospholipid form and triglycerides, with some ethanol solvent left over

from the manufacturing process.  Krill oil, therefore, was within the scope of the

---

[5]    *See* Joint Statement of Undisputed Fact # 5, *Jedwards Int'l, Inc. v. United States*, Court No. 11-00031, ECF No. 38.

[6]    Chapter 15 of the HTSUS only covers fats and oils consisting of triglycerides.  The krill oil, being predominately EPA and DHA in phospholipid form, had insufficient triglyceride content to be classified in Chapter 15. *Jedwards*, 161 F. Supp. 3d at 1361.

tariff term "extract", and the CIT held that it was classifiable under heading 1603 as an extract of a crustacean.[7]

The *Marcor* decision cited by the *Jedwards* court construed the common meaning of the term "extract" by reviewing various dictionaries. That case involved the tariff classification of a product consisting of between 52 percent and 60 percent shark fin cartilage and between 40 percent and 48 percent added dextrin. *Marcor Development Corp. v. United States,* 926 F. Supp. 1124, 1128 (CIT 1996). In concluding that the imported product was not classifiable under heading 1603, the court defined for tariff purposes the word "extract" to mean as follows:

> The common thread running through the various dictionary definitions of "extract" **is that an extract must maintain the essence of the main source.** Extract is defined as: "a preparation containing the essence of the substance from which it is derived: Essence Concentrate." *Webster's Third New International Dictionary;* " a preparation supposed to possess the virtue of the original substance in concentrated form." *Webster's New International Dictionary, 2nd Edition;* and a "concentrated preparation of the essential constituents of a food, flavoring, or other substance; concentrate." *The American Heritage Dictionary, 2nd edition.*

*Id.* at 1132-33 (emphasis added). The court concluded that the imported merchandise did not maintain the essence of shark cartilage because the imported product contained almost 50 percent added dextrin, was not concentrated, and had a different odor, color and taste from that of shark cartilage. *Id.* at 1133.

---

[7]    This meant that classification under heading 3824 as argued by the defendant was wrong as a matter of law because the krill oil was "elsewhere specified or included" under heading 1603. *Id.* at 1359.

The *Marcor* decision is illustrative also on the legal meaning of the tariff term "of fish." That case construed the reference to "fish" in Chapter 21, Note 1(e) to include "the flesh or organic structure of the animal fish." *Id.* at 1132. While this construction was derived partially from the court's interpretation of Congress' intent to not limit Chapter 21 Note 1(e) to simply the flesh of the animal, the court also looked at previous judicial authority with respect to the term "fish." *Id.* at 1131. In *United States v. Carnegie*, 8 C.C.P.A. 377, 378 (1918), the Court of Customs and Patent Appeals (the predecessor to the U.S. Court of Appeals for the Federal Circuit) determined that any part of the fish's flesh or organic structure was considered fish. *Id.* Likewise, in *Rosenstein Bros. v. United States*, 4 Cust. Court Appls. 401, 403 (1913), the U.S. Court of Customs Appeals (later renamed the Court of Customs and Patent Appeals) held that fish oil was "part of the fish itself" for tariff purposes, notwithstanding that the oil was expressed from the fish and then discarded. *Id.*

Considering the above, BASF respectfully submits that this Court should adopt the legal meaning of the term "extracts . . . of fish" expressed in the *Jedwards* and *Marcor* decisions for purposes of heading 1603. In other words, if the imported fish oil ethyl esters concentrates are preparations containing the essence of the substance from which they were derived -- the crude fish oil --, and the fish oil is construed to be part of the organic structure of the fish from which it was extracted, then heading 1603 is the legally sustainable heading for the imported products. In turn, this means the imported products are, in fact, "elsewhere specified or

included" in heading 1603, thus eliminating both the United States' as entered classification and its counterclaimed one as options for the imported merchandise.

B.     *The Imported Merchandise Contains the Essence of Fish Oil*

As set out above, legal authority establishes that an extract for purposes of heading 1603 is a preparation containing the essence of the substance from which it was derived, and that fish oil, being part of the organic structure of the fish from which it is removed, is fish for tariff purposes.  The next question for this Court, therefore, is whether the imported products meet this definition.

The United States' position is that the omega-3 fatty acid ethyl esters in the imported products, as products of transesterification of the semi-refined and neutralized fish oil, are not naturally found extracts of fish oil and thus not within the scope of heading 1603.[8]  They have different chemical structures, molecular weights, and densities than the triglyceride molecules from which they are derived. Notwithstanding these differences, however, the issue for this Court is whether the imported omega-3 fatty acid ethyl esters still maintain the essence of the fish oil starting material from which they are derived notwithstanding having been transesterified from one ester form to another.

---

[8]     Fatty acid ethyl esters can occur naturally, but at low levels. SUMF at ¶32.

1.    The EPA and the DHA Fatty Acids in the
Imported Products Is the Same EPA
and DHA Fatty Acids Severed from the Fish Oil

Essence is defined as "1a. the intrinsic or indispensable quality or qualities that serve to characterize or identify something; 3a An extract that has the fundamental properties of a substance in concentrated form." *See* Pl. Ex.3, "Essence," *The American Heritage Dictionary of the English Language*, p. 608 (5th ed., 2016); see also "Essence," *New Oxford American Dictionary*, p. 576 (2d Ed. 2005) ("the intrinsic nature or indispensable quality of something . . .").[9]  Based on the following, the essence of the crude fish oil, the substance from which the imported products are derived, is imparted by the omega-3 fatty acids.

Unrefined fish oil is approximately 90 percent long chain fatty acids (EPA, DHA, and others). The rest of the oil consists of sterols, (including cholesterol), fatty acid esterified cholesterol, free fatty acids, vitamins A, D, E, and some water-soluble amino acids, peptides, and minerals.  *See*, Pl. Ex. 4, "Fish Oil Handling/Processing" *Technical Evaluation Report compiled for USDA National Organic Program*, (Mar. 5, 2015) at p. 1.  Only fish oil contains a balanced profile of EPA and DHA fatty acids. *See* Pl. Ex. 1, Omega-3 Product at p. 5 of 19.

Many health benefits associated with fish oil are imparted by these omega-3 fatty acids, and in particular the EPA and DHA fatty acids.  They are essential components of cell membranes, and help support lipid metabolism, immune function, and skin health. Omega-3 fatty acids reduce the risk of heart attacks by

---

[9]    The above cited sources, and other dictionary entries quoted in this memorandum of law are reproduced in Pl. Ex. 3.

lowering triglyceride levels in human blood.  *See*, Pl. Ex. 5, "Chemistry of Healthy

Hearts," *BASF Corporation*, Aug 7, 2023 (https://www.basf.com/us/en/media/smart-

scientists/hearthealth.html) at p. 2 of 3.  *See also*, Pl. Ex. 6, Swanson, Block, Mousa,

"Omega-3 Fatty Acids EPA and DHA Health Benefits Throughout Life," (2012) 3(1)

*Adv. Nutr.* at p. 1 (Omega-3 fatty acids have been linked to healthy aging, and low

levels of dietary EPA and DHA fatty acids have been associated with poor fetal

development, impaired cardiovascular function, and increased risk of Alzheimer's

disease).  *See also*, Pl. Ex. 7, Rizvi, Chao and Liaw, "Concentration of Omega-3

Fatty Acids from Fish Oil Using Supercritical Carbon Dioxide," in *Supercritical*

*Fluid Extraction and Chromatography Techniques and Applications*, Charpentier

and Sevenants, Eds., ASC Symposium Series 366, pg. 89, 90, American Chemical

Society, Washington DC 1988 ("Recently, fish oils have attracted wide commercial

and academic interest as a rich source of polyunsaturated fatty acids, particularly . .

. EPA . . .and DHA, which are reported to possess potential therapeutic

advantages").[10]

   For these reasons, BASF's goal is to create products rich in these omega-3

fatty acids that can be sold to companies for use in making omega-3 concentrates

---

[10]     Interestingly, CBP, recognizing that omega-3 fatty acid ethyl esters
can be used as an adjunct to diet to reduce triglyceride levels in adult patients with
high triglyceride levels, has issued administrative binding tariff classification
rulings classifying omega-3 acid ethyl esters in bulk form under subheading
3003.90.0000 as "Medicaments . . . consisting of two or more constituents which
have been mixed together for therapeutic or prophylactic uses, not put up in
measured doses or in forms or packaging for retail sales . . .."  *See* N066891 (July 10,
2009) (product was 48% EPA ethyl ester and 38% DHA ethyl ester); N298125 (July
11, 2018) (imported product was EPA ethyl ester).

and other consumer-ready human nutritional supplements, typically in soft gelatin capsules containing the oil. To create products high in EPA and DHA fatty acids, those fatty acids must first be severed from the glycerol backbones binding them as triglycerides in crude fish oil. SUMF at ¶17, ASUMF at ¶3.

After transesterification, these fatty acids, having been extracted from the glycerol and now as ethyl esters, can be isolated and concentrated for commercial applications. *See*, Pl. Ex. 3, "Extract," *Oxford Dictionary of Biochemistry and Molecular Biology* p. 233 (2d. ed. 2006) (defining "extract" as "1. To remove from or separate; to obtain by some chemical and/or physical process."). *See also*, Pl. Ex. 8, Ciriminna, Meneguzzo, Delisi, Pagliaro, "Enhancing and improving the extraction of Omega-3 from fish oil" (2017), *Sustainable Chemistry and Pharmacy* 5 (2017) at p.54 ("[h]ence, in order to produce **extracts of high omega-3 concentration**, the omega-3 fatty acids are usually converted into ethyl esters via reaction with ethanol . . . followed by distillation . . .") (emphasis added). Thus, via this chemical reaction, the desired fatty acids have been extracted from the glycerol matrix, individually bonded with an ethanol molecule and concentrated as ethyl esters to create omega-3 products with high levels of EPA and DHA fatty acids. SUMF at ¶19.

The key fact is that the EPA and DHA omega-3 fatty acids found in the imported product are the same EPA and DHA fatty acids removed from the triglyceride-based fish oil, albeit now in a different ester form because of transesterification. SUMF at ¶34. As such, the EPA, DHA, and other fatty acids

present in the ethyl esters in the imported merchandise originally occurred naturally in, and were part of the organic structure of, the crude fish oil starting material. *See* Pl. Ex. 9, Deposition Transcript of Expert Witness Dr. Gerard Bannenberg, ("Bannenberg Dep.") pg. 17: 18 – 22 ("I think it is important to make clear that the EPA and the DHA that we're discussing today in the commodity [the imported products] is exactly the same EPA and DHA found in fish or other source"). *See* also Pl. Ex. 10, Expert Report of Expert Witness Dr. Gerard Bannenberg, ("Bannenberg Expert Report). The fatty acids carry forward the essence of the crude fish oil into the ethyl esters, as it is the fatty acids that are common to the structure of triglyceride-based fish oil and fish oil ethyl esters. SUMF at ¶¶ 17, 19, 20, 34. It is these fatty acids, particularly the polyunsaturated omega-3 fatty acids (including EPA and DHA), that BASF is isolating and concentrating for commercial health benefits:

> Q. I think you mentioned the EPA and DHA are the essence of the products. That's the crucial part.
>
> A. I will say all fatty acids are really the essence of the fish oil, but we are focusing them on the ones we really want, the ones that we know is -- has a positive effect on the human body. That's the whole intention here, to pull and concentrate the Omega-3s, which is the positive thing about the fish.

Pl. Ex. 11, Deposition Transcript of USCIT Rule 30(b)(6) of BASF Corporation by Henrik Fismen ("Fismen Dep.") pg. 115: 8 – 15.

These fatty acids, now in ester form, are the main constituents of the imported merchandise, with the Omevital® products being at least 93 percent fatty acid ethyl esters, and the PronovaPure® at least 97 percent. SUMF at ¶¶ 24, 25, 26,

27, 28.  More specifically, the combined EPA and DHA ethyl ester content of the

imported products ranges from 55 percent to 65 percent, with the rest of the fatty

acid ethyl esters based on other fatty acids.  *Id.*

Not surprisingly, the EPA and DHA fatty acids predominate the EPA and

DHA ethyl esters.  For example, the molecular weight of an EPA ethyl ester is

330.50, of which 285.5 (86.4%) constitutes EPA fatty acid and 45 (13.6%) ethanol.[11]

Pl. Ex. 12, Plaintiff's Response to Defendant's First Interrogatories and Request for

Production Directed to Plaintiff, ("Plaintiff's Interrogatory Responses") at pp 11-13.

Similarly, the molecular weight of a DHA ethyl ester is 365.54, of which 311.5

(87.4%) constitutes DHA fatty acid and 46 (12.6%) ethanol.[12]  *Id.*  The following

structures illustrates this predominance of the EPA and DHA fatty acids in the

EPA and DHA ethyl esters:

---

[11]     There is one oxygen atom that is shared between EPA fatty acid and
ethanol in the EPA ethyl ester molecule.  If this oxygen atom is counted as
belonging to the EPA molecule, and not the ethanol molecule as it was in the
calculation in the text, then by molecular weight 301 (91.4%) constitutes EPA fatty
acid and 29 (8.8%) ethanol.

[12]     Like in footnote 11, the DHA fatty acid and the ethanol share one
oxygen atom in the DHA ethyl ester molecule.  If that oxygen atom is counted as
belonging to the DHA molecule, then the calculation of molecular weight would
change to 327.5 (91.4%) for the EPA fatty acid and 29 (8.1%) for the ethanol.



*Id.* at p. 12.

The above chemical structures demonstrate that the essential fatty acids present in the crude fish oil remain present as fatty acids in the imported merchandise. They have just gone from being three fatty acids bonded to a glycerol matrix to individual fatty acids bonded to an ethanol matrix via transesterification. *Id.* at p. 11. The above also demonstrates how the EPA and DHA fatty acids constitute the bulk of the imported merchandise. For example, using 55 percent as the lowest percentage of combined EPA and DHA ethyl esters present in any of the imported product (i.e., the Omevital® 3322 EE and the Omevital® 4510 EE products,

SUMF at ¶¶ 24, 26) and 86 percent as the rounded-down weight of the EPA and

DHA fatty acids in those esters, then a minimum of 47 percent (86% x 55%) of the

weight of the imported products is attributable to just the EPA and DHA fatty acids

originally from the crude fish oil.  This percentage increases significantly when the

other fatty acids present in the non-EPA or non-DHA fatty acid ethyl esters in the

imported products are included too.

The commercially desirable EPA and DHA fatty acids have now been carried

forward from the crude fish oil starting material into the imported products at

higher concentrated levels, which are used to provide health benefits to humans. Pl.

Ex. 11, Fismen Dep., p. 115: 8 – 15.  Upon ingestion, the human body absorbs EPA

and DHA fatty acids ethyl esters by severing the fatty acids from the ethanol

molecule.  Pl's AUMF at ¶ 12; Pl. Ex. 9, Bannenberg Dep., p. at 45:6 – 46:3.  Once

freed of the ethanol molecule, the EPA and DHA fatty acids are absorbed in the

intestines.[13]  *Id*.  The remaining ethanol molecule provides no nutritional value, and

its role as the new matrix for the fatty acids is over.  Pl. Ex. 9, Bannenberg Dep., p.

at 46:8-22.

Based on the above, the imported products, having high omega-3 fatty acid

content, and in particular high EPA and DHA fatty acid content, contain the

essence of the crude fish oil from which the imported products are derived.  Pl. Ex

11, Fismen Dep., p. 115: 8 – 15.  The desired fatty acids are chemically extracted

---

[13] Similarly, the human body processes EPA and DHA fatty acids found in
triglyceride-based fish oils the same way.  First the body frees the fatty acids from
the triglyceride's glycerol backbone, and then the body absorbs the fatty acids. Pl's
AUMF at ¶ 12.

from the triglycerides fish oil starting material and reformed in a different ester form in the imported merchandise.  SUMF at ¶¶ 17, 19, 20.  These key fatty acids extracted via transesterification and now present as ethyl esters are the same fatty acids from the crude fish oil, thus carrying the essence of the fish oil into the imported merchandise.  SUMF at ¶34; Pl. Ex. 9, Bannenberg Dep., pg. at 19: 4-9. ("And I wanted to explain that what is in those chemical structures in fish and in the [ethyl esters] concentrate is EPA and DHA, that that portion of the molecule is exactly the same as you find in the fish so that that is clear").

2.     Other Physical Characteristics of the Ethyl Esters
       Reflect the Essence of the Fish Oil Starting Material

Other factors also point to the conclusion that the fish oil ethyl esters capture the essence of the crude fish oil from which they are derived.  The fish oil ethyl esters are semi-synthetic compounds, SUMF at ¶6, meaning they are produced from "synthesis from a naturally occurring material."  Pl. Ex. 3, "Semi Synthetic", *New Oxford American Dictionary*, p. 1541 (2nd ed. 2005).  That natural occurring starting material is crude fish oil, SUMF at ¶11, and the imported products share many characteristics with it.  Like crude fish oil, the imported products are liquid, lipidic substances, and in fact are referred to as oils in the omega-3 industry.  Pl's AUMF at ¶1.  The imported products have a slight fish oil odor and taste, but less so than that associated with crude fish oil.  SUMF at ¶¶30, 31.  They are a light-yellow color, while crude fish oil is a darker brown.  SUMF at ¶29.  Of course, the

differences in odor, taste and color are to be expected as the imported products are refined products, designed for human consumption, while crude fish oil is not. In fact, when compared to a triglyceride-based fish oil sold by BASF, PronovaPure® 150:500TG, the similarities are much closer, as both products are light or pale yellow in color and have a fishy odor and taste. Pl. Ex. 12, Plaintiff's Interrogatory Responses at p. 14.

The imported products consist only of: 1) omega-3 ethyl esters chemically derived from crude fish oil via transesterification (a minimum of 93 percent for the Omevital® products and 97 percent for the PronovaPure® product), which are concentrated to achieve high levels of EPA and DHA fatty acids; 2) partial glycerides, oligomers, and triglycerides, (a maximum of 7 percent for Omevital® products and 3 percent maximum for the PronovaPure® product), which are natural, organic parts of the original triglycerides subject to the transesterification but which were not converted to ethyl esters, and 3) the small amount of tocopherol purposely added to the imported products as an antioxidant to prevent rancidity (a minimum of 1 percent for the Omevital® products and .2 percent for the PronovaPure® product). SUMF at ¶¶23, 24, 25, 26, 27, 28. In other words, only the added tocopherol is not derived from the crude fish oil starting material.

This is an important consideration. In *Marcor*, the court concluded that the imported shark cartilage did not fall within the scope of heading 1603 because almost half the imported product (40 to 48 percent) was dextrin, a drying agent added to prevent the shark cartilage from clogging the spray dryer. *Marcor*, 926 F.

Supp. at 1128, 1133. In contrast, the facts relating to the production of the imported products in this case align closer to those in *Jedwards*. In *Jedwards*, the court held the krill oil contained substances naturally occurring in the krill and a small amount of residual ethanol, distinguishing the krill oil from the shark cartilage in *Marcor* based on the latter's inclusion of the significant amount of added dextrin. *Jedwards*, 161 F. Supp.3d at 1359 ("Customs failed to acknowledge that *Marcor* involved an <u>added</u> ingredient in high quantity that prevented the imported product from being an extract") (emphasis in original; citation omitted).

Similarly, BASF's fish oil ethyl esters have an added ingredient not derived from fish oil, the tocopherol, which is added in extremely small amounts as an antioxidant to prevent the oil from becoming rancid. See *Explanatory Notes to the Harmonized Commodity Description and Coding System* ("*ENs*"), at 16.03 (extracts of heading 1603 may contain "salt or other substances added in sufficient quantities to ensure their preservation"). The other substances that make up the imported products – the ethyl esters, oligomers, partial glycerols and triglycerides – all result from the transesterification of the crude fish oil starting material and carry forward the essence of that starting material (the fatty acids originally in the crude fish oil) into the finished imported products.

As discussed earlier in this brief, omega-3 polyunsaturated fatty acids are important for many aspects of good health, in particular heart health, yet adequate dietary intake of EPA and DHA fatty acids is limited to fish and seafood. Therefore, dietary supplements fill this gap by providing alternative sources of these fatty

acids.  Toward that goal, BASF markets to its customers the nutritional benefits of its products, which benefits are imparted by the EPA and DHA fatty acids.  This includes the fact that its ethyl esters, being so high in the "good" polyunsaturated fatty acids derived from crude fish oil, are responsible for significantly less "bad" saturated fats than found in regular triglyceride-based fish oil, and thus are better for lowering triglycerides in humans.  *See* Pl's AUMF at ¶ 2; Pl. Ex. 1, Omega-3 Product, at p. 16 of 19; Pl. Ex. 12, Plaintiff's Interrogatory Responses at pp. 16-19; Pl. Ex. 13, Product Analysis Reports.

The company's nutritional information sheets for the imported merchandise highlights this fact by setting out the amounts of the desirable omega-3 polyunsaturated atty acids compared to the less desirable saturated and monosaturated fatty acids in each imported product. *See* Pl's AUMF at ¶ 10; Pl. Ex.13, Product Analysis Reports.  Furthermore, BASF provides its customers with allergen information for the imported merchandise, identifying "fish and products thereof" as an allergen associated with it, thus acknowledging the fish oil presence in the imported products. *See* Pl's AUMF at ¶9; Pl. Ex.14, Allergen Information. The company also issues responsible sourcing statements, which communicate that BASF is producing fish oil ethyl ester concentrates and refined fish oil from responsibly-sourced fish. *See* Pl's AUMF at ¶ 11; Pl. Ex.15, BASF Statement on Responsible Sourcing.  The message being conveyed is clear.  Fish oil ethyl ester concentrates are high in polyunsaturated fatty acids, in particular the EPA and DHA fatty acids deemed beneficial for human health, and those fatty acids trace

back to fish oil.  Therefore, the essence of the crude fish oil, imparted by the omega-3 fatty acids, is retained in, and becomes the commercial reason for, the imported merchandise.

In sum, the imported fish oil ethyl esters are extracts of fish for purposes of heading 1603.  They are preparations containing the essence of the fish oil from which they were derived, with that essence imparted by the omega-3 fatty acids, in particular the EPA and DHA fatty acids.  Those fatty acids are chemically severed from the crude fish oil's triglyceride state and then synthesized into a new ester form – ethyl esters.  Now in ethyl ester form, those fatty acids can be concentrated into products high in EPA and DHA fatty acids.  These ethyl esters, like their starting material crude fish oil, are lipidic substances with a discernable fishy smell, taste, and color.  The imported products can now be marketed and sold as sources of omega-3 fatty acids and can be used to reduce the risk of heart attack and provide other health benefits to humans because of the presence of the omega-3 fatty acids.

The imported merchandise is provided for in heading 1603 and as a matter of law must be classified there.  In turn, the imported products are "elsewhere specified or included" in the tariff and cannot be classified in either residual catch-all provisions advocated by the defendant.  Judgment must be for BASF, holding that the imported merchandise is classifiable under subheading 1603.00.90, and free of duty.

37

**III.    Defendant's Counterclaim Cannot Be Sustained as a
Matter of Law under 28 U.S.C. § 1583 or 19 U.S.C. § 1202.**

Defendant asserted a counterclaim in this case, arguing that the imported
products should be reclassified as an "other food preparation" under subheading
2106.90.98 or subheading 2106.90.99, depending on the year of entry.  ECF No. 32.
This tariff provision carries a higher duty rate than that assessed by CBP at entry.
The counterclaim alleges that this court has jurisdiction to adjudicate the
counterclaim pursuant to 28 U.S.C. § 1583, but also identified 19 U.S.C. § 1202 *et
seq.* as a statutory authority for its counterclaim.  *Id.*  Nevertheless, a counterclaim
under 28 U.S.C. § 1583 or 19 U.S.C. § 1202 cannot be supported by either of those
statutes, so summary judgment must be issued in BASF's favor on this issue.

1.    Defendant Cannot Raise an Alternative Tariff
Classification Via Counterclaim in a Classification Case

As a matter of law, a counterclaim cannot be raised in a tariff classification
dispute where the defendant seeks via the counterclaim to challenge CBP's
liquidated classification and rate of duty.  *See Cyber Power Sys. (USA) Inc. v. United
States*, 586 F. Supp. 3d 1325 (CIT 2022) *("Cyber Power"); Second Nature Designs,
Ltd. v. United States*, 586 F. Supp. 3d 1334 (CIT 2022) ("*Second Nature I*"); *Maple
Leaf Mktg, Inc. United States*, 639 F. Supp. 3d 1363 (CIT 2023) *("Maple Leaf")*;
*Second Nature Designs, Ltd. v. United States*, 654 F. Supp. 3d 1301 (CIT 2023)
("*Second Nature II*").   Defendant's counterclaim cites to 28 U.S.C. § 1583 and 19
U.S.C. § 1202 *et seq* as the basis for its counterclaim. Those statutory sections,

however, have been interpreted as not establishing a cause of action raised by a counterclaim in a classification case.

Section 1583 provides the CIT with jurisdiction to hear counterclaims.  This section, however, "did not provide the United States with any statutory authority to assert counterclaims challenging the liquidated classification and duty rate." *Cyber Power* at 1333 (footnote omitted).  Instead, the plain language of section 1583 is jurisdictional.  While Congress gave the CIT jurisdiction to hear such claims via section 1583, the plain language of this statute does not create a substantive cause of action that a defendant could assert as a counterclaim.  *Id.  See also*, *Second Nature I* at 1338 (jurisdictional grant set out in Section 1583 "is not a cause of action"); *Maple Leaf* at 1366 (Section 1583 "is jurisdictional, and does not create any cause of action"); *Second Nature II* at 1306 ("'[T]he plain meaning of Section 1583 is clear and the statute is purely jurisdictional'", *quoting Cyber Power* at 1333 n.14).  This Court must also construe section 1583 as purely jurisdictional.

The *Cyber Power* court made short order of 19 U.S.C. § 1202 *et seq* as statutory support for the defendant's ability to raise a counterclaim in a tariff classification case.  As the court pointed out, section 1202 sets forth the provisions of the HTSUS, but "[n]othing in the plain, unambiguous terms of Section 1202 permits the United States to challenge CBP's classification via a counterclaim." *Cyber Power* at 1331.  *See also*, *Second Nature I* at 1338 (adopting the conclusions set out in *Cyber Power*); *Maple Leaf* at 1366-67 ("nothing in the plain, unambiguous terms of Section 1202 permits the United States to challenge CBP's classification

39

via counterclaim"); *Second Nature II* at 1306 ("'[s]ection 1202 only sets forth the HTSUS'", quoting *Cyber Power* at 1330).  Likewise, section 1202 does not provide the defendant with a counterclaim-based cause of action in this tariff classification case.

The courts have also rejected other statutory bases alleged by the United States as establishing a substantive cause of action raised via counterclaim in a tariff classification case.   For example, the *Cyber Power* found that 19 U.S.C. § 1503 did not create a cause of action, as that statute addresses reliquidations ordered by the CIT and issues related to appraisement, not classification.  *Cyber Power* at 1330.  Reliance on 19 U.S.C. § 1514(a) was also misplaced, as that provision, while suspending finality of liquidation over entries subject to administrative protest, does not authorize counterclaims challenging CBP's classification.  *Id.* at 1331-32. Likewise, 19 U.S.C. § 1505(b) does not authorize counterclaims seeking to increase duties resulting from a change in classification; it only authorizes collection of increased duties based on a CIT order of reliquidation.  *Id.* at 1330, n.9.   *Second Nature I* and *Second Nature II* adopted the conclusions reached by the *Cyber Power* court on the counterclaim issue, and *Maple Leaf* reiterated those conclusions as a basis for its holding that its defendant had failed to support a claim for a cause of action via counterclaim.  *See Second Nature I* at 1330; *Maple Leaf* at 1365-66; *Second Nature II* at 1306.  The court in *Maple Leaf* analyzed and rejected 28 U.S.C. § 2643(b) as a basis to assert a counterclaim, construing that section as empowering the CIT to take various actions and provide relief to litigants, but not creating a

cause of action in favor of litigants. *Maple Leaf* at 1366.  Similarly, the *Second Nature II* held that 28 U.S.C. § 1582(s) is jurisdictional and does not create a substantive cause of action.

Thus, the holdings in *Cyber Power*, *Second Nature I*, *Maple Leaf*, and S*econd Nature II* point to the conclusion that a defendant cannot maintain a counterclaim in a tariff classification dispute, as no statutory authority for that type of cause of action exists.  This court has authority to redesignate an improperly designated counterclaim as an affirmative defense "if justice requires."  *See U.S. Court of International Trade Rules*, rule 8(d)(2).   However, as a matter of law, this counterclaim cannot be maintained, and summary judgment must be issued in favor of BASF on this issue.[14]

2.    Even if the Counterclaim is Recharacterized a Defense, <u>Heading 2106 Does Not Provide for the Imported Products</u>

If this court elects to recharacterize the defendant's counterclaim as a defense against BASF's claim for classification under heading 1603, then summary judgment must still enter in BASF's favor. As addressed above, heading 2106 only covers food preparations that are "not elsewhere specified or included."  The imported merchandise, being specifically provided for in heading 1603 for the reasons set out in this memorandum of law, is "elsewhere specified or included."

---

[14]  Notwithstanding that no valid statutory basis exists to support the defendant's counterclaim, this court may conclude that the appropriate tariff classification carries a higher duty rate than originally assessed by CBP, pursuant to *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

*Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002).  Heading 1603, being more specific than heading 2106 for this reason, is the legally sustainable tariff classification for the imported products.

Furthermore, heading 2106 is subject to exclusionary chapter note 1(e) to Chapter 21.  That note excludes from Chapter 21 (and thus classification under heading 2106) and in favor of Chapter 16, "[f]ood preparations, other than the products described in heading 2103 or 2104, containing more than 20 percent by weight of sausage, meat, meat offal, blood, insects, fish or crustaceans, molluscs or other aquatic invertebrates, or any combination thereof (chapter 16)".  CBP has confirmed that no dispute exists that the imported merchandise is a preparation of fish, in that fish is used as the raw material for the imported merchandise, first testifying in its Rule 30(b)(6) deposition on direct examination:

> "Q. . . .[W]ould you consider this [the imported products] to be a preparation of fish? . . .
>
> A.  Okay. Yeah. Yeah. I would say yes . . ..")",

Pl. Ex. 16, Deposition Transcript of USCIT Rule 30(b)(6) of Defendant by John E. Rhea ("Rhea Dep.") pg. 41: 14-23; and then again during examination by defendant's counsel:

> Q: Okay.  So in what way is this a preparation of fish?  In the sense that fish is being used as a raw material for the merchandise?
>
> A.  Yes. I guess, yeah.

Pl. Ex. 16, Rhea Dep. 66: 20- 23.

As a preparation of fish, therefore, Chapter 21, Note 1(e) is implicated. Fish yields crude fish oil,[15] which in turn is the starting materials for the ethyl esters and the residual partial glycerides, oligomers, and triglycerides. Only the tocopherol antioxidant has no tie to either the crude fish oil starting material or the fish from which the oil was extracted. The tocopherol constitutes no more than 1 percent in the Omevital® products and no more than 0.2 percent of the PronovaPure® 150:500 EE product.

The balance of the imported products, therefore, is connected to fish via the fish oil starting material. As discussed above at pages 30 to 32, at least 47 percent of the weight of the imported products is attributable to the EPA and DHA fatty acids in the EPA and DHA ethyl esters, which fatty acids trace directly back to the crude fish oil and the organic structure of the fish from which the crude fish oil was extracted. This percentage increases significantly when the imported products' other fatty acids and the upwards of seven percent (or maximum of three percent in the PronovaPure® product) remaining partial glycerides, triglycerides and oligomers are included. Pl. Ex. 9, Bannenberg Dep., pg. at 107: 5-20. In all cases, however, the omega-3 fatty acids constitute more than 20 percent by weight of the imported product. As such, the imported products are excluded from Chapter 21, and thus from heading 2106, by application of Chapter 21, Note 1(e), in favor of heading 1603.

---

[15] As discussed at page 24, *supra*, any part of a fish's organic structure, including fish oil, is considered fish for tariff purposes.

Therefore, even if the defendant's counterclaim is redesignated as a defense against plaintiff's argued classification, this court must still find in BASF's favor. As addressed in this brief, because the imported merchandise is provided for under heading 1603, it cannot be classified under heading 2106 (or 3824) as those provisions only apply when goods cannot be classified elsewhere in the tariff. The defense does nothing to overcome this statutory hurdle once the court finds heading 1603 to be the appropriate tariff provision. Nor can it overcome the statutory hurdle created by exclusionary chapter note, note 1(e) to Chapter 21, which again points to heading 1603 as the appropriate tariff provision for the imported merchandise.

## CONCLUSIONS

For the reasons stated herein, summary judgment should be entered in favor of BASF.  The Court should hold that the imported product -- Omevital® 3322 EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, Omevital® 3426 EE and PronovaPure® 150:500 EE – be classified under subheading 1603.00.90, HTSUS, and order CBP to reliquidate the subject entries with that classification and to refund the excess duties paid by BASF, with interest as provided for by law.

Respectfully submitted,

/s/Frederic D. Van Arnam, Jr.

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email:  rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*

Dated:  April 30, 2024
New York, NY

45

## CERTIFICATE OF COMPLIANCE

Pursuant to the Standard Chambers Procedures of the U.S. Court of International Trade, this Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment contains 9974 words, as determined by Microsoft Word. This word count is within the limit of 14,000 words set forth in Rule 2(B).


/s/Frederic D. Van Arnam, Jr.

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email: rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*


Dated: April 30, 2024
New York, NY