UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Consol. Court No. 13-00318 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

## **ORDER**

Upon consideration of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, and upon consideration of all other papers and proceedings had herein; it is hereby

**ORDERED** that defendant's cross-motion for summary judgment is granted;

**ORDERED** that plaintiff's motion for summary judgment is denied;

**ORDERED** that judgment is entered for defendant; and it is further

**ORDERED** that U.S. Customs and Border Protection shall reliquidate the entries of the subject merchandise before the Court under subheading 2106.90.99, Harmonized Tariff Schedule of the United States (HTSUS) (2011 and 2012) or subheading 2106.90.98, HTSUS (2018), depending on the date of entry for each particular entry.

_____
JUDGE

Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

_____

|  |  |
|---|---|
| BASF CORPORATION, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | :    Consol. Court No. 13-00318 |
|  | : |
| UNITED STATES, | : |
|  | : |
| Defendant. | : |

_____ :

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel:*

Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

LUKE MATHERS
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9236

Dated:  July 2, 2024

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................ 2

QUESTION PRESENTED ............................................................................................... 8

SUMMARY OF ARGUMENT ......................................................................................... 8

ARGUMENT ..................................................................................................................... 9

    I.    Standard Of Review ................................................................................................ 9

    II.    BASF's Merchandise Is Not Classifiable As An "Extract[] … Of … Fish" Of Heading 1603 ......................................................................................................... 12

        A.    "Extracts" Are Concentrated Flavorings For Foods—Not BASF's Mostly Flavorless, Semi-Synthetic Compounds Used As Dietary Supplements .................................................. 12

        B.    "Extracts" Are Extracted—Not Derivatized, Like BASF's Merchandise .................. 16

        C.    Even If BASF's Merchandise Were An Extract—Which It Is Not—It Would Be An Extract Of Fish Oil, Not "Of … Fish" As Heading 1603 Requires ...................................... 20

        D.    BASF's Counterarguments Are Unavailing ............................................................. 21

    III.    BASF's Merchandise Is A "Food Preparation[]" Of Heading 2106 ................................ 23

        A.    "Food Preparations" Are Specially Made Up Substances Intended To Be Ingested—Just Like BASF's Merchandise ................................................................. 23

        B.    No Other Heading Of The HTSUS Specifies Or Includes BASF's Merchandise ...... 24

        C.    Note 1(e) To Chapter 21 Does Not Exclude BASF's Merchandise From Classification Under Heading 2106 ................................................................. 26

        D.    The World Customs Organization—Which Maintains The Harmonized System And Its Explanatory Notes—Agrees That Ethyl Esters Derived From Fish Oil Are Classified Under Heading 2106 ................................................................. 28

        E.    Subheading 2106.90.99 (2011 And 2012) Or 2106.90.98 (2018) Covers BASF's Merchandise, Depending On The Date Of Entry ................................................. 29

CONCLUSION ................................................................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*ADC Telecomms., Inc. v. United States,*
  916 F.3d 1013 (Fed. Cir. 2019) ........................................................................ 9, 10

*Airflow Tech., Inc. v. United States,*
  524 F.3d 1287 (Fed. Cir. 2008) ............................................................................ 18

*Algoma Steel Corp. Ltd. v. United States,*
  865 F.2d 240 (Fed. Cir. 1989) .............................................................................. 26

*Am. Net & Twine Co. v. Worthington,*
  141 U.S. 468 (1891)............................................................................................... 11

*Amcor Flexibles Singen GmbH v. United States,*
  425 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ....................................................... 29

*Anhydrides & Chems., Inc. v. United States,*
  130 F.3d 1481 (Fed. Cir. 1997) ............................................................................ 11

*Carl Zeiss, Inc. v. United States,*
  195 F.3d 1375 (Fed. Cir. 1999) ............................................................................ 28

*Chemtall, Inc. v. United States,*
  878 F.3d 1012 (Fed. Cir. 2017) ............................................................................ 30

*Cummins Inc. v. United States,*
  377 F. Supp. 2d 1365 (Ct. Int'l Trade 2005) ................................................. 28, 29

*Cummins Inc. v. United States,*
  454 F.3d 1361 (Fed. Cir. 2006) ............................................................................ 28

*Cyber Power Sys. (USA) Inc. v. United States,*
  586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022) ....................................................... 30

*Deckers Corp. v. United States,*
  752 F.3d 949 (Fed. Cir. 2014) .............................................................................. 21

*Drygel, Inc. v. United States,*
  541 F.3d 1129 (Fed. Cir. 2008) ............................................................................ 10

*Encino Motorcars, LLC v. Navarro,*
  584 U.S. 79 (2018)................................................................................................. 11

*Energizer Battery, Inc. v. United States,*
  190 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ....................................................... 28

*Intel Corp. Inv. Pol'y Comm. v. Sulyma,*
   140 S. Ct. 768 (2020) ................................................................ 17, 18

*Jarvis Clark Co. v. United States,*
   733 F.2d 873 (Fed. Cir. 1984) ................................................................ 31

*Jedwards Int'l, Inc. v. United States,*
   161 F. Supp. 3d 1354 (Ct. Int'l Trade 2016) ........................................ *passim*

*Jewelpak Corp. v. United States,*
   97 F. Supp. 2d 1192 (Ct. Int'l Trade 2000) ........................................ 14

*Maple Leaf Mktg., Inc. v. United States,*
   639 F. Supp. 3d 1363 (Ct. Int'l Trade 2023) ...................................... 30

*Marcor Dev. Corp. v. United States,*
   926 F. Supp. 1124 (Ct. Int'l Trade 1996) ........................................ *passim*

*Mondelez Glob. LLC v. United States,*
   253 F. Supp. 3d 1329 (Ct. Int'l Trade 2017) ...................................... 23

*Nature's Touch Frozen Foods (W.) Inc. v. United States,*
   639 F. Supp. 3d 1287 (Ct. Int'l Trade 2023) .......................... 11, 24, 25

*Nutricia N. Am., Inc. v. United States,*
   666 F. Supp. 3d 1363 (Ct. Int'l Trade 2023) .......................... 24, 26, 30

*Orlando Food Corp. v. United States,*
   140 F.3d 1437 (Fed. Cir. 1998) ................................................................ 23

*Philadelphia Energy Sols. Ref. & Mktg., LLC v. United States,*
   89 F.4th 1364 (Fed. Cir. 2024) ................................................................ 14

*Ratzlaf v. United States,*
   510 U.S. 135 (1994) ................................................................................ 14

*RKW Klerks Inc. v. United States,*
   94 F.4th 1374 (Fed. Cir. 2024) ........................................................ 9, 10

*Rocknel Fastener, Inc. v. United States,*
   267 F.3d 1354 (Fed. Cir. 2001) ................................................................ 10

*Rollerblade, Inc. v. United States,*
   112 F.3d 481 (Fed. Cir. 1997) ......................................................... 22, 27

*Rosenstein Bros. v. United States,*
   4 Ct. Cust. Appls. 401, T.D. 33840 (1913) ........................................ 21

*Second Nature Designs Ltd. v. United States,*
    654 F. Supp. 3d 1301 (Ct. Int'l Trade 2023) ................................................................. 31

*Second Nature Designs, Ltd. v. United States,*
    586 F. Supp. 3d 1334 (Ct. Int'l Trade 2022) ................................................................. 30

*StoreWALL, LLC v. United States,*
    644 F.3d 1358 (Fed. Cir. 2011) ................................................................. 10, 14

*Telebrands Corp. v. United States,*
    865 F. Supp. 2d 1277 (Ct. Int'l Trade 2012) ................................................................. 10

*Tomoegawa (U.S.A.), Inc. v. United States,*
    763 F. Supp. 614 (Ct. Int'l Trade 1991) ................................................................. 30

*Trijicon, Inc. v. United States,*
    686 F. Supp. 3d 1336 (Ct. Int'l Trade 2024) ................................................................. 12

*United States v. Bajakajian,*
    524 U.S. 321 (1998) ................................................................. 31

*United States v. Geo. S. Bush & Co.,*
    24 C.C.P.A. 313 (1936) ................................................................. 21, 26

*United States v. Lyman,*
    26 F. Cas. 1024 (C.C.D. Mass. 1818) ................................................................. 31

*United States v. Wurts,*
    303 U.S. 414 (1938) ................................................................. 31

**Statutes**

28 U.S.C. § 2640(a)(3) ................................................................. 28

**Harmonized Tariff Schedule of the United States**

General Rules of Interpretation:

    General Rule of Interpretation 1 ................................................................. 10, 11

    General Rule of Interpretation 3(c) ................................................................. 11

    General Rule of Interpretation 6 ................................................................. 11, 29

Chapter 4:

    Heading 0410 ................................................................. 25, 26

Chapter 15:

    Heading 1504 ................................................................................................ 23, 24, 25, 27

Chapter 16:

    Heading 1603 .............................................................................................................. *passim*

        Subheading 1603.00.90 ...................................................................................... 7, 8

Chapter 21:

    Note 1(e) ................................................................................................. 24, 26, 27, 28

    Heading 2106 .............................................................................................................. *passim*

        Subheading 2106.90.98 (2018) ................................................................... *passim*

        Subheading 2106.90.99 (2011 and 2012) ............................................... *passim*

Chapter 29:

    Heading 2936 .................................................................................................................... 18

Chapter 32:

    Heading 3201 .................................................................................................................... 18

Chapter 38:

    Note 1(b) ........................................................................................................................... 25

    Heading 3824 ................................................................................................ 23, 24, 25, 29

        Subheading 3824.90.40 (2011) ............................................................................ 7

        Subheading 3824.90.41 (2012 and 2018) ........................................................ 7

**Rules**

USCIT Rule 30(b)(6) ......................................................................................................... 27

USCIT Rule 56(a) ................................................................................................................. 9

**Other Authorities**

A.M. Pearson, *Meat Extracts*,
    reprinted in *Encyclopedia of Food Sciences and Nutrition* (2d ed. 2003) ............................... 14

Culinary Institute of America, *The Professional Chef* (8th ed. 2006) .................................... 13, 16

Explanatory Note 04.10 ......................................................................................... 26

Explanatory Note 16.03 ................................................................................... *passim*

*Extract*, Cambridge English Dictionary,
    https://dictionary.cambridge.org/us/dictionary/english/extract ................................. 13

*Extract*, Collins Dictionary,
    https://www.collinsdictionary.com/us/dictionary/english/extract ............................ 13

General Explanatory Note to Chapter 16 ................................................................. 20

General Explanatory Note to Chapter 38 ................................................................. 25

James Peterson, *Sauces: Classical and Contemporary Sauce Making* (3d ed. 2008) ................. 13

Jonathan H. Choi, *The Substantive Canons of Tax Law*, 72 Stan. L. Rev. 195 (2020) ............... 11

Kenneth N. Anderson & Lois E. Anderson,
    *The International Dictionary of Food and Nutrition* (1993) .............................. 13, 16

*Larousse Gastronomique* (Jenifer Harvey Lang ed. 1988) ........................................... 13

*Product*, Oxford English Dictionary,
    https://www.oed.com/dictionary/product_n1 (Mar. 2024) ..................................... 25

Trimethylamine, *Stedman's Medical Dictionary* (Nov. 2014) ...................................... 15

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

_____
                                        :
BASF CORPORATION,                       :
                                        :
                    Plaintiff,          :
                                        :
          v.                            :          Consol. Court No. 13-00318
                                        :
UNITED STATES,                          :
                                        :
                    Defendant.          :
_____ :

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Harmonized Tariff Schedule of the United States (HTSUS) comprises an internationally harmonized nomenclature categorizing articles of commerce into headings and subheadings. The heading and subheading under which an imported commodity is classified determines the rate of duty owed. And the text of the tariff names the merchandise covered by each heading and subheading, often defining a commodity as having a particular quality, chemical composition, or method of manufacture. The meaning of a word or phrase in a heading, and the way a commodity is made, can therefore have significant consequences in determining the applicable rate of duty.

This case turns on the meaning of the word "extracts." Heading 1603, HTSUS, covers "[e]xtracts and juices of meat, fish or crustaceans, molluscs or other aquatic invertebrates[.]" Extracts (or essences) are flavorful preparations that contain the concentrated taste of a particular food, like a savory beef extract used to flavor stock. Extracts are, as their name suggests, extracted—that is, the naturally occurring compounds that give a food its distinctive taste are isolated through, for example, reduction or distillation.

BASF's merchandise—ethyl ester concentrates derived from fish oil—does not meet that description.  BASF creates its merchandise by combining ethanol with naturally occurring fish oil to synthesize artificial compounds called ethyl esters.  This chemical derivatization process, known as transesterification, is the same process that is used to create biodiesel.  These ethyl esters containing beneficial omega-3 fatty acids are then concentrated and, after importation, encapsulated into dietary supplements—not used as flavorings.  This chemical transformation that yields an artificial, mostly tasteless compound means that BASF's merchandise is not an "[e]xtract[] … of … fish" of heading 1603, HTSUS.

Instead, BASF's merchandise is appropriately classified as a "[f]ood preparation[] not elsewhere specified or included" of heading 2106, HTSUS—just as the World Customs Organization, the author of the Harmonized Tariff Schedule and its accompanying Explanatory Notes, has concluded regarding materially identical merchandise.  Accordingly, the Court should grant the Government's cross-motion for summary judgment and order reliquidation under heading 2106.

## **BACKGROUND**

"The merchandise at issue in this action consists of products imported by BASF under the names Omevital® 3322 EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, Omevital® 3426 EE and PronovaPure® 150:500 EE"—BASF's "merchandise," for short.  Joint Statement of Undisputed Material Facts (Joint SUMF) ¶ 3, ECF No. 68-1.  The merchandise is comprised of "semi-synthetic omega-3 fatty acid ethyl ester concentrates derived from fish oil by chemical modifications."  *Id.* ¶ 6.  They contain at least 93 percent "ethyl esters rich in omega-3 fatty acids," with the remainder constituting "partial glycerides, oligomers, and triglycerides" (which

"are present in the imported merchandise as organic impurities"), and a small amount of "tocopherol added as an antioxidant." *Id.* ¶¶ 24–28, 36.

To make the merchandise, BASF first "purchases crude fish oil, typically derived from anchovies, sardines, and mackerel." *Id.* ¶ 11. This "starting material" is "produced from ungutted whole fish by physically separating the oil in the fish from the fish solids." *Id.* ¶¶ 11–12. It is a "really dark brown," "Guinness"-like, "almost blackish," "viscous fluid" with the odor of "fish that has been around for some time." Defendant's Additional Statement of Undisputed Material Facts (Gov't SUMF) ¶ 11, ECF No. 71-2; USCIT Rule 30(b)(6) Deposition of Henrik Fismen (Fismen Dep.) at 31:24–32:13, Government Exhibit (Gov't Ex.) 1, ECF No. 71-3; Joint SUMF ¶ 29

"Crude fish oil is predominately composed of triglycerides." Joint SUMF ¶ 13. "Triglycerides are esters of glycerol, having a structure of three fatty acids bound to a single glycerol backbone." *Id.* ¶ 14. The diagram below depicts a triglyceride molecule:



Expert Report of Dr. Syed S.H. Rizvi (Rizvi Report) at ¶ 17, Gov't Ex. 2, ECF No. 71-4.

"Of the three fatty acids that make up each triglyceride in the crude fish oil, typically one is" either eicosapentaenoic acid (EPA) or docosahexaenoic acid (DHA). Joint SUMF ¶¶ 10, 15. EPA and DHA are "polyunsaturated omega-3 fatty acids" that "are thought to promote good

health." *Id.* ¶¶ 8, 10.  They are not produced by fish, but rather "enter the food chain when microalgae that produce EPA and DHA are eaten by small aquatic organisms such as zooplankton, which in turn are eaten by fish."  *Id.* ¶ 16; Rizvi Report ¶ 16.

Turning back to the processing of the merchandise—after obtaining crude fish oil, BASF "deacidifi[es]" and "strip[s]" it "to remove environmental impurities and portions of the crude fish oil not desired for further processing."  Joint SUMF ¶ 18.  "The resulting product" is called "semi-finished, neutralized triglyceride fish oil."  *Id.*  BASF then "subjects the semi-finished triglyceride fish oil to ethyl transesterification[.]"  *Id.* ¶ 19.

Transesterification is a "chemical reaction" that requires the addition of "ethanol and a chemical catalyst" to "synthesize fatty acid ethyl esters" from natural triglycerides.  *Id.*; Rizvi Report ¶ 20.  Through transesterification, "the three fatty acids attached to the glycerol backbones of the triglycerides in the semi-refined fish oil are chemically severed from the glycerol backbones.  During the reaction, the fatty acids individually bond with one ethanol molecule each, forming three discrete fatty acid ethyl ester molecules from each triglyceride molecule.  The glycerol left over after the synthesis of the fatty acid ethyl esters is removed."  Joint SUMF ¶ 19; *see* Rizvi Report ¶ 20.  The below diagram depicts transesterification of a triglyceride molecule into fatty acid esters using methanol and a catalyst:



Rizvi Report ¶ 20 (explaining that glycerol is "also known as glycerin").

"The fatty acid ethyl ester molecules in the imported merchandise … do not occur naturally in crude fish oil but are instead created through the transesterification process."  Joint SUMF ¶ 33.  They are "new chemical identities" that "cannot be extracted from fish[.]"  Gov't SUMF ¶ 1; Rizvi Report ¶ 26.

"Extraction is a process for removal of a targeted item from a matrix" and transference "into a different solvent or phase."  Gov't SUMF ¶ 2; Rizvi Report ¶ 28.  Physical methods can be used to extract compounds from fish "(such as grinding, cooking, pressing, and centrifuging)," or chemical extraction methods can be used "(such as Soxhlet extraction and enzyme-assisted extraction)."  Gov't SUMF ¶ 3; Rizvi Report ¶ 29.

Transesterification is "not an extraction process but rather a chemical reaction"— specifically, "derivatization"—that "creates a synthetic derivative" of naturally occurring triglycerides.  Gov't SUMF ¶ 4; Rizvi Report ¶¶ 26–27, 30–32.  Derivatization "results in the transformation of a chemical compound (the educt) into another similar compound (the derivative) by altering one or more of its functional groups."  Gov't SUMF ¶ 5; Rizvi Report ¶ 30 (quotation omitted).  Transesterification is a "form of derivatization" through which "methyl or ethyl alcohol are combined with a substance (the educt) to chemically modify it, not to remove a targeted item from a matrix, which creates an entirely new compound as a result (a derivative), in this case a fatty acid ethyl ester."  Gov't SUMF ¶ 6; Rizvi Report ¶ 31.  "This is the same process that is used to make biodiesel from vegetable and animal fats and oils."  Gov't SUMF ¶ 7; Rizvi Report ¶ 20.

"The ethyl ester molecules have different chemical structures, molecular weights, sizes, densities, and boiling points than the triglyceride molecules" from which they were derivatized.

Joint SUMF ¶ 35; Rizvi Report ¶ 25.  Ethyl ester molecules are at least "theoretically" more prone to oxidation and also create different products in the human body when digested.  Gov't SUMF ¶¶ 8–9; Deposition of Dr. Gerard Bannenberg (Bannenberg Dep.) at 77:6–23, Gov't Ex. 3, ECF No. 71-5; Rizvi Report ¶ 25.  Ethyl esters of omega-3 fatty acids, unlike natural fish triglycerides, can even dissolve Styrofoam.  Gov' SUMF ¶10; Bannenberg Dep. at 73:21–77:5.

Continuing with BASF's processing: after transesterifying semi-finished, neutralized triglyceride fish oil into fatty acid ethyl esters, BASF employs "additional distillation to concentrate and separate the ethyl esters made up of the omega-3 polyunsaturated fatty acids from those ethyl esters made up of the saturated and the monounsaturated fatty acids, which are not desired, resulting in products high in EPA and DHA ethyl esters."  Joint SUMF ¶ 21.  Over 13 percent of the "molecular weight of an EPA ethyl ester" is attributable to ethanol, and over 12 percent of the "molecular weight of DHA ethyl ester" is attributable to ethanol.  Plaintiff's Statement of Additional Undisputed Material Facts (Pl.'s SUMF) ¶¶ 7–8, ECF No. 68-2. "[N]atural tocopherol, a form of vitamin E in soybean oil," is then "added to the resulting" merchandise "as an antioxidant, which protects" it "from oxidation."  Joint SUMF ¶ 23; *see* ECF No. 68-4 at 2 (flowchart summarizing BASF's manufacturing process).

By the end of its processing, the "imported merchandise is a light-yellow liquid," with a "slight fish-like odor" and "minimal fish oil taste," Joint SUMF ¶¶ 29 – 31, "a little less visc[osity]" than crude fish oil, and without the taste or smell of "fresh fish," Fismen Dep. at 33:8–34:5.  Gov't SUMF ¶ 12.  "BASF imports the merchandise in bulk form, after which it is sold to companies that use it to manufacture human dietary supplements."  Joint SUMF ¶ 9. Dietary-supplement manufacturers often add flavorings like lemon to merchandise like BASF's

to mask what little fishy taste remains, something which is "very popular among consumers" in the United States.  Gov't SUMF ¶ 13; Bannenberg Dep. at 50:17–51:11.

The specific merchandise at issue in this case was "contained in five entries made by BASF between December 2011 and May 2012 at the Port of Los Angles, California, and in one entry made by BASF on April 28, 2018, at the Port of Newark, New Jersey."  Joint SUMF ¶ 4. "At liquidation, U.S. Customs and Border Production classified the [merchandise] under subheading 3824.90.40, [HTSUS] (2011), or subheading 3824.90.41, HTSUS (2012 and 2018), depending on the date of entry."  *Id.* ¶ 5.  That provision covers "chemical products and preparations of the chemical or allied industries (including those consisting of mixtures of natural products), not elsewhere specified or included: Other: Other: Other: Fatty substances of animal or vegetable origin and mixtures thereof," dutiable at 4.6 percent *ad valorem*.  Customs denied BASF's timely filed protests, and BASF paid "[a]ll liquidated duties, taxes, and fees … prior to the filing of this case."  Joint SUMF ¶ 2.

BASF now moves for summary judgment.  Plaintiff's Motion for Summary Judgment (BASF Br.), ECF No. 68.  BASF argues that its merchandise should be classified as "[e]xtracts and juices of meat, fish or crustaceans, molluscs or other aquatic invertebrates: Other," of subheading 1603.00.90, HTSUS (2011, 2012, and 2018), duty-free.  *See id.*  The Government agrees that Customs' classification was incorrect; however, as asserted in the Government's counterclaim, ECF No. 32, and as explained below, the merchandise is correctly classified as "[f]ood preparations not elsewhere specified or included: Other: Other," of subheading 2106.90.99, HTSUS (2011 and 2012) or 2106.90.98, HTSUS (2018), dutiable at 6.4 percent *ad valorem*.

## QUESTION PRESENTED

Whether the BASF's merchandise is properly classified as:

(1) "Extracts and juices of meat, fish or crustaceans, molluscs or other aquatic invertebrates: Other," of subheading 1603.00.90, HTSUS (2011, 2012, and 2018); or

(2) "Food preparations not elsewhere specified or included: Other: Other," of subheading 2106.90.99, HTSUS (2011 and 2012) or 2106.90.98, HTSUS (2018).[1]

## SUMMARY OF ARGUMENT

An "extract … of … fish" is a concentrated, savory flavoring which contains only substances that are naturally occurring in fish, as caselaw, reliable lexicographic sources, and Explanatory Note 16.03 all confirm. The undisputed material facts, however, show that BASF's merchandise does not meet that description. It is composed of artificial ethyl esters derivatized from natural fish oil triglycerides through transesterification, a chemical reaction that adds ethanol and removes glycerol to create a new compound that is not and cannot be extracted from fish. The merchandise also lacks the appearance, odor, and taste of crude fish oil—a naturally occurring, dark, viscous, pungent substance—or even of fresh fish, for that matter. And it is used to make dietary supplements, whose manufacturers add flavorings like lemon to mask what little odor and taste remain after BASF's processing. The merchandise is therefore not an "[e]xtract[] … of … fish" of heading 1603. BASF's arguments to the contrary wrongly focus on sub-molecular portions of its merchandise, rather than the imported merchandise as a whole.

---

[1] There are no material differences between the versions of the relevant HTSUS provisions and Explanatory Notes in effect at the time of entry in 2011, 2012, and 2018. The Explanatory Notes in effect in 2011, 2012, and 2018 that the Government cites are reproduced in Gov't Exs. 9 (4th ed. 2007), ECF No. 71-11; 10 (5th ed. 2012), ECF No. 71-12; and 11 (6th ed. 2017), ECF No. 71-13, respectively.

Instead, BASF's merchandise is a "[f]ood preparation[] not elsewhere specified or included" of heading 2106. It is a "food preparation"—a specially made-up nutritive substance—intended to be used in dietary supplements. And no other heading in the HTSUS describes the merchandise. The Court should therefore hold that the correct classification of BASF's merchandise is under subheading 2106.90.99, HTSUS (2011 and 2012) or 2106.90.98, HTSUS (2018), depending on the date of entry, and order reliquidation of the subject entries accordingly.

## ARGUMENT

### I.    Standard Of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT Rule 56(a). Because there is no dispute as to any material facts, the Court's determination "of the classification of the goods collapses into a determination of the proper meaning and scope of the HTSUS terms that, as a matter of statutory construction, is a question of law. *RKW Klerks Inc. v. United States*, 94 F.4th 1374, 1378 (Fed. Cir. 2024) (quotation omitted).

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." *ADC Telecomms., Inc. v. United States*, 916 F.3d 1013, 1017 (Fed. Cir. 2019) (quotation omitted). "The first four digits of an HTSUS provision constitute the heading, whereas the remaining digits reflect subheadings." *Id.* (quotation omitted). The HTSUS also contains "General Rules of Interpretation (GRIs) that govern the classification of merchandise." *RKW Klerks*, 94 F.4th at

1378.  "The GRI[s] apply in numerical order, meaning that subsequent rules are inapplicable if a preceding rule provides proper classification."  *ADC Telecomms.*, 916 F.3d at 1017 (quotation omitted).

"GRI 1 provides, 'classification shall be determined according to the terms of the headings and any relative section or chapter notes.'"  *RKW Klerks*, 94 F.4th at 1378 (quoting GRI 1).  Thus, "[w]hen applying GRI 1, [a] court first construes the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading."  *Id.* (quotation omitted).  "The HTSUS is designed so that most classification questions can be answered by GRI 1" without resort to "the less precise inquiries presented by" the succeeding GRIs.  *Telebrands Corp. v. United States*, 865 F. Supp. 2d 1277, 1280 (Ct. Int'l Trade 2012), *aff'd*, 522 F. App'x 915 (Fed. Cir. 2013).

Where a tariff term is not defined in the HTSUS, "the term's correct meaning is its common meaning," which is "presumed to be the same as its commercial meaning."  *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001) (quotation omitted). "In order to determine the common commercial meaning of a tariff term, courts may consult dictionaries, encyclopedias, scientific authorities, and other reliable information sources."  *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011).  That includes the World Customs Organization's Explanatory Notes to the Harmonized Tariff Schedule, which, though not binding, "are 'generally indicative' of the proper interpretation of a tariff provision."  *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008) (quotation omitted).  Courts credit "the unambiguous text of relevant explanatory notes absent persuasive reasons to disregard it."  *Id.*

After determining the heading under which a good is classified pursuant to GRI 1, the Court must then determine the applicable subheading pursuant to GRI 6. "[T]he classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the [preceding GRIs] on the understanding that only subheadings at the same level are comparable." GRI 6.

One final point on the legal framework of tariff classification: BASF argues that "ambiguity in classification cases is resolved 'in favor of the importer, since the intention of Congress to impose a higher duty should be expressed in clear and unambiguous language.'" BASF Br. at 18 (quoting *Am. Net & Twine Co. v. Worthington*, 141 U.S. 468, 474 (1891), and citing *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997)). That is not the case. This substantive canon did not survive the New Deal-era Supreme Court, *see* Jonathan H. Choi, *The Substantive Canons of Tax Law*, 72 Stan. L. Rev. 195, 251–54 (2020), and since then, the Court has made clear that statutes must be given a "fair reading" absent a textual command otherwise, *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018). As such, no substantive canon can displace the statutory rules governing classification. *Nature's Touch Frozen Foods (W.) Inc. v. United States*, 639 F. Supp. 3d 1287, 1307 (Ct. Int'l Trade 2023) (under the HTSUS, "canons and duty rates do not control classification—the text of the headings and subheadings do"). Indeed, GRI 3(c) requires that ambiguity be resolved in favor of "the heading which occurs last in numerical order," not the heading with the lower duty rate. Accordingly, any ambiguity in the HTSUS's terms must be resolved using the statute's own interpretive rules and traditional tools of statutory construction—not an outdated canon that is contradicted by the HTSUS's plain text.

**II.    BASF's Merchandise Is Not Classifiable As An "Extract[] … Of … Fish" Of Heading 1603**

Because the terms of the Government's heading are met only if BASF's merchandise is not specified elsewhere in the HTSUS, the analysis starts with BASF's proffered heading: heading 1603. *See Trijicon, Inc. v. United States*, 686 F. Supp. 3d 1336, 1342–43 (Ct. Int'l Trade 2024) (merchandise was classified under a heading covering lamps "not elsewhere specified or included" only after concluding that the importer's heading without such a limitation did not describe the merchandise).  Heading 1603 provides for "[e]xtracts and juices of meat, fish or crustaceans, molluscs or other aquatic invertebrates."  "Extracts and juices of meat" and "fish," however, are concentrated flavorings, as dictionaries, encyclopedias, and Explanatory Note 16.03 confirm—not artificial derivatives with minimal taste used as dietary supplements.  Nor has BASF's merchandise merely been extracted.  It is synthesized through transesterification, which is a *derivatization* process, not an *extraction* process.  Accordingly, BASF's merchandise does not meet the terms of heading 1603.

**A.    "Extracts" Are Concentrated Flavorings For Foods—Not BASF's Mostly Flavorless, Semi-Synthetic Compounds Used As Dietary Supplements**

Reliable lexicographic sources demonstrate that the common meaning of "extract" (also known as "essence") is the concentrated flavor of a particular food, usually obtained through reduction or distillation.  That definition does not encompass BASF's merchandise—artificial, mostly flavorless fish-oil derivatives intended for use as dietary supplements.

As this Court has noted, dictionaries generally define an "extract" as "a preparation containing the essence of the substance from which it is derived"; "a preparation supposed to possess the virtue of the original substance in concentrated form"; or a "concentrated preparation of the essential constituents of a food, flavoring, or other substance; concentrate."  *Marcor Dev.*

*Corp. v. United States*, 926 F. Supp. 1124, 1132–33 (Ct. Int'l Trade 1996) (quoting various

dictionaries).   That general definition of "extract" as a concentrated essence of food or flavoring

has remained consistent since *Marcor* was decided.  An extract is still "a very concentrated

liquid that is used for flavoring food or for its smell," *Extract*, Collins Dictionary,

https://www.collinsdictionary.com/us/dictionary/english/extract, or "a substance removed from

another substance, often a food, and containing a basic quality or flavor," *Extract*, Cambridge

English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/extract.

In the specific context of food and nutrition, encyclopedias clarify that extracts are

concentrated aromatic flavorings obtained through, for example, distillation.  One source states

that "extracts" are "[c]oncentrated flavorings obtained from foods … by various methods such as

boiling down stock or distillation."  Kenneth N. Anderson & Lois E. Anderson, *The

International Dictionary of Food and Nutrition* 93 (1993) ("Essences are extracts, as are meat

concentrates.").  Another defines "extracts" as "concentrated aromatic liquid[s] used … to

enhance the flavour of certain culinary preparations."  *Larousse Gastronomique* 423 (Jenifer

Harvey Lang ed. 1988).  *See also* James Peterson, *Sauces: Classical and Contemporary Sauce

Making* 88 (3d ed. 2008) ("*Essences* are extracts made from vegetables, meats, or seafood and

are used as last-minute flavorings for sauces."); Culinary Institute of America, *The Professional

Chef* 1177 (8th ed. 2006) (defining "essence" as "[a] concentrated flavoring extracted from an

item, usually by infusion or distillation.").[2]  Thus, according to both dictionaries and relevant

encyclopedias, extracts are concentrated flavorings obtained through reduction, distillation, or

similar extraction processes.

---

[2] The preceding sources are reproduced in Gov't Ex. 4, ECF No. 71-6.

This understanding of extracts as concentrated flavorings is consistent with statutory context. As with any other statute, the words in a tariff heading must be interpreted by looking to surrounding context. *Philadelphia Energy Sols. Ref. & Mktg., LLC v. United States*, 89 F.4th 1364, 1369 (Fed. Cir. 2024) ("[T]he Supreme Court has long made clear that the meaning of statutory language, plain or not, depends on context." (quotation omitted)); *Jewelpak Corp. v. United States*, 97 F. Supp. 2d 1192, 1196 (Ct. Int'l Trade 2000) (using "the doctrine of *noscitur a sociis* ('associated words')" to interpret a term within a tariff heading). Here, the meaning of the word "[e]xtracts" is informed by its application to not only "fish" but also "meat." And "[m]eat extract is a common flavoring additive for soups, stews, sauces, casseroles, canned meat items, pot pies, bouillon and bouillon cubes, gravies and other items where meat flavoring improves the products." A.M. Pearson, *Meat Extracts*, reprinted in *Encyclopedia of Food Sciences and Nutrition* 3816 (2d ed. 2003), Gov't Ex. 5, ECF No. 71-7. That "[e]xtracts … of meat" describes flavorings containing the concentrated essence of meat confirms that "[e]xtracts … of … fish" describes similarly flavorful preparations. After all, a single statutory term should bear the same meaning "each time it is called into play." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994).

Were there any doubt about the appropriate construction of heading 1603, Explanatory Note 16.03 confirms that the phrase "[e]xtracts … of … fish" refers to concentrated fish flavorings. *StoreWALL*, 644 F.3d at 1363 (Explanatory Notes can "clarif[y] the scope of" a tariff term). "Though obtained from different sources, the extracts of" heading 1603 "have very similar physical characteristic (appearance, odour, flavour, etc.) and chemical composition." Explanatory Note 16.03. "Extracts of fish are obtained, e.g., by concentrating water extracts of the flesh of herring or other fish or made from fish meal …; during the production all or part of

the constituents which give the fishy taste (e.g., trimethylamine[3] in the case of sea fish) may be eliminated and such extracts therefore have characteristics similar to those of meat extracts." *Id.* "Extracts are used for making certain food preparations such as soups (whether or not concentrated) and sauces." *Id.* In short, Explanatory Note 16.03 confirms that "[e]xtracts" of heading 1603 are flavorings obtained by extracting the essence of meat or fish.

Thus, in *Marcor*, the Court held that a shark fin preparation was not classifiable under heading 1603 because it lacked the "odor, color or taste" of shark fin after processing. 926 F. Supp. at 1132–33. And in *Jedwards International, Inc. v. United States*, by contrast, the Court held "a dark, viscous" krill oil "with a strong odor" that "contain[ed] only substances that are naturally occurring in krill" was properly classified as an extract of heading 1603. 161 F. Supp. 3d 1354, 1357–58 (Ct. Int'l Trade 2016).

Here, however, BASF's merchandise does not meet the plain meaning of "[e]xtract[] … of … fish." Like in *Marcor* but unlike in *Jedwards*, BASF's merchandise lacks the odor, color, and taste of fish. It has "slight" odor, "minimal" taste, "light-yellow" coloration, neither the smell nor taste of "fresh fish," and is not intended to be flavoring for a dish but rather a dietary supplement. The appearance, odor, and taste of the crude fish oil from which the merchandise was ultimately derived—a "really dark brown," "Guinness"-like, "almost blackish," "viscous fluid" with the odor of "fish that has been around for some time," Fismen Dep. at 31:24–32:13—has almost entirely been removed through BASF's processing. In fact, dietary-supplement manufacturers often add flavorings to merchandise like BASF's to mask what little taste remains—something which is "very popular among consumers" in the United States.

---

3 Trimethylamine is "[a] degradation product, often by putrefaction, of nitrogenous plant and animal substances (e.g., beet sugar residue or herring brine)." *Stedman's Medical Dictionary* 940130 (Nov. 2014) (Westlaw), Gov't Ex. 6, ECF No. 71-8.

Bannenberg Dep. at 50:17–51:11.  BASF's merchandise is thus not the sort of savory flavoring that heading 1603 describes.

### B.  "Extracts" Are Extracted—Not Derivatized, Like BASF's Merchandise

Although BASF's merchandise is not an "[e]xtract[] … of … fish" because it is not a concentrated flavoring, it is also not an "extract" because it is derivatized, rather than extracted, from fish oil.  Dictionaries, encyclopedias, and Explanatory Note 16.03 all contemplate that extracts are obtained through extraction processes, like reduction and distillation.  Kenneth N. Anderson & Lois E. Anderson, *The International Dictionary of Food and Nutrition* 93 (1993) (extracts are obtained simply by "boiling down stock or distillation"); Culinary Institute of America, *The Professional Chef* 1177 (8th ed. 2006) (essences are "extracted from an item, usually by infusion or distillation"); *Marcor*, 926 F. Supp. at 1133 ("Moreover, nowhere in the Explanatory Notes is there an indication that anything other than water is concentrated to make the extract.").  But BASF's merchandise is manufactured not through simple extraction but rather through complex processing that features transesterification, a derivatization reaction that consumes ethanol and produces semi-synthetic ethyl esters.

As Dr. Syed S.H. Rizvi, Professor of Food Process Engineering at the Institute of Food Science at Cornell University, explains, extraction "is a process for removal of a targeted item from a matrix" and transference "into a different solvent or phase."  Rizvi Report ¶ 28.  Physical methods can be used to extract compounds from fish "(such as grinding, cooking, pressing, and centrifuging)," or chemical extraction methods can be used "(such as Soxhlet extraction and enzyme-assisted extraction)."  *Id.* ¶ 29.

Derivatization, on the other hand, "results in the transformation of a chemical compound (the educt) into another similar compound (the derivative) by altering one or more of its

functional groups." *Id.* ¶ 30 (quotation omitted). In other words, derivatization synthesizes a new molecule. Transesterification is a "form of derivatization" through which "methyl or ethyl alcohol are combined with a substance (the educt) to chemically modify it, not to remove a targeted item from a matrix, which creates an entirely new compound as a result (a derivative), in this case a fatty acid ethyl ester." *Id.* ¶ 31. Incidentally, "[t]his is the same process that is used to make biodiesel from vegetable and animal fats and oils." *Id.* ¶ 20.

Transesterification "is not an extraction process." *Id.* ¶ 27. Instead, transesterification of fish oil triglycerides into ethyl esters creates "new chemical identities" that are not naturally occurring in fish, cannot be extracted from fish, and have different molecular structures and chemical properties than naturally occurring triglycerides. *Id.* ¶¶ 25, 26, 32. As BASF's own expert acknowledged, ethyl esters have a lower molecular weight than natural triglycerides, are at least "theoretically" more prone to oxidation, create different products in the body when digested, and have different chemical structures. Bannenberg Dep. at 77:6–23. In fact, unlike natural fish triglycerides, ethyl esters can dissolve Styrofoam. Bannenberg Dep. at 73:21–77:5.

In short, although BASF asserts that the omega-3 fatty acids in its merchandise were "chemically extracted from the triglyceride[] fish oil starting material" via "transesterification," BASF Br. at 32–33, this assertion is inconsistent with the plain meaning of "extract." Ethyl esters of omega-3 fatty acids obtained by transesterifying fish oil with ethanol are chemical derivatives with different properties than the triglycerides from which they were derivatized— not "[e]xtracts" of heading 1603.

That conclusion is bolstered by the HTSUS itself, whose drafters understood the difference between extracts and derivatives, yet omitted derivatives from heading 1603. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) (courts "generally presum[e]

that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another" (quotation omitted)).  Take heading 3201, for example.  That heading distinguishes between "[t]anning *extracts* of vegetable origin," on the one hand, and "tannins and their salts, ethers, *esters and other derivatives*," on the other.  Or consider heading 2936, which covers "[p]rovitamins and vitamins, natural or reproduced by synthesis (*including natural concentrates*), *derivatives thereof* used primarily as vitamins, and intermixtures of the foregoing[.]"  If the HTSUS's drafters intended for heading 1603 to cover more than extracts, they could have included the phrase "and derivatives thereof," similar to how they crafted heading 2936.  That the HTSUS's drafters did not use "derivative" language in heading 1603, but did use it elsewhere, supports the conclusion that BASF's merchandise is not encompassed by heading 1603.  *See Intel*, 140 S. Ct. at 777; *Airflow Tech., Inc. v. United States*, 524 F.3d 1287, 1292 (Fed. Cir. 2008) (noting that the HTSUS's drafters could have used a "broader term" than the one they used, had they wanted the subheading at issue to encompass more merchandise).

This Court's two cases interpreting heading 1603 also support the conclusion that BASF's non-extractive processing of its merchandise excludes it from heading 1603.

First, consider *Marcor*.  There, the shark fin preparation at issue "was treated with an enzyme, mixed with dextrin … and [did] not have the same odor, color or taste as simple shark fin cartilage," among other things, and thus did not retain "the essence of the original shark cartilage" as heading 1603 requires.  *Marcor*, 926 F. Supp. at 1133 (noting that the only processing that Explanatory Note 16.03 contemplates is concentrating water fractions from fish).  Similarly, here, naturally occurring fish triglycerides are processed with a catalyst and ethanol—

18

not merely concentrated through reduction or distillation—to synthesize ethyl esters which lack the odor, color, and taste of the starting fish oil material and of fish itself.

Contrast *Marcor* and this case with *Jedwards*. There, the phospholipid krill oil at issue was "a dark, viscous liquid with a strong odor" and, as the Court emphasized, by the end of their processing "contain[ed] only substances that are naturally occurring in krill." 161 F. Supp. 3d at 1357–58. Nor did the krill oil's processing "involve[] an added ingredient in a high quantity," like the shark-cartilage processing at issue in *Marcor*. *Id.* at 1359. Instead, the krill oil was "manufactured in a two-stage process," with stage one consisting of physical extraction ("heating, cooking, drying and separating the krill meal" from krill) and stage two involving solvent extraction ("extraction of substances from the krill meal using ethanol"). *Id.* at 1357; *see* Rizvi Report ¶ 29 (explaining that krill oil is obtained through physical and chemical extraction methods like cooking and solvent extraction).

Here, however, BASF's merchandise lacks the color, odor, taste, and viscosity of the starting fish oil material (and of fish, for that matter). Nor does it contain "only substances that are naturally occurring in" fish. Rather, the ethyl esters, which cannot be extracted from fish, are synthesized through transesterification. And transesterification, similar to the processing at issue in *Marcor* but unlike the processing in *Jedwards*, requires a significant added ingredient: ethanol. Ethanol, rather than being present in the merchandise in a small amount as residual solvent, *Jedwards*, 161 F. Supp. 3d at 1358, *replaces* glycerol in the natural fish triglycerides to create ethyl esters. In the end, ethanol comprises 12.6 or 13.6 percent of EPA and DHA ethyl esters' molecular weight, Pl.'s SUMF ¶¶ 7–8, making it neither a solvent nor residual.

Indeed, as BASF's own expert acknowledges, the process for manufacturing krill oil is "much less involved than the process for obtaining an omega-3 concentrate." Gov't SUMF ¶ 14;

Bannenberg Dep. at 98:21–99:20. "[K]rill oil is not typically further processed similarly to fish oils" but is rather obtained through "solvent-mediated extraction" using ethanol as a solvent. Gov't SUMF ¶ 14; Bannenberg Dep. at 98:21–99:20 (admitting that "you're really not doing a lot of processing to the krill oil"). The krill oil at issue in *Jedwards*, therefore, is not comparable to BASF's merchandise. *See* Bannenberg Dep. at 98:21–99:20 (explaining that "in the context of this case, the krill manufacturing is not relevant" due to the "very different process" used to make merchandise like BASF's). Both *Marcor* and *Jedwards*, which interpret heading 1603, therefore support the Government's position that BASF's merchandise is not an "[e]xtract[]" of heading 1603.

### C.  Even If BASF's Merchandise Were An Extract—Which It Is Not—It Would Be An Extract Of Fish Oil, Not "Of … Fish" As Heading 1603 Requires

BASF's claim hinges on the conclusion that the term "fish" in heading 1603 includes "fish oil." *See* BASF Br. at 25 (arguing that its merchandise "maintain[s] the essence of the fish oil starting material from which" it was "derived," and that "fish oil … is fish for tariff purposes"). But this conclusion is mistaken: "fish" is not "fish oil." Thus, even putting aside that the common meaning of the term "extract" does not describe BASF's merchandise, BASF's claim for classification under heading 1603 fails for the independent reason that its merchandise is not a preparation "of … fish," but rather, by BASF's own concession, a preparation of fish oil.

Heading 1603's plain language requires that an extract be "of fish"—not of "fish oil." "Fish" means "the flesh or organic structure of the animal fish," which is broad enough to encompass fish parts like skin, bones, and fins. *Marcor*, 926 F. Supp. at 1132 (holding that the term "fish" encompasses shark fin cartilage); *see* General Explanatory Note to Chapter 16 (explaining that "fish" includes the "skins thereof"). But the tariff term "fish" is not broad enough to include "processed material made therefrom"—like "fish oil, which, of course, is not

fish." *United States v. Geo. S. Bush & Co.*, 24 C.C.P.A. 313, 316 (1936).[4]  BASF's concession that its merchandise is a preparation of fish oil (or of molecular portions thereof), rather than of fish, BASF Br. at 25, is thus fatal to its claim for classification under heading 1603.

It is true that the Court of Customs Appeals held in 1913 that fish liquid was considered part of fish for the purpose of determining the dutiable weight of tinned herring, BASF Br. at 24, but that case has no bearing on this one.  In *Rosenstein Brothers v. United States*, 4 Ct. Cust. Appls. 401, T.D. 33840 (1913), the issue was whether the weight of certain liquid within tins of herring should have been deducted from the fish's dutiable weight.  The court held that the liquid, which was not added as a preservative but rather had seeped out of the herring after being tinned, was part of the fish's dutiable weight just as its fins and bones were.  *Id.* at 403.  That makes sense: the weight of a fish includes everything naturally contained in it.  But it does not explain what constitutes "fish" for the purposes of tariff classification.  *George S. Bush & Co.* answers that question: "fish oil" is not "fish," "of course," seeing as it is a different commodity. 24 C.C.P.A. at 316.  As such, a product of heading 1603 must be an extract of "fish," not of "fish oil"—yet BASF's merchandise is concededly a preparation of fish oil.

### D.  BASF's Counterarguments Are Unavailing

BASF does not appear to contest that its merchandise lacks the essence of the *fish* from which it was ultimately derived.  Nowhere does BASF suggest that its merchandise substantially maintains the appearance, odor, or flavor of fish.  Instead, BASF's primary contention is that its merchandise maintains the essence of the *fish oil* from which it was derivatized via

---

[4] The Federal Circuit has "[a]dopted the case law of" its predecessor court, the Court of Customs and Patent Appeals, "as [its] binding precedent."  *Deckers Corp. v. United States*, 752 F.3d 949, 964 (Fed. Cir. 2014).

transesterification because it still contains the beneficial omega-3 fatty acids that were once contained within fish. BASF Br. at 25–37. This argument falls short.

For one thing, in arguing that its merchandise maintains the essence of fish oil by retaining omega-3 fatty acids, BASF focuses on the wrong "essence." The relevant "essence" is the "odor, color or taste" of the starting material. *Marcor*, 926 F. Supp. at 1133; *see Jedwards*, 161 F. Supp. 3d at 1357 (krill oil classified under heading 1603 was a "dark, viscous liquid with a strong odor"); Explanatory Note 16.03. That omega-3 fatty acids are retained in the merchandise says nothing of the odor, color, or taste either of fish or of natural fish oil—which the merchandise substantially lacks. That alone is fatal to BASF's argument.

Fundamentally, though, BASF's theory is that its merchandise need only be *sourced* from fish—that is, contain parts of molecules that were originally contained within fish—to be classifiable as an "[e]xtract[]" of heading 1603. *See also* BASF Br. at 36 (noting that BASF "issues responsible sourcing statements" and allergen warnings communicating that its merchandise was sourced from fish). But this theory wrongly focuses on portions of the molecules contained in the merchandise instead of the merchandise itself. Merchandise must be classified in its imported state, not broken down into its components. *See Rollerblade, Inc. v. United States*, 112 F.3d 481, 487 (Fed. Cir. 1997). Moreover, taken to its logical limit, BASF's position would actually mean that the merchandise is an extract of the algae from which fish ultimately obtain omega-3 fatty acids—not of fish.

In sum, BASF's semi-synthetic merchandise is not an "[e]xtract[] … of … fish" of heading 1603. It is not a concentrated flavoring containing the savory essence of fish, nor was it obtained through extraction to yield only naturally occurring substances. Rather, it was derivatized from natural fish oil triglycerides into semi-synthetic ethyl esters, which cannot be

extracted from fish and which have different properties from natural fish oil triglycerides. BASF's merchandise is therefore not classifiable under heading 1603.

## III.    BASF's Merchandise Is A "Food Preparation[]" Of Heading 2106

Because BASF's merchandise is not classifiable under heading 1603, the analysis turns to the Government's proposed classification: heading 2106.  Heading 2106 encompasses "[f]ood preparations not elsewhere specified or included" in the HTSUS.  "Food preparations" are specially made substances with nutritive value for human ingestion.  That describes BASF's merchandise, which comprises processed substances, later encapsulated as dietary supplements, that provide humans with beneficial omega-3 fatty acids.

Nor is BASF's merchandise "elsewhere specified or included" in the HTSUS.  It is not classifiable as a fish oil of heading 1504, a chemical product of heading 3824, or an extract of heading 1603.  And, as we explain further below, the World Customs Organization agrees— omega-3-rich ethyl esters derived from fish oil are properly classified under heading 2106. Accordingly, heading 2106—and specifically, subheading 2106.90.99 (2011 and 2012) or 2106.90.98 (2018), depending on the date of entry—describes BASF's merchandise.

### A.    "Food Preparations" Are Specially Made Up Substances Intended To Be Ingested—Just Like BASF's Merchandise

To start, BASF's ethyl ester products are "food preparations."  "The common meaning of 'food' is that of a substance that is intended to be ingested."  *Mondelez Glob. LLC v. United States*, 253 F. Supp. 3d 1329, 1335 (Ct. Int'l Trade 2017).  And a "preparation" is "a substance specially prepared, or made up for its appropriate use or application, e.g. as food or medicine, or in the arts or sciences."  *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998) (quotation omitted).  Thus, "food preparations" are specially made up or prepared substances (as supposed to raw, unprepared edible products) intended to be ingested.  *See*

*Nutricia N. Am., Inc. v. United States*, 666 F. Supp. 3d 1363, 1379 (Ct. Int'l Trade 2023)

("specially-formulated combinations of nutritional substances" are "food preparations" within

the meaning of heading 2106); *Nature's Touch*, 639 F. Supp. 3d at 1303–04 ("freezing" a fruit

and vegetable mixture does not constitute "preparation" under the HTSUS).

BASF's merchandise fits that description.  It is not a raw nutrient but has instead been

specially made up through extensive processing, like transesterification.  It is intended to be

ingested by humans as a dietary supplement.  And when ingested, the body breaks down the

merchandise's ethyl esters to obtain omega-3 fatty acids, which have recognized nutritive value.

Thus, BASF's merchandise qualifies as a "food preparation[]"—as BASF agrees, *see* BASF Br.

at 42–44 (arguing that the merchandise is a "[f]ood preparation[]" within the meaning of Note

1(e) to Chapter 21).

### B.  No Other Heading Of The HTSUS Specifies Or Includes BASF's Merchandise

BASF's merchandise also meets the second condition of heading 2106, as it is not

"elsewhere specified or included" in the HTSUS.  No other heading—in particular, heading

1504, 3824, or 1603—describes artificial ethyl esters like BASF's that have been chemically

derived from fish oil and are intended for human ingestion.

First, BASF does not dispute that its merchandise cannot be classified under heading

1504, which provides for "[f]ats and oils and their fractions, of fish or marine mammals, whether

or not refined, but not chemically modified."  As this Court concluded in *Jedwards*, animal oils

classifiable under Chapter 15 are, with few exceptions not relevant here, triglycerides.  161 F.

Supp. 3d at 1360–62.  Because the merchandise has been chemically transformed from naturally

occurring triglycerides into ethyl esters through transesterification, it cannot be classified under

heading 1504—which expressly excludes oils that have been "chemically modified"—or any other heading of Chapter 15, for that matter.

Second, BASF also does not dispute that its merchandise cannot be classified as a "chemical product[] … not elsewhere specified or included" of heading 3824, despite Customs' conclusion at liquidation.  Note 1(b) to Chapter 38 excludes from heading 3824 "[m]ixtures of chemicals with foodstuffs or other substances with nutritive value, of a kind used in the preparation of human foodstuffs (generally, heading 2106)."  The General Explanatory Note to Chapter 38 confirms that "[t]he mixtures which are excluded by virtue of Note 1(b) are those which are of a kind used in the preparation of human foodstuffs and which are valued for their nutritional qualities."  That describes BASF's merchandise: it is a mixture of ethyl esters, antioxidants, and various organic impurities, that is used to create dietary supplements rich in beneficial omega-3 fatty acids.  BASF's merchandise is thus excluded from heading 3824 by Note 1(b) to Chapter 38—which, in turn, directs classification under heading 2106.

And third, BASF's merchandise is not classifiable as "[e]xtract[] … of … fish" of heading 1603, for all the reasons already explained.  Accordingly, because no other heading of the HTSUS describes BASF's merchandise, it is classifiable only under heading 2106, as a "[f]ood preparation[] not elsewhere specified or included."[5]

---

[5] Heading 0410, under which BASF has never contended its merchandise is classifiable, is also inapplicable.  It provides for "[e]dible *products* of animal origin, not elsewhere specified or included," not man-made "preparations."  "Edible products of animal origin," in other words, are edible things that animals themselves have generated but that have not been prepared in any way beyond being preserved.  *Product*, Oxford English Dictionary, https://www.oed.com/dictionary/product_n1 (Mar. 2024) ("A thing generated or produced by, or as if by, nature or a natural process."), Gov't Ex. 7, ECF No. 71-9.  Otherwise, the heading would have used the common tariff term "preparations."  *See Nature's Touch*, 639 F. Supp. 3d at 1303–04 ("preparation" means something more than preservation by freezing). The Explanatory Notes confirm this.  Heading 0410 includes "[t]urtles' eggs," whether "fresh, dried or otherwise

*(cont'd)*

### C.  Note 1(e) To Chapter 21 Does Not Exclude BASF's Merchandise From Classification Under Heading 2106

Apart from the argument that heading 1603 covers its merchandise, BASF's main contention is that Note 1(e) to Chapter 21 excludes from heading 2106 any "[f]ood preparations … containing more than 20 percent by weight of sausage, meat, meat offal, blood, insects, fish or crustaceans, molluscs or other aquatic invertebrates, or any combination thereof (chapter 16)." BASF Br. at 42–44.  BASF's argument, at its core, is that because its merchandise contains omega-3 fatty acids that were *sourced* from fish, the merchandise itself "contain[s] … fish" within the meaning of Note 1(e).  But Note 1(e) does not apply because BASF's merchandise does not "contain[] … fish" at all, let alone 20 percent fish.

As explained, "fish" means "the flesh or organic structure of the animal fish," and thus encompasses fish parts like skin, bones, and fins.  *Marcor*, 926 F. Supp. at 1132.  "Fish" does not include "processed material made therefrom"—like "fish oil, which, of course, is not fish." *Geo. S. Bush & Co.*, 24 C.C.P.A. at 316.  BASF's merchandise undisputedly consists of derivatized fish oil.  It therefore does not "contain[] … fish" within the meaning of Note 1(e) to Chapter 21.

The text of Note 1(e) itself makes that clear.  At the end of Note 1(e) is a reference to "chapter 16."  This indicates that merchandise described by the Note should be classified under a heading contained in Chapter 16.  *See Nutricia*, 666 F. Supp. 3d at 1371 ("The reference to 'section IV' indicates that the products described in the note … are to be classified in section IV

---

preserved," but not prepared into oil; and "birds' nests," whether "untreated" or "cleaned." Explanatory Note 04.10.  BASF's merchandise, not resembling these exemplars and having been prepared from crude fish oil through extensive processing, is therefore not classifiable under heading 0410.  And although *Marcor* classified a processed shark fin product under heading 0410, it did so without engaging in any analysis of the heading's terms or its Explanatory Note, 926 F. Supp. at 1137, and is thus of little persuasive value on this score.  *See Algoma Steel Corp. Ltd. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989) (trial court decisions do not bind other trial courts).

of the HTSUS, which includes chapter 21, rather than in section VI (which includes chapter 30).").  If the word "fish" in Note 1(e) included fish oil or its molecular constituents, as BASF argues, then Note 1(e) would have referenced not just "chapter 16" but also Chapter 15.  After all, Chapter 15 names fish oil in heading 1504.  But Note 1(e) does not mention Chapter 15.  This omission confirms that the HTSUS's drafters intended Note 1(e) to encompass only the plain meaning of "fish": whole fish and their parts (like meat, skin, bones, and fins), not fish oil, fish-oil-derived merchandise like BASF's, or the mere molecular constituents of such merchandise.

On that note, even putting aside that "fish" does not include fish-derived merchandise like fish oil, the merchandise before the Court comprises artificial ethyl esters, not just the omega-3 fatty acid portions thereof.  In other words, it is not enough that BASF's merchandise is partially sourced from fish.  Instead, the merchandise as imported, not broken down into its components, *Rollerblade*, 112 F.3d at 487, must contain fish.  Indeed, the HTSUS's drafters knew how to exclude all edible things "of animal origin" from Chapter 21, had they desired to do so.  They did not, however, use such language.  Note 1(e) thus describes preparations containing fish—*i.e.,* meat, skin, bones, fins, and the like—not merely preparations containing omega-3 fatty acids, molecular constituents that are not "fish" (and that, it bears repeating, are not even produced by fish but rather by algae).

Finally, BASF suggests that the Government conceded the applicability of Note 1(e) through a USCIT Rule 30(b)(6) deposition of Customs' representative.  BASF Br. at 42.  Not so.  Customs' representative did not (and, in any event, cannot) offer testimony as to the interpretation of the tariff term "fish," and equally, as to the legal issues of whether BASF's merchandise contains "fish."  *See* BASF Br. at 24 (conceding that the tariff term "of fish" has

"legal meaning"). Rather, he testified that fish serves as an initial "raw material" for BASF's

merchandise—not that it "contain[s] … fish," as the terms of Note 1(e) require. And regardless

of Customs' understanding of the tariff, "the court has an independent duty to conduct its own

legal and factual analysis on the basis of the record developed before it." *Energizer Battery, Inc.*

*v. United States*, 190 F. Supp. 3d 1308, 1316 (Ct. Int'l Trade 2016) (citing 28 U.S.C. §

2640(a)(3)). The Government is thus not foreclosed from pointing out that Note 1(e) is

inapplicable.

Accordingly, because BASF's merchandise does not "contain[] … fish," Note 1(e) to

Chapter 21 does not exclude the merchandise classification under heading 2106.

### D. The World Customs Organization—Which Maintains The Harmonized System And Its Explanatory Notes—Agrees That Ethyl Esters Derived From Fish Oil Are Classified Under Heading 2106

Additionally, the Word Customs Organization agrees that ethyl esters derived from fish

oil similar to BASF's are appropriately classified under heading 2106. A World Customs

Organization classification opinion, though "not given deference by United States courts," can be

"persuasive authority" in determining the meaning of the Harmonized System.[6] *Cummins Inc. v.*

*United States*, 454 F.3d 1361, 1366 (Fed. Cir. 2006), *aff'g* 377 F. Supp. 2d 1365 (Ct. Int'l Trade

2005). Indeed, "as the chief architect of the HTS(US), the WCO's objective interpretations of

the language it devised" is entitled to respectful consideration. *Cummins Inc.*, 377 F. Supp. 2d at

1376.

In 2018, the World Customs Organization classified a "product consisting of ethyl esters

of highly concentrated omega-3 fatty acids EPA … and DHA … produced from anchovy oil"

---

[6] The "Harmonized System" is the internationally standardized tariff nomenclature that
the HTSUS implements and is virtually identical to Chapters 1 through 97 of the HTSUS up to
the six-digit level. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1378 n.1 (Fed. Cir. 1999).

under heading 2106.  Gov't Ex. 8, ECF No. 71-10.  That merchandise, which was produced from "raw anchovy oil" that underwent "deacidification, ethyl esterification, distillation, filtration, bleaching and deodorization," also contained "Vitamin E (tocopherol)" as an added antioxidant. *Id.*  It was "presented in barrels and" was intended to "be used in the manufacture of food supplements." *Id.*

The merchandise that the World Customs Organization classified under heading 2106 is substantially the same as BASF's.  Both underwent substantially similar processing, contain the same antioxidant, are also imported in bulk, and are likewise used to make dietary supplements rather than used as flavorings.  *See id.*  Moreover, the World Customs Organization reached its decision after thorough consideration of alternative headings, including heading 3824 and the headings of Chapter 15, across multiple sessions.  *See id.*  No delegate so much as suggested that the merchandise could be considered "[e]xtracts … of … fish" of heading 1603.  *See id.*

The World Customs Organization's "objective interpretation[] of the language it devised," though not binding, persuasively confirms that BASF's merchandise is appropriately classified under heading 2106.  *Cummins Inc.*, 377 F. Supp. 2d at 1376; *see Amcor Flexibles Singen GmbH v. United States*, 425 F. Supp. 3d 1287, 1299–300 (Ct. Int'l Trade 2020) (noting that a World Customs Organization classification opinion supported the Court's interpretation of the tariff).

### E.  Subheading 2106.90.99 (2011 And 2012) Or 2106.90.98 (2018) Covers BASF's Merchandise, Depending On The Date Of Entry

Because BASF's merchandise is classifiable under heading 2106, it is further classifiable under subheading 2106.90.99 (2011 and 2012) or 2106.90.98 (2018), depending on the date of entry, pursuant to GRI 6.  "The products at issue are not '[p]rotein concentrates or textured protein substances' of subheading 2106.10, HTSUS and thus are classified in six-digit

subheading 2106.90, HTSUS ('Other:')." *Nutricia*, 666 F. Supp. 3d at 1380. And "[t]he uncontested facts do not demonstrate that they are described by any of the eight-digit subheadings" within subheading 2106.90. *Id.* "Therefore, the correct eight-digit subheading is subheading 2106.90.99, HTSUS ('Food preparations not elsewhere specified or included: Other: Other: Other: Other: Other: Other')," for the merchandise entered before 2018, and subheading 2106.90.98, HTSUS, for the merchandise entered in 2018. *Id.*

The Court should therefore hold that BASF's merchandise is properly classified under subheading 2106.90.99 (2011 and 2012) or 2106.90.98 (2018), depending on the date of entry, and order reliquidation of the subject entries in accordance with that classification.[7]

One final note: BASF argues that the Government lacks a statutory cause of action to bring a classification counterclaim here, and therefore, summary judgment should be granted in BASF's favor. BASF Br. at 38–41. This is incorrect. The Government's position is that it has the authority to raise alternative classifications carrying higher duty rates as counterclaims. This, in the Government's view, comports with the legislative history of the counterclaim provision, *see Tomoegawa (U.S.A.), Inc. v. United States*, 763 F. Supp. 614, 621 (Ct. Int'l Trade 1991), and provides up-front notice to importers of the risk of an adverse judgment. The Government acknowledges that this Court has recently held that the Government lacks a *statutory* cause of action to bring such a counterclaim. *Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022); *Second Nature Designs, Ltd. v. United States*, 586 F. Supp. 3d 1334 (Ct. Int'l Trade 2022); *Maple Leaf Mktg., Inc. v. United States*, 639 F. Supp. 3d 1363 (Ct. Int'l Trade 2023); *Second Nature Designs Ltd. v. United States*, 654 F. Supp. 3d 1301 (Ct. Int'l

---

[7] Classification stops at the eighth digit because ten-digit statistical suffixes are not part of the HTSUS's legal text. *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1026 (Fed. Cir. 2017).

Trade 2023).  But the Court has not yet considered whether the Government's cause of action instead stems from federal *common law*, which has long provided a non-statutory basis for the Government's revenue claims.  *United States v. Bajakajian*, 524 U.S. 321, 344 n.18 (1998) ("In both England and the United States, an action of debt was used to recover import duties owed the Government[.]" (citing *United States v. Lyman*, 26 F. Cas. 1024, 1030 (C.C.D. Mass. 1818) (Story, C.J.)); *cf. United States v. Wurts*, 303 U.S. 414, 415 (1938) (the United States needs "no statute" to bring an action to recover funds erroneously paid).

Regardless, BASF fails to explain why its argument makes any difference in this case. "[T]he court's ability to order the payment of increased duties from [an importer] does not depend on whether there is a counterclaim."  *Second Nature Designs*, 654 F. Supp. 3d at 1307 n.6.  Thus, Customs can collect any additional duties owed as a result of the Court's reclassification of BASF's merchandise, as BASF itself appears to acknowledge.  BASF Br. at 41 & n.14.  Accordingly, that the Government raised classification under heading 2106 as a counterclaim does not prevent the Court from reaching "the correct decision," *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984), and ordering reliquidation under subheading 2106.90.99 (2011 and 2012) or subheading 2106.90.98 (2018)—which will in turn permit the Government to collect the additional duties owed for this classification.

## **CONCLUSION**

For these reasons, the Court should grant the Government's cross-motion for summary judgment, deny BASF's motion for summary judgment, enter judgment in the Government's favor, and order reliquidation of the subject entries under subheading 2106.90.99, HTSUS (2011 and 2012) or 2106.90.98, HTSUS (2018), depending on the date of entry.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel:*                                     /s/ Luke Mathers
Michael A. Anderson                   LUKE MATHERS
Office of the Assistant Chief Counsel   Trial Attorney
International Trade Litigation           Department of Justice, Civil Division
U.S. Customs and Border Protection    Commercial Litigation Branch
                                                    26 Federal Plaza, Room 346
                                                    New York, New York 10278
                                                    (212) 264-9236
Dated:  July 2, 2024                        *Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Consol. Court No. 13-00318 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

## <u>CERTIFICATE OF COMPLIANCE</u>

I, LUKE MATHERS, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief in support of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 9,345 words.

/s/ Luke Mathers
LUKE MATHERS