

Barnes, Richardson & Colburn, LLP
New York / Chicago / Washington, DC

100 William Street, Suite 305
New York, NY  10038

Tel:  212-725-0200
Fax:  212-889-4135
www.barnesrichardson.com

303 East Wacker Drive
Suite 305
Chicago, IL  60601
Tel:  312 565-2000
Fax:  312 565-1782

1850 M Street, NW
Suite 1060
Washington, DC  20036
Tel:  202 483-0070
Fax:  202 483-0092

August 22, 2024

**By CM/ECF**

Joseph A. Laroski, Jr., Judge
U.S. Court of International Trade
One Federal Plaza
New York, NY 10279

   Re: *BASF Corporation v. United States*,
     Consol. Ct. No. 13-00318
     <u>Corrections Made in Corrected Filing</u>

Dear Judge Laroski:

  Plaintiff BASF Corporation by its undersigned counsel is writing to advise the Court of certain corrections being made to Plaintiff's Response in Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment, ECF No. 76, ("Response Papers") which was filed with the Court on August 20, 2024.  After filing the Response Papers, the undersigned counsel was advised by defendant's counsel that a reference to a chapter note made on page 42, footnote 14 of the Response Papers was incorrect, in that the note cited, Note 6 to Chapter 4, was not part of the Harmonized Tariff Schedule of the United States on the dates the entries in this case were made. Plaintiff's counsel confirmed that to be accurate and requested direction from the Court on how to correct this error.  The Court advised to file a full corrected version of the Response Papers, including all attachments and exhibits, and to provide the Court a letter stating the corrections made and confirming that no other changes have been made other than those identified in the letter.  Toward that goal, plaintiff submits this letter.



Joseph A. Laroski, Jr., Judge                                    August 22, 2024
U.S. Court of International Trade                                          Page 2

Changes have been made in two places in the Response Papers.  First, the citation in the Table of Authorities, at page v, to "Chapter 04, Note 6 . . . . . . . . .[p.] 42" has been completely redacted.

Second, the second paragraph of footnote 14 on page 42 of the Response Papers has been edited to remove reference to Note 6, and then revised accordingly. More specifically, the second paragraph has been edited to redact the content shown below in red strikethrough:

> One last point on heading 0410.  In its Cross-Motion, defendant states that the heading covers only "edible things that animals themselves have generated but that have not been prepared in any way beyond being preserved."  *Id.*  ~~The heading, however, includes insects, which are defined by Note 6 to Chapter 0410 as "[f]or the purposes of heading 0410, the term "insects" means edible non-living insects, whole or in parts, fresh, chilled, frozen, dried, smoked, salted or in brine, as well as flours and meals of insects, fit for human consumption."~~  Heading 0410~~, therefore,~~ captures more than things animals themselves have generated (as per defendant's position) and includes as edible products of animal origin ~~processed products such as flours and meals of insects, or, as per the *Marcor* court,~~ mixtures of shark fin cartilage and dextrin.

Then edits were made to complete and provide context for the remaining paragraph, which edits are shown below in red font:

> One last point on heading 0410.  In its Cross-Motion, defendant states that the heading covers only "edible things that animals themselves have generated but that have not been prepared in any way beyond being preserved."  *Id.*  As per the *Marcor* court, however, the mixture of shark fin cartilage and dextrin was classifiable in heading 0410. Therefore, heading 0410 captures more than things animals themselves have generated (as per defendant's position) and includes processed products as edible products of animal origin.

Joseph A. Laroski, Jr., Judge                                    August 22, 2024
U.S. Court of International Trade                                         Page 3


     Plaintiff also confirms that these are the only edits made in the corrected version of the Response Papers. Thank you for your consideration and be assured of our prompt and full cooperation in the event you have any questions.


                                Sincerely,


                                /s/Frederic D. Van Arnam, Jr.
                                Frederic D. Van Arnam, Jr.

                                *Counsel for BASF Corporation*


FDVA/ep

cc:     Luke Mathers by CM/ECF
         Trial Attorney
         Department of Justice, Civil Division

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., JUDGE

_____
                                              :
BASF CORPORATION,                             :
                                              :
                          Plaintiff,          :
                                              :
            v.                                :    Consol. Court No. 13-00318
                                              :
UNITED STATES,                                :
                                              :
                          Defendant.          :
_____       :

## **PROPOSED ORDER**

Upon considering Plaintiff's Motion for Summary Judgment, Defendant's

Cross-Motion for Summary Judgment, and upon consideration of other papers and

proceedings had herein, it is hereby

**ORDERED** that Plaintiff' Motion for Summary Judgment be, and hereby is

granted; and it is further

**ORDERED** that Defendant's Cross-Motion for Summary Judgment be, and

hereby is denied; and it is further

**ORDERED** that Defendant shall reliquidate all entries of Omevital® 3322

EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, Omevital® 3426 EE and

PronovaPure® 150:500 EE under subheading 1603.00.90, HTSUS; and it is further

**ORDERED** that Defendant shall refund all excess duties collected on the imported merchandise, with interest as provided for by law.

_____
Joseph A. Laroski, Jr., Judge

Dated: _____
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., JUDGE

_____

|  |  |  |
|---|---|---|
| | : | |
| BASF CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Consol. Court No. 13-00318 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

_____

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
BARNES, RICHARDSON & COLBURN, LLP
100 William Street, Suite 305
New York, New York 10038

Tel: (212) 725-0200, ex. 126
rvanarnam@barnesrichardson.com
*Attorneys for Plaintiff*

Dated:      August 20, 2024
            New York, New York

TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................i-ii

TABLE OF AUTHORITIES ..........................................................................iii-vii

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT..................................1

SUMMARY OF ARGUMENT .........................................................................2

ARGUMENT ..................................................................................................6

     A.    Plaintiff's Motion Should be Granted
         Because the Imported Fish Oil Ethyl Ester
         Concentrates are "Extracts . . . of . . . Fish"
         for Purposes of Heading 1603 ...............................................................6

          1.    Use as a Concentrated Flavoring for Food is not
                a Condition for Classification in Heading 1603...........................8

          2.    Heading 1603 Does Not Require that Extracts Have
                the Same "Odor, Color, or Taste" of the Fish from Which
                they are Derived .........................................................................13

          3.    The Transesterification Process Creates a Product
                that Meets the *Marcor* and *Jedwards* Definition
                of an Extract ..............................................................................17

          4.    Crude Fish Oil is Part of the Organic
                Structure of the Fish ................................................................23

          5.    BASF's Fish Oil Ethyl Ester Concentrates Have the
                Essence of Fish as Made Evident by the Presence of
                EPA, DHA and Other Fatty Acids .............................................26

     B.    The Defendant's Cross-Motion Must be Denied as the
         Imported Merchandise is Specified or Included
         Elsewhere in Heading 1603 ..................................................................30

1.    The Goods are Excluded from Headings 2106
      and 3824 Because they are Classified in
      of Heading 1603.............................................................30

2.    Note 1(b) to Chapter 38 Does Not Direct
      the Imported Goods into Heading 2106..........................................31

3.    Note 1(e) to Chapter 21 Directs
      the Imported Goods into Heading 1603..........................................34

4.    The World Customs Organization Opinion Is Inapposite
      for Determining if the Imported Goods
      are Classified in Heading 1603.....................................................37

5.    Defendant Has Not Established
      Authority to Assert a Counterclaim
      in a Classification Case...............................................................39

CONCLUSIONS .............................................................................49

CERTIFICATE OF COMPLIANCE ........................................................50

TABLE OF AUTHORITIES

CASES                                                                                      PAGE

*Am. Net. & Twine Co. v. Worthington*
141 U.S. 468 (1891) ............................................................................ 7

*Anhydrides & Chems., Inc. v. United States,*
130 F.3d 1481 (Fed. Cir.1997) ......................................................... 7

*BFP v. Resolution Trust Co.,*
511 U.S. 531 (1994) ............................................................................ 9

*CamelBak Prods., v. United States,*
649 F.3d 1361 (Fed. Cir. 2011) ........................................................ 3

*Carl Zeiss, Inc. v. United States,*
195 F.3d 1375 (Fed. Cir. 1999) ........................................................ 9

*Cummins Inc. v. United States,*
54 F.3d 1361 (Fed. Cir. 2006) ................................................... 37, 38

*Cyber Power Sys. (USA) Inc. v. United States,*
586 F. Supp. 3d 1325 (CIT 2022) ............................................. passim

*Hernandez. v. Mesa,*
589 U.S. 93 (2020) ............................................................................ 42

*Intel Corp. Inv. Pol'y Comm v. Sulyma,*
589 U.S. 178 (2020) ............................................................................ 9

*Jarvis Clark Co. v. United States,*
733 F.2d 873 (Fed. Cir. 1984) .................................................... passim

*Jedwards Int'l, Inc. v. United States,*
161 F. Supp. 3d 1354 (Ct Int'l Trade 2016) .............................. passim

*Logictech, Inc. v. United States,*
532 F. Supp. 3d 1358 (Ct Int'l Trade 2021) .............................. passim

*Maple Leaf Mktg, Inc. United States,*
639 F. Supp. 3d 1363 (CIT 2023) ................................. 39, 40, 45, 46, 48

*Marcor Development Corp. v. United States*,
926 F. Supp. 1124 (1996) ............................................................................*passim*

*Mitsubishi Int'l Corp. v. United States*,
5 F. Supp 2d 991 (Ct Int'l Trade 1998) aff'd 182 F. 3d 884 (Fed. Cir 1999) ...... 46, 47

*National Advanced Sys. v. United States*,
26 F.3d 1107 (Fed. Cir. 1994) ................................................................... 10

*Nidec Corp. v. United States*,
68 F.3d 1333 (Fed. Cir. 1995) ...................................................................... 8

*Plexus Corp. v. United States*,
489 F. Supp. 3d 1379 (Ct Int'l Trade 2020) .............................................. 15

*Rollerblade, Inc. v. United States*, 282 F.3d 1349
(Fed. Cir. 2014) ....................................................................................9, 30

*Rubie's Costume Co. v. United States*,
337 F.3d 1350 (Fed. Cir. 2003) ................................................................. 15

*Sanchez-Llamas. v. Oregon*,
548 U.S. 331 (2006) .................................................................................. 38

*Schlumberger Tech. Corp. v. United States*,
845 F.3d 1158 (Fed. Cir. 2017) ................................................................... 8

*S.C. Johnson & Sons Inc. v. United States*,
999 Fed. 3d 1382 (Fed. Cir. 2021) ........................................................... 10

*Second Nature Designs, Ltd. v. United States*,
586 F. Supp. 3d 1334 (CIT 2022)...........................................39, 45, 46, 48

*Second Nature Designs, Ltd. v. United States*,
654 F. Supp. 3d 1301 (Ct Int'l Trade 2023) ....................................39, 44, 45, 46, 48

*United States v. Bajakajian*,
524 U.S. 321 (1998)................................................................................. 41

*United States v. Carnegie*,
8 C.P.P.A. 377 (1918)......................................................................... 23, 26

*United States v. Geo. S. Bush & Co.*,
24 C.C.P.A. 313 (1936)........................................................................ 24, 25

iv

*United States v. Greek Orthodox Church of Evangelismo,*
49 C.C.P.A. 35, 40 (1962) ................................................................. 7

*United States v. Wurts,*
303 U.S. 414 (1938) ...................................................................... 41

*Winter-Wolff, Inc. v. United States,*
996 F. Supp. 1258 (Ct Int'l Trade 1998) ................................... 38

## STATUTES AND REGULATIONS

19 U.S.C. § 1202 ........................................................................40

1 9 U.S.C. § 1501..........................................................................41

1 9 U.S.C. § 1514(a) ....................................................................40

28 U.S.C. § 1581........................................................................*passim*

28 U.S.C. § 1582 ..................................................6, 41, 44, 45

28 U.S.C § 1583 .......................................................... *passim*

19 U.S.C. § 1592.........................................................................41

28 U.S.C § 2643(b) ...............................................6, 43, 45, 47

28 U.S.C § 2643(c).................................................6, 44, 45, 47

USCIT Rule 56...............................................................................1

General Rule of Interpretation Rule 3(a).............................7

General Rule of Interpretation Rule 3(b).............................7

General Rule of Interpretation Rule 3(c)..........................7, 8

Heading 0410 ...............................................................................42

Heading 1603 ...................................................................*passim*

Subheading 1603.00.90......................................................................................*passim*

Chapter 21, Note l(e) .........................................................................2, 5, 34, 35, 37

Heading 2106 ......................................................................................*passim*

Subheading 2106.90.98 ......................................................................................39

Subheading 2106.90.99......................................................................................39

Chapter 38, Note l(b) ...........................................................................5, 31, 32, 33

Heading 3824 ......................................................................................*passim*

Subheading 3824.90.40......................................................................................31

Subheading 3824.90.41.................................................................................12, 31, 33

Subheading 3824.99.41......................................................................................31

OTHER AUTHORITIES

USCBP Ruling N316256 (Dec. 4, 2020) ...................................................................11

USCBP Ruling N327097 (Aug. 11, 2022)..................................................................11

USCBP Ruling N326884 (July 19, 2022) ..................................................................11

Explanatory Notes to the Harmonized Commodity
Description and Coding System to Section 16.03................................................14, 15

Classification of Two Products Called xxx and xxx (Requested Norway)
Harmonized System Committee, World Customs Organization
Doc. No. NC2344E1 (Feb. 7, 207)..................................................................5, 37, 38

The American Heritage Dictionary of the English Language,
(5th ed. 2005) ......................................................................................18

Oxford Dictionary of Biochemistry and Molecular Biology (2nd. ed. 2006)..............18

"Fish Oil Handling/Processing" *Technical Evaluation Report
compiled for USDA National Organic Program*, (Mar. 5, 2015)..............................26

vi

Ciriminna, Meneguzzo, Delisi, Pagliaro, "Enhancing and
Improving the Extraction of Omega-3 from Fish Oil" (2017),
*Sustainable Chemistry and Pharmacy* 5 (2017) ...............................................21, 22

Mingruo Guo Dr., "Lipids and Lipid Related Functional Foods",
*Functional Foods: Principles and Technologies* 161 (2009). .........................23, 35

Rocha, F.R.P; Zagatto, E.A.G., "Chemical Derivatization in Flow Analysis,"
*Molecules*, (2022).......................................................................................................17

Wilson, I.D.; Adlard, E.R.; Cooke, M.; Poole, C.F. "Derivatization",
*Encyclopedia of Separation Science*; (2017)...........................................................17

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JOSEPH A. LAROSKI, JR., JUDGE

```
_____
                                        :
BASF CORPORATION,                       :
                                        :
                    Plaintiff,          :
                                        :
          v.                            :    Consol. Court No. 13-00318
                                        :
UNITED STATES,                          :
                                        :
                    Defendant.          :
_____ :
```

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the U.S. Court of International Trade, plaintiff BASF Corporation respectfully submits this response to defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment. For ease of readability, BASF will refer to the defendant's consolidated cross motion and opposition as its "Cross-Motion."[1]

---

[1] As to the Cross-Motion, ECF. No. 71, the defendant bears the burden of proving that there are no genuine issues of material fact, and BASF receives the benefit of all reasonable inferences. *See* USCIT Rule 56(c).

In support of its opposition to the defendant's Cross-Motion, BASF incorporates by reference its Motion for Summary Judgment, Memorandum in support thereof and all materials and exhibits attached thereto in support. *See* ECF. No. 68. Hereafter, reference to plaintiff's summary judgment motion and memorandum will be to plaintiff's "Motion." Reference to this Opposition to Defendant's Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment shall be to plaintiff's "Response Memorandum."

,

## I.     SUMMARY OF ARGUMENT

The defendant's Cross-Motion fails to establish that the imported products are not extracts of fish under subheading 1603.00.90 or that the imported merchandise is not excluded from Chapter 21 by application of Note 1(e).  The imported products are fish oil ethyl ester concentrates that are rich in the omega-3 fatty acids eicosapentaenoic acid ("EPA") and docosahexaenoic acid ("DHA").  The fish oil ethyl ester concentrates are created when triglyceride-based crude fish oil is purified and then transesterified, severing via chemical reaction the desired fatty acids present in the crude fish oil, including the EPA and DHA, from the glycerol backbone of the triglyceride esters that make up crude fish oil.  Then, each free fatty acid from the fish oil attaches to an ethanol molecule, resulting in the creation of three fatty acid ethyl esters.  These resulting fatty acid ethyl esters are concentrated to isolate and maximize the desired omega-3 fatty acid ethyl esters, the ones containing the EPA and DHA fatty acids originally present in the crude fish oil.  Like the triglyceride-based fish oil from which the imported goods are directly produced, the imported fish oil ethyl ester concentrates are oily, viscous, lipidic substances referred to as oils in the omega-3 industry.  They are light yellow in color, with a slight fish taste and smell.

Notwithstanding all this, the defendant argues that the imported products are not extracts of fish for tariff purposes.  This argument fails under the weight of the principles of tariff construction as applied to the facts, which establishes that 1) the tariff heading reference to "extracts" in heading 1603 provides for preparations

containing the essence of the substance from which they are derived; 2) the essence of a substance is the intrinsic or indispensable quality or qualities that serve to characterize or identify something; 3) the essences of the imported products and of their crude fish oil starting material are imparted by the fatty acids, especially the omega-3 fatty acids EPA and DHA, which are severed from the crude fish oil and transesterified from a triglyceride ester form into the imported ethyl ester form; and 4) the crude fish oil (i.e., the raw ingredient starting material for the imported merchandise) is part of the flesh or organic structure of fish and thus is considered fish for tariff purposes. For the reasons stated below, the Court should grant plaintiff's Motion and deny the defendant's Cross-Motion.

The defendant advances several arguments as to why the Court should not classify the imported merchandise under heading 1603 and should classify it under heading 2106. None have merit.

First, defendant argues that heading 1603 is a use provision predicated on the imported product being used as a concentrated flavoring for food. Heading 1603 is not a use provision. Instead, heading 1603 is an *eo nomine* tariff provision that incorporates all forms of the named article including improved forms, in this case, all forms of extracts of fish. *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364–65 (Fed. Cir. 2011). It does not require that an extract of fish have the "odor, color or taste" of fish to stay within the heading. It does not prohibit extracts that result from chemical reactions. And it must be construed in accordance with the historical tariff meaning of "fish" to include the flesh or organic structure of the

animal fish, which would include crude fish oil.  Instead, the test articulated in
*Marcor Development Corp. v. United States,* 926 F. Supp. 1124 (CIT 1996) and in
*Jedwards Int'l, Inc. v. United States*, 161 F. Supp. 3d 1354 (CIT 2016), is whether
the imported merchandise is "'a preparation containing the essence of the substance
from which it is derived.'"  *Jedwards*, 161 F. Supp. 3d at 1358, *quoting Marcor*, 926
F. Supp. *at* 1132-33 (CIT 1996).  BASF has set out in detail in its Motion, ECF
No.68, and in this Response Memorandum, how the essence of the fish oil, which
essence is imparted by the EPA and DHA omega-3 and other fatty acids, is
transferred into the imported fish oil ethyl ester concentrates, and that the crude
fish oil is part of the organic structure of the fish, making it fish for tariff purpose.
As such, the imported fish oil ethyl ester concentrates have the fundamental
properties of the fish (*i.e*: the EPA and DHA omega-3 and the other fatty acids), but
now in concentrated form.  They are "[e]xtracts . . . of . . . fish" for purposes of
heading 1603.  Plaintiff's motion for summary judgment must be granted.

Second, defendant argues that the imported fish oil ethyl ester concentrates
are not provided for in heading 1603.  For this reason, defendant's Cross-Motion
must be denied.  Defendant fails to change the clear meaning of "extracts" in
heading 1603 from "a preparation containing the essence of the substance from
which it is derived" to one more favorable to its position.  As such, the imported fish
oil ethyl esters are classifiable under heading 1603. That means they are "elsewhere
specified or included."  Being so, headings 2106 and 3824 are not legally sustainable
tariff classifications because both those provisions only include goods **not**

"elsewhere specified or included."

Third, defendant's arguments on the tariff meanings of Note 1(b) to Chapter 38 and Note 1(e) to Chapter 21 miss the mark. The plain meaning of both notes directs the imported goods out of heading 2106. The imported fish oil ethyl ester concentrates are not "[m]ixtures of chemicals with foodstuffs or other substances with nutritive value" as defined in Chapter 38, Note 1(b) because no foodstuffs or other substances with nutritive value are mixed with the fatty substances of fish origin that make up the imported goods. Furthermore, the fish oil ethyl ester concentrates are more than 20 percent fish by weight because the weight of the various fatty acids and other fatty substances provide well more than 20 percent of the weight of the imported merchandise. As such, the goods are excluded from Chapter 21 by application of Note 1(e) to that chapter.

Fourth, defendant cites a WCO opinion as support for its argument that the imported merchandise is classifiable under heading 2106. That opinion, however, did not consider classification of the products under heading 1603, which is the issue before this Court. As such, the opinion has no persuasive authority on the threshold issue this Court must resolve.

Fifth, defendant failed to establish a basis, statutory or otherwise, for its counterclaim cause of action, which therefore must be dismissed. At best, it is an affirmative defense. As an affirmative defense, it is not a cause of action seeking affirmative relief upon which this Court can enter a judgment awarding defendant money damages. Neither *Jarvis Clark Inc. v. United States*, 733 F.2d 878 (Fed. Cir.

1984) nor 28 U.S.C. §2643(b) or (c) provide a statutory basis for this Court to order money damages. In this case before the Court, no cause of action exists under 28 U.S.C. §§1581, 1582, or 1583 providing the United States a path to reclassify merchandise or to collect duties on those liquidated entries in excess of the duties assessed at liquidation.

Accordingly, BASF is entitled to summary judgment, and this Court should classify the imported merchandise in subheading 1603.00.90. If this Court determines that subheading 1603.00.90 is the legally sustainable tariff classification, then defendant's arguments for classification in either headings 2106 or 3824 are moot, as each is a basket, residual provision that only applies if the imported merchandise is "not elsewhere specified or included."

## II.    ARGUMENT

A.    *Plaintiff's Motion Should Be Granted Because the Imported Fish Oil Ethyl Ester Concentrates are "Extracts . . . of . . . Fish" for Purposes of Heading 1603.*

In its Cross-Motion, the defendant side-steps discussing the legal construction of heading 1603 made and used in *Marcor Development Corp. v. United States,* 926 F. Supp. 1124 (CIT 1996) and in *Jedwards Int'l, Inc. v. United States*, 161 F. Supp. 3d 1354 (CIT 2016). Those courts construed the reference to 'extracts' in Heading 1603 to be "**a preparation containing the essence of the substance from which it is derived**." *Jedwards* at 1358, *quoting Marcor at*

1132-33 (CIT 1996) (emphasis added).  Applying this test, BASF's fish oil ethyl ester

concentrates are within the scope of heading 1603, as the essence of the imported

product is imparted by the EPA and DHA omega-3 fatty acids and the other fatty

acids extracted from the crude fish oil and then concentrated as fish oil ethyl ester

concentrates.  Defendant puts forward various constructions on the meaning of

heading 1603, each of which must be rejected as not legally sustainable.[2]

_____

[2]  Defendant contests plaintiff's citation to *Am. Net & Twine Co. v. Worthington*, 141 U.S. 468, 474 (1891) and *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997).  These cases stand for the proposition that ambiguity in classification cases is resolved in favor of the importer.  In response, the defendant argues that this "substantive canon did not survive the New Deal-era Supreme Court," and cites a law review article on tax law as support. Regardless of the author of that law review's opinion, the Federal Circuit in the *Anhydrides & Chems., Inc.* decision, **issued in 1997**, thus well post the New Deal Supreme Court period, called out as applicable this rule of liberal construction in favor of importers.  *Anhydrides & Chems., Inc*, 130 F.3d at 1485.  Thereafter, *Anhydrides & Chems., Inc* was cited as authority for this proposition in *Logitech, Inc. v. United States*, 532 F. Supp. 3d 1358, 1364 (Ct Int'l Trade 2021) ("A corollary is 'the rule of construction of revenue statutes whereby unclear or ambiguous tariff classifications have traditionally been resolved in favor of the importer.' *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997) (*citing*, inter alia, *United States v. Greek Orthodox Church of Evangelismo*, 49 CCPA 35, 40 (1962) (referring to the 'rule of liberal construction in favor of the importer'))."  It seems that, at least in Customs duty cases, this canon of statutory construction survives.

Defendant also cites General Rule of Interpretation ("GRI") 3(c) as support for its argument that the rule of liberal construction in favor of importers is no longer applicable.  Defendant's argument is misplaced. GRI 3(c) resolves classification disputes when the imported merchandise is classifiable under two or more headings, in which case the heading last in numerical order would prevail, assuming the classification could not be resolved pursuant to GRI 3(a) or 3(b).  In this case, however, GRI 3(c) has no application because both headings 2106 and 3824 are residual, catch all provisions that apply only when no other tariff provision provides for the goods.  In this regard, the issue before the Court is binary.  If the imported merchandise is provided for by heading 1603 as argued by plaintiff, then it is provided for elsewhere and cannot go into either heading 2106 or 3824.  If it does not go into heading 1603, then the court must decide if it goes into either 2106 or

1.    Use as a Concentrated Flavoring for Food
is not a Condition for Classification in Heading 1603

Defendant offers a new construction of the legal meaning of heading 1603, one that limits the heading to concentrated flavorings **used** as flavorings for food. *See* Cross-Motion at ECF. No.71, at p. 12 ("'Extracts'" Are Concentrated Flavorings for Food . . .") and p. 16 ("BASF's merchandise is thus not the sort of savory flavoring that heading 1603 describes"). This construction fails for the following reason and must be rejected as legally deficient as an improper attempt to expand the clear meaning of the heading as construed by the *Marcor* and *Jedwards* courts.

There are three main types of headings under the Harmonized Tariff Schedule of the United States ("HTSUS"): *eo nomine*, use, and basket provisions. An *eo nomine* provision describes commodities by well-known names or terms and includes all items falling into that category regardless of form. *Nidec Corp. v. United States,* 68 F.3d 1333, 1336 (Fed. Cir. 1995). A use provision, however, describes articles by their principal or actual use. *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017). Basket provisions are residual, catch-all provisions that capture goods not elsewhere classifiable in the tariff.

---

3824. The imported merchandise will never be classifiable in two or more headings so GRI 3(c) will not be implicated in this case.

Furthermore, the "ambiguity" that the canon seeks to resolved in favor of the importer is any ambiguity that may arise when a court construes the meaning of a tariff heading and other section and chapter notes. Thus, any ambiguity as to the meaning of heading 1603 and its reference to "[e]xtracts . . .of . . . fish" is to be resolved in favor of the importer BASF.

*Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002) (basket provisions are tariff provisions stating "not specified or included elsewhere" or similar language).[3]

On its face, heading 1603 does not define its scope by reference to the "use" of the extract, but rather is an *eo nomine* provision that includes all forms of extracts of fish. Had the drafters intended to make heading 1603 a use provision in the way the defendant is currently arguing, they could have drafted it that way: "Extracts of . . .fish . . . [used as flavorings for food]". *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 186 (2020) (courts "'generally presum[e] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another'" quoting *BFP v. Resolution Trust Co.*, 511 U.S. 531, 537 (1994)). Congress not having done this, this Court should not read a use limitation into a non-use, *eo nomine* provision unless the provision "itself inherently suggests a type of use." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). Nothing about the express language of the heading inherently suggests that the extract be designated for the specific use of flavoring food.

Notwithstanding that legal principle, the defendant is trying to do just that,

---

[3] Headings 2106 and 3824 are examples of catch all, basket provisions that only capture goods not elsewhere classifiable in the tariff.

by arguing that heading 1603 covers only "concentrated flavoring for food." This, of course, is contrary to the construction used in both *Marcor* and *Jedwards*, where those courts construed the common and commercial meaning of the phrase "[e]xtracts of . . . fish" through reference to dictionaries and other lexicons and held that an extract is a preparation containing the essence of the substance from which it is derived.  This definition does not suggest a specific type of use, much less one limiting extracts of fish to extracts of fish used to flavor foods.  *See S.C. Johnson & Sons Inc. v. United States*, 999 F. 3d 1382, 1389-90 (Fed. Cir. 2021) (definitions used to construe "household" and "article" did not suggest that heading 3924 --"other household articles . . . of plastics" -- required a certain type of use).  Instead, the drafter of heading 1603 set out an *eo nomine* tariff provision that covers extracts of fish (and meat, crustaceans, mollusks, or other aquatic invertebrates) regardless of how it is used, and in all forms.  *See National Advanced Sys. v. United States*, 26 F.3d 1107, 1111 (Fed. Cir. 1994) (absent limiting language or indicia of contrary legislative intent, *eo nomine* tariff provisions cover all forms of the named article).

Nevertheless, the defendant cites both *Marcor* and *Jedwards* as supporting its position that extracts of fish must be used to flavor foods.  *See* Cross-Motion at ECF. No.71, at p. 15. This position is not supported by either case or by the historical actions of U.S. Customs and Border Protection ("CBP" or "Customs").

Most damning to the defendant's argument is the *Jedwards* decision. In that case, the imported merchandise, krill oil rich in EPA and DHA fatty acids, was imported in bulk, and then distributed to manufacturers for encapsulation and

distribution as **human nutritional supplements in capsules**. *See* Joint Statement of Undisputed Facts # 3, 6, *Jedwards Int'l, Inc. v. United States*, Court No. 11-00031, ECF No. 38. *See also*, *Jedwards*, 161 F. Supp. 3d 1354, 1357 (krill oil marketed as a nutritional substance). The krill oil was not imported for use as a flavoring for food. Instead, exactly like BASF's imported products, the krill oil was imported for encapsulation and sale as human nutritional supplements as "Krill Oil Superba™." The *Jedwards* court held that heading 1603 provided for the krill oil as an extract, even though it was to be used as a human nutritional supplement rather than as a concentrated flavoring for food. *Id.* at 1362.

Customs, as well, has a history of classifying similar oil products under heading 1603, notwithstanding that those oil products are intended for use as nutritional supplements or other nutraceuticals and not as concentrated flavoring for food. In ruling N316256 (Dec. 4, 2020), CPB classified a mixture of green lipped mussel oil blended with turmeric oil, virgin olive oil and vitamin E and encapsulated in a soft gel capsule in subheading 1603.00.9010. The agency made no mention of heading 1603 being conditioned on the imported product being used as concentrated flavoring for food; if it had, the imported products, being used as nutraceuticals, would have eliminated heading 1603 as a classification. Likewise, in N327097 (Aug. 11, 2022), CBP issued a binding tariff ruling classifying pure caviar oil in subheading 1603.00.9090. In that ruling, the agency recognized the use of the oil in food and cosmetic applications but made no mention that it was to be used as a flavoring. Similarly, in N326884 (July 19, 2022), the agency classified

11

krill oil imported to be encapsulated as a dietary supplement in subheading 1603.00.9090. Again, use as a concentrated flavoring for food was not a factor in any of CBP's above-cited decisions, copies of which are set out as Plaintiff's Exhibit ("Pl. Ex.) 18.

Lastly, on five separate occasions CBP granted administrative protests filed by BASF, reclassifying BASF's PronovaPure fish oil ethyl ester concentrates, including PronovaPure® 150:500 EE, from subheading 3824.90.41 to subheading 1603.00.90. In its rule 30(b)(6) deposition, the defendant acknowledged that it had granted these protests, reclassifying the goods in subheading 1603.90.00:

> Q.    Can you look at the first page [of the protest], please, and if you will look at box 18, can you tell me what the disposition of this protest was?
>
> A.    It says agree with 1603.
>
> Q.    . . . So this appears to be a protest where Customs granted BASF's request for reclassification of this merchandise, ethyl ester fish oil merchandise, under . . . [subheading] 1603.00.90 . . . and you agree with that?
>
> A.    Yes.

Pl. Ex. 19, Deposition Transcript of USCIT Rule 30(b)(6) of Defendant by John E. Rhea ("Rhea Dep.") p. 57: 2 – 15; *see generally id*, pp 55 - 57. These protests were granted, and these shipments classified in subheading 1603.00.90, notwithstanding that BASF's imported products were to be encapsulated by its customer in gelatin capsules and then sold as omega-3 fish oil supplements and not used as flavoring for food.

2.    Heading 1603 Does Not Require that
Extracts Have the Same "Odor, Color or Taste"
of the Fish from Which they are Derived.

In addition to making the flawed argument that heading 1603 requires an

extract be used as a concentrated flavoring for food, defendant makes a second

unsupported argument that extracts of fish must have the same "odor, color or

taste" of fish to stay within heading 1603, citing *Marcor* and *Jedwards* as so

holding.  Cross-Motion at ECF. No.71, at pp. 18 - 20.  In *Marcor,* the shark cartilage

protein food grade product did not have the same odor, color or taste of shark

cartilage.  *Marcor*, 926 F. Supp. at 1133.  Alternatively, the *Jedwards* court noted

that the imported krill oil had a dark color and a strong odor. *Jedwards*, 161

F.Supp. 3d at 1356.

The defendant's attempt to define the heading in terms of odor, color or taste

fails under the weight of the very cases it cites.  The defendant argues that the

*Marcor* court "held" that the imported merchandise was not classifiable under

heading 1603 because it lacked the odor, color or taste of shark fin.  Cross-Motion at

ECF. No. 71, at p. 15.  To the contrary, in addition to odor, color and taste, the court

noted other criteria, when viewed as a whole, pushed the imported product out of

heading 1603:  the finished product contained approximately 50 percent dextrin (an

added ingredient with no relationship to fish); it was not concentrated; and as a

mixture of approximately 50 percent shark fin cartilage and 50 percent dextrin, the

imported merchandise was neither fish flesh nor fish meal.  Odor, color or taste

were simply factors in the court's determination of whether the approximately 50

13

percent shark fin cartilage and 50 percent dextrin powder mixture was a preparation containing the essence of fish.

On the other hand, in *Jedwards*, the court's mention of the krill oil's color and strong odor is found only once, in the "undisputed facts" section of the opinion. The *Jedwards* court never cites these physical characteristics as reasons to include or exclude a product as an extract of heading 1603. *Jedwards*, 161 F.Supp. 3d at 1356. To suggest otherwise is unsupported by the decision.[4]

The defendant's attempt to read into heading 1603 these criteria as dispositive factors is undercut further by the Explanatory Notes ("*ENs*") to Section 16.03. *See Explanatory Notes to the Harmonized Commodity Description and Coding System* at 16.03. While the *ENs* references odor, color and taste (as **"appearance, odour, flavour"**) (emphasis added), the reference is not a comparison of the odor, color and taste of the extract to that of the material from which the extract is taken. Instead, it is a reference to general characteristics of the different types of products classifiable as extracts of heading 1603: "[t]hough obtained from different sources, the extracts of this heading have very similar physical characteristics (appearance, odour, flavour, etc.) and chemical composition." *ENs at 16.03.* As for "appearance, odour, flavour," the *ENs* state

---

[4] The defendant also quotes *Jedwards*' reference to the krill oil product only containing substances naturally occurring in krill. *See* Cross Motion at ECF. No. 71 at p. 15, *quoting Jedwards*, 161 f. Supp. 3d at 1357-58. The krill oil in *Jedwards*, however, also contained residual ethanol. *Jedwards* at 1357. In addition, the ENs to 16.03 recognize that articles of that heading can have added preservatives, like the alpha tocopherol added to preserve the BASF fish oil ethyl ester concentrates. *See ENs at 16.03* ("All these products may contain salt or other substances added in sufficient quantities to ensure their preservation").

that extracts of heading 1603 can be in solid or liquid form ("appearance"), and as

for "flavour," recognize that steps can be taken to limit or remove an unpalatable

taste. *Id.* ("during the production all or part of the constituents which give the fishy

taste (e.g., trimethylamine in the case of sea fish) may be eliminated and such

extracts therefore have characteristics similar to those of meat extracts"). While

"odour" is not discussed in the *ENs*, if steps can be taken to limit or remove a

particular taste and remain in heading 1603, then, consistent with this approach,

steps to reduce or remove a particular odor, such as when raw materials are

processed and refined into palatable consumer products, would not be a reason to

reject heading 1603. Color is not mentioned as a factor.

Thus, the ENs establish that extracts of heading 1603 can have different

physical appearances, odors and flavors than their starting material.[5] In the case of

---

[5] The *Marcor* court read the ENs to heading 1603 as limiting extracts of fish to those derived by concentrating water. *Marcor*, 926 F. Supp. at 1133. This read of the ENs, however, disregards the fact that the reference to using water to concentrate is predicated by "e.g." – "Extracts of fish are obtained, **e.g.,** by concentrating water extracts of the flesh of herring or other fish or made from fish meal (whether or not defatted)" (emphasis added). Of course, e.g. is from the Latin *exempli gratin*, meaning "for the sake of example." Its use in the ENs is not meant to limit extracts of fish to those derived via water concentration or made from fish meal. To the contrary, its use has the opposite effect, as it gives two examples ("e.g."), but not the only examples, of how an extract of fish can be obtained.

Furthermore, examples given in the ENs are not to be read as limiting the language of the heading being construed by the reviewing court. *Plexus Corp. v. United States*, 489 F. Supp. 1379, 1396-97 (Ct Int'l Trade 2020) ("[t]his Court and the U.S. Court of Appeals for the Federal Circuit . . . have rejected similar attempts to use ENs to interpret a heading as narrower than its plain meaning interpretation. *See Rubie's Costume Co. v. United States* 337 F.3d 1350, 1359 (Fed. Cir. 2003); *Apple Inc. v. United States*, 43 CIT __, 375 F. Supp. 3d 1288, SLIP OP. 2019-32 (2019), *aff'd*, 964 F.3d 1087 (Fed. Cir. 2020)"). Nothing about the tariff language of heading 1603 suggests that extracts of fish are limited to extracts

BASF's fish oil ethyl ester concentrates, they are an oily, viscous, lipidic substance. Plaintiff's Statement of Additional Undisputed Material Facts (Pl's AUMF), ECF No. 68, Att. # 2 at ¶1. They have a slight fish oil odor and taste, but less so than the crude fish oil starting material, and they are a light-yellow color, whereas the crude fish oil is a darker brown. Statement of Undisputed Material Facts (SUMF), ECF No. 68, Att. # 1 at ¶¶29, 30, 31. This makes sense, as the imported merchandise is now a refined product, ready for human consumption, while the crude fish oil starting material is not. While the imported merchandise only mildly smells like, tastes like[6], or has the color of crude fish oil does not change the fact that the essence of fish, passed forward into the fish oil ethyl ester concentrates by the EPA and DHA omega-3 and other fatty acids, comes from the organic structure of the fish from which the crude fish oil originated. The fish oil ethyl ester concentrates "possess the virtue of the original substance in concentrated form." *Marcor,* 926 F. Supp. at 1133, *citing Webster's New International Dictionary*, 2nd Edition.

---

derived via water concentration. The *Marcor* court erred by reading the ENs as so limited.

[6] As defendant notes twice in its Cross-Motion, the fishy taste found in the imported fish oil ethyl ester concentrates is fishy enough that dietary supplement manufacturers will mask it with lemon or other flavorings to appeal to customer demands. Cross-Motion, ECF No. 71 at pp. 6, 8. In other words, the fish taste in the imported products is stronger than defendant implies it to be.

3.    The Transesterification Process
      Creates a Product that Meets the
      *Marcor* and *Jedwards* Definition of an Extract

Defendant argues on pages 16 through 20 of its Cross-Motion that the

imported products cannot be considered extracts because they are produced via

transesterification and transesterification is a process of derivatization not

extraction.  This argument is simply playing with words and should be rejected.

Derivatization is a chemical process used to modify a compound to improve

its properties for a specific analytical technique.  *See* Pl. Ex. 20, Rocha, F.R.P;

Zagatto, E.A.G., "Chemical Derivatization in Flow Analysis," *Molecules*, (2022) p. 2,

*quoting* Wilson, I.D.; Adlard, E.R.; Cooke, M.; Poole, C.F. "Derivatization*",

Encyclopedia of Separation Science*; (2017) ("changing in some way the basic

chemical or physical structure of a compound, usually to a single product, which

may be more useful for the analysis of the original analyte)". This process is

commonly used in analytical chemistry to enhance the detection, separation, and

quantification of compounds, especially when dealing with complex mixtures or

substances that are otherwise difficult to analyze directly.  *Id*. at 1.  Derivatization

is not correct terminology for purposes of the classification of the imported

merchandise, as the object of the transesterification is not to facilitate the analytical

measurement of the EPA and DHA fatty acids.  Instead, it is to sever them free

from the triglyceride's glycerol backbone, so that they can be concentrated as ethyl

esters.

Neither the language of heading 1603 nor the way it has been construed by

17

the courts exclude substances extracted from other substances via chemical reaction as the defendant argues. *See* Cross-Motion, ECN 71 at p. 17 ("although BASF asserts that the omega-3 fatty acids in its merchandise were 'chemically extracted from the triglyceride[] fish oil starting material' via 'transesterification,' . . . this assertion is inconsistent with the plain meaning of 'extract'"). To the contrary, the plain meaning of "extract," as construed by the *Marcor* and *Jedwards* courts, is a preparation containing the essence of the substance from which it is derived, regardless of how the resulting, essence-containing substance is separated from its essence-rich starting material.

This interpretation is consistent with the common and commercial meaning of the word "extract." Dictionaries and other scientific lexicons recognize that extracts can result from a chemical process. *See* Pl. Ex. 3, ECF No. 68, Att. # 5, "Extract," *Oxford Dictionary of Biochemistry and Molecular Biology*, p. 233 (2d. ed. 2006) ("1. To remove from or separate; to obtain by some **chemical and/or physical process**") (emphasis added); *see also* "Extract," *American Heritage Dictionary*, p.629 (4th ed. 2000) ("1. To draw or pull out. . . 3. To obtain from a substance **by chemical or mechanical action** . . ..") (emphasis added). For example, one way to extract gold from certain types of gold ore is via chemical reaction. Ore containing gold (Au) in low concentrations is reacted with sodium cyanide (NaCN). The cyanide ion forms a new and different complex ion with the gold, Au(CN)2. This new molecule renders the gold portion soluble, which can now be extracted from the insoluble ore, allowing it to be further processed and refined

from the Au(CN) 2 complex into the desired end-product, Au.[7]

In fact, defendant's expert witness testified it was possible to extract something via chemical reaction, and that he could not rule out that transesterification such as used by BASF was a reactive extraction:

> Q. Okay. Are you familiar with the scientific field of reactive extraction?
>
> A. Somewhat, yes.
>
> Q. Can you explain to me what that field is?
>
> A. I mean, where you conduct reaction and do extraction. For example, when you are doing ethanol -- in esterification, you could be doing esterification and extraction at the same time, you know. That will be an example of reactive extraction.
>
> Q. So what -- what BASF is doing is reactive extraction?
>
> A. I -- it's hard to tell how -- in what way they do it.
>
> Q. But what you're saying, it could be done as -- via transesterification?
>
> A. Possible.

---

[7] Reactive extraction – using chemical reactions to extract organic and inorganic substances for other substances – is a common method by which a parent compound is broken down or transformed to release a desired compound, especially in metals. For example, another method for extracting gold from ore is to form a gold-mercury amalgam, which can be extracted from the ore. This is a chemical reaction, whereby the gold ore is mixed with mercury, forming an amalgam that extracts the gold from the ore: $Au$ (solid) + $Hg$ (liquid) $\rightarrow AuHg$ (amalgam). Another example involves uranium, where sulfuric acid ($H_2SO_4$) is reacted with uranium oxide ($U_3O_8$) to form uranyl sulfate, which is soluble in water: $U_3O_8 + 2H_2SO_4 \rightarrow UO_2(SO_4)_2 + 2H_2O$. The chemical form of the uranium oxide (a mineral) is chemically changed to a uranium sulfate that can be isolated.

        *        *        *        *        *

Q.   So it's possible to extract something via
     chemical reaction?

A.   That's right.

Q.   Okay.  And that would be reactive extraction?

A.   That's what I said, yes.

*See* Pl. Ex. 21, Deposition Transcript of Expert Witness Dr. Syed S.H. Rizvi, ("Rizvi

Dep.") pg. 59: 19 – 60.11; 60:23 - 61:3.

Similarly, plaintiff's expert witness, Dr. Gerard Bannenberg, Director of

Technical Compliance and Outreach at GOED, the Global Organization for EPA

and DHA Omega-3s, testified that transesterification could be viewed as a form of

extraction, whereby the EPA and DHA are extracted from the glycerol backbone

found in the triglyceride ester form:

Q.   You said that extraction could
     be more broadly understood to include --

A.   You can envision that the
     process of transesterification of the
     triglyceride to the fatty ethyl ester can
     be viewed as a type of extraction from the
     perspective of the EPA and the DHA because
     the purpose of making fatty [acid] ethyl
     ester products is to get the EPA and DHA
     out of the triglyceride structure.
     Whether you want to call that an
     extraction reaction or not, you can view
     this as a type of extraction. Why?
     Because you cannot do anything with EPA
     and DHA in the triglyceride structure.
     You cannot concentrate the EPA and DHA.

Q.   So this -- you can view

20

transesterification as a type of
extraction of EPA and DHA?

A.    I think so.

*See* Pl. Ex. 22, Deposition Transcript of Expert Witness Dr. Gerard Bannenberg,

Director of Technical Compliance and Outreach at GOED, the Global Organization

for EPA and DHA Omega-3s, ("Bannenberg Dep) p. 95: 10 - 96: 5.

Finally, consider the article from *Sustainable Chemistry and Pharmacy* titled

"Enhancing and Improving the **Extraction** of Omega-3 from Fish Oil" (emphasis

added).  Pl. Ex. 8, ECF No. 68, Att. # 10.  As its title states, this article is about how

to improve and enhance the processes whereby omega-3 fatty acids are extracted

from crude fish oil. *Id*. at 55 ("Investigating progress in **fish oil omega-3**

**extraction**, purification and stabilization methodologies, this study provides an

overview of this sector of the emerging bioeconomy") (Emphasis added).

This article reviews the traditional extraction processes recognized by those

in the field for creating fish oil omega-3 extracts.  Regarding extraction by

transesterification and molecular distillation, the authors state the following:

> A first progress occurred about a decade ago when the above
> mentioned '18/12TG' oil 30% in EPA+DHA was first replaced by
> 55% omega-3 ethyl ester oil.  Triglycerides comprising natural
> fish oil usually contain one long-chain omega-3 PUFA
> [polyunsaturated fatty acid] bound to one glycerol molecule.
> Hence in order to produce **extracts of high omega-3**
> **concentration**, the omega-3 fatty acids are usually converted
> into ethyl esters via reaction with ethanol catalyzed by base at
> 80-90° C, followed by distillation under ultralow pressure ($10^{-3}$
> bar) at 140-160° C.

> This molecular distillation (MD) step produces omega-3 ethyl

esters (EE) concentrates of about 55% concentration which still
are those mostly found at retail stores.[8]

*Id*. at 56.  Later in the article, the authors refer to this method as an
"extraction process."  *Id*. at 57 ("**the extraction process** based on
molecular distillation at ultralow pressures and high temperatures needs
to be replaced by milder extraction process based on green solvents")
(emphasis added).

This article recognizes what this Court should find.  BASF's fish oil
ethyl ester concentrates are *extracts* high in omega-3 fatty acids derived
from crude fish oil by an *extraction process*, notwithstanding that this
extraction process involves a chemical reaction.  The extract is rich in EPA
and DHA omega-3 and other fatty acids that trace directly to the crude fish
oil starting material, and which had imparted the essence of the crude fish
oil.  See Pl. Ex. 9, ECF No.68, Att. # 11 at p. 17: 18 – 22 ("I think it is
important to make clear that the EPA and the DHA that we're discussing
today in the commodity [the imported products] is exactly the same EPA
and DHA found in fish or other source").  As such, BASF's imported fish oil
ethyl ester concentrates fall within the *eo nomine* designation of extracts of
fish.

---

[8]  The imported merchandise ranges from 55% to 65% EPA and DHA
concentration and is used after importation by BASF's customers to produce omega-
3 fish oil capsules that are sold at retail and other over-the-counter stores.

4.    Crude Fish Oil is Part of the
Organic Structure of the Fish

Next, the defendant argues that fish oil is not fish, therefore, plaintiff"s

products, if found by this Court to be extracts, would be extracts of fish oil, not fish

and not within heading 1603.  Cross-Motion, ECF No. 71 at pp. 20-21.  The question

before the Court, however, is not whether fish oil is fish; instead, the Court needs to

determine whether fish oil is part of the flesh or organic structure of the fish; if it is,

then for tariff purposes it is considered fish.  *See United States v. Carnegie*, 8

C.C.P.A. 377, 378 (1918), (any part of the fish's flesh or organic structure was

considered fish); *Marcor*, 926 F. Supp. at 1132 (reference to "fish" in Chapter 21,

Note 1(e) includes "the flesh or organic structure of the animal fish").  Contrary to

the defendant's argument, crude fish oil is part of the organic structure of fish.  In

turn, this renders the imported products, which have the essence of the crude fish

oil starting material, extracts of fish for tariff purposes.

Fish oil is part of the fish body.  *See* Pl. Ex. 23, Mingruo Guo Dr., "Lipids and

Lipid Related Functional Foods", *Functional Foods: Principles and Technologies*

161, 180 (2009) (fish oil is derived from the tissues of fatty fish).  The triglyceride

esters containing the EPA and DHA omega-3 fatty acids are part of the fat tissue of

the fish.  The fat cells, called adipocytes, are specialized cells in the fatty tissues

that store triglycerides in droplets in the cell, called oil bodies.  Fat is stored there

and is mobilized when needed. For example, fat is burned for energy generation to

drive metabolism or generate heat.  For the defendant to imply that crude fish oil is

23

not part of the organic structure of the fish from which it is derived is unfounded.[9]

Defendant relies on *United States v. Geo. S. Bush & Co.*, 24 C.C.P.A. 313 (1936) to argue that fish oil is not fish. This case involved whether fish meal, imported for use as fertilizer or animal feed but not for human consumption, was classifiable either as "guano" in paragraph 1583 of the Tariff Act of 1922, or if not, then under paragraph 1575 as "[f]ish imported to be used for purposes other than human consumption." *Id.* at 314. The court rejected both argued classifications. First, it held that the chief use of the imported merchandise was animal feed, not guano or other fertilizer. *Id.* at 314. Regarding paragraph 1575, the court noted that fish, after being caught, were processed to expel the fish oil, leaving a residue to be ground into the fish meal, but creating two products – fish oil and residue that the importer characterized as joint or co-products. The court then appears to paraphrase the importer's argument for classifying fish meal in paragraph 1575, *to wit* that the fish meal co-product is fish for purposes of paragraph 1575, but that

---

[9] A few times in its Cross-Motion, defendant points out that the EPA and DHA omega-3 fatty acids are not produced naturally by the fish. Instead, the EPA and DHA omega-3 fatty are produced by microalgae, which is eaten by zooplankton, which is then eaten by fish. Thus, defendant suggests that the EPA and DHA fatty acids are not part of the organic structure of the fish because they are really part of the microalgae. *See* Cross-Motion, ECF No. 71 at pp. 4, 22, 27. This argument disregards how the food chain works. Fish, like humans or any mammal, need to obtain essential nutrients from food. Fish eat zooplankton that have eaten microalgae, resulting in the zooplankton, now containing the EPA and DHA original found in the microalgae, being killed and digested in the intestinal tract of the fish. The lipids containing the EPA and DHA are digested, absorbed by the fish and then distributed across its body where they are retained in the oil stored in the fish. So, focusing on microalgae as the bottom of the trophic chain for EPA and DHA does not negate that the EPA and DHA (and other fatty acids) found in microalgae are consumed by fish, digested by fish, stored as lipids in fish, and become part of the organic structure of fish.

24

fish oil co-product is not. *Id.* at 315. The court rejected this argument, holding that the reference to "fish" in paragraph 1575 covered unprocessed fish only and not various forms of it. *Id.* Thus, fish meal was not considered fish for purposes of paragraph 1575 of the Tariff Act of 1922.

*United States v. Geo. S. Bush & Co*, however, does not address the pivotal issue of whether fish oil is part of the organic structure of the fish from which it was derived. The record on appeal in that case, however, established what should be self-evident, that fish oil is part of the organic structure of fish: "fish boiled **to break down the cellular structure**, is pressed through either a screw, hydraulic or 'expeller' type press **to express the oil therefrom**, and the residue is ground into meal." *Id.* at 314 (emphasis added).

The *Marcor* court observed that historically the tariff term "fish" had not been construed narrowly. *Marcor,* 926 F. Supp. at 1131 ("those few cases defining fish demonstrate that the term has never been narrowly defined). This is why the *Marcor* court carried forward the "the flesh or organic structure of the animal fish" criteria used in prior judicial authority. *Id.* at 1132. Its spirit was followed in *Jedwards,* and in the CBP administrative rulings classifying various oils as extracts in heading 1603. This Court should apply it too.

   5. BASF's Fish Oil Ethyl Ester Concentrates
     Have the Essence of Fish as Made Evident
     <u>by the Presence of EPA, DHA and Other Fatty Acids</u>

Next, defendant argues that "BASF does not appear to contest that its

merchandise lacks the essence of the *fish* from which it was ultimately derived."

Cross-Motion, ECN 71 at pp. 21-23.  Hopefully the Court will give plaintiff's Motion

a more comprehensive reading than did the defendant.

BASF sets out its position clearly and convincingly in its Motion and in the

Statement of Uncontested Facts, which position is bolstered further by its

arguments in this Response Memorandum.  As a matter of law, the starting

material crude fish oil, being part of the organic structure of fish, is considered fish

for tariff purposes.  *See United States v. Carnegie*, 8 C.C.P.A. 377, 378 (1918);

*Marcor*, 926 F. Supp. at 1132.  In turn, this unrefined fish oil is approximately 90

percent long chain fatty acids, such as EPA and DHA.  *See* Pl. Ex. 4, ECF No.68,

Att. # 6, "Fish Oil Handling/Processing" *Technical Evaluation Report compiled for*

*USDA National Organic Program*, (Mar. 5, 2015) at p. 1.

From this starting material, plaintiff sets out to extract the EPA and DHA

omega-3 and other fatty acids from the crude fish oil via transesterification.

Plaintiff's Motion, ECF No. 68, at 6 -13.  The resulting ethyl esters are then distilled

and concentrated to maximize the desired omega-3 fatty acid ethyl esters – the ones

that contain the EPA and DHA fatty acids originally present in the crude fish oil.

*SUMF*, ECF 68, Att. # 1, at ¶¶20, 34; Plaintiff's Motion, ECF No. 68, at 9 - 12.

BASF wants to isolate and concentrate the ethyl esters containing the EPA and

26

DHA polyunsaturated omega-3 fatty acids because these fatty acids have demonstrated effectiveness in providing and promoting health benefits to humans. *SUMF*, ECF 68, Att. # 1, at ¶20; Plaintiff's Motion, ECF No.68, at 6, 26, 29.   Even the defendant's fact witness testified that the nutritive and commercial benefits of the imported merchandise trace back to the omega-3 fatty acids:

> Q.  So what in the imported ethyl ester
>      fish oils imparts the nutritive value?
>
> A.  It would be the Omega 3's.
>
> Q.  Okay, and I assume that's why people
>      buy fish oil because they want the Omega 3's?
>
> A.  Yes. . . .

Pl. Ex. 19, Deposition Transcript of USCIT Rule 30(b)(6) of Defendant by John E. Rhea ("Rhea Dep.") p. 30: 9-16.  And finally, the parties do not dispute that the EPA and DHA omega-3 fatty acids found in the imported products are the same EPA and DHA fatty acids removed from the crude fish oil.  *SUMF*, ECF 68, Att. # 1, at ¶34; Plaintiff's Motion, ECF No. 68, at pp. 28, 33.

Thus: 1) if the essence of crude fish oil is imparted by the long chain fatty acids that make up approximately 90 percent of the oil, and, 2) the imported products are created first by extracting those desired EPA and DHA omega-3 and other fatty acids from the crude fish oil and then concentrating them into products with higher levels of those desired omega-3s for use to promote good human health, and 3) as a matter of tariff law, fish oil is fish because it is part of the organic structure of the fish, then clearly BASF's products are preparations containing the

essence of the fish from which they are derived.  They are extracts of fish within the scope of heading 1603.

For purposes of heading 1603, the essence of a fish is not limited to "odor, color, or taste", contrary to defendant's repeated position.  *See* Cross-Motion, ECN 71 at p. 22.  Plaintiff refuted this improper construction of heading 1603 in Section A 2 to this Response Memorandum, at pages 13 to 16 *supra*, which argument is incorporated by reference again.  Instead, the key issue is whether the imported merchandise has the fundamental properties of the fish oil (which is considered fish) in concentrated form.  In this case, the fundamental properties of crude fish oil are not how it appears or how it smells, but rather its composition, as it is the omega-3 fatty acids found in that fish oil that are being extracted for concentration and then commercial use.  Not its smell, color, or taste.

In sum, the test articulated in the *Marcor* and *Jedwards* cases is whether the imported merchandise is "'a preparation containing the essence of the substance from which it is derived.'"  *Jedwards* at 1358, *quoting Marcor at* 1132-33 (CIT 1996).  BASF has set out in detail in its Motion, ECF No.68, and as amplified in this Response Memorandum, how the essence of the fish oil, which is imparted by the EPA and DHA omega-3 and other fatty acids, is carried forward into the imported fish oil ethyl ester concentrates.  These fatty acids are severed from their natural triglyceride ester state found in the crude fish oil starting material via a chemical reaction called transesterification and reformed into a new ester form called ethyl

esters.  As ethyl esters, the desired EPA and DHA omega-3 fatty acids can be concentrated into the high levels found in the imported merchandise, which cannot occur while the EPA and DHA are bound to glycerol as triglyceride esters. Plaintiff's Motion, ECF No.68, pp 25-37.  These polyunsaturated omega-3 fatty acids, now found in higher, concentrated levels in the imported merchandise, impart the health benefits associated with fish oil and omega-3s and become the commercial reason for the products.  *Id.* pp 26-27, 37.

Clearly, BASF's fish oil ethyl ester concentrates, because of the high levels of omega-3 and other fatty acids, contain the essence of the fish oil from which they are derived.  *See* Plaintiff's Motion, ECF No.68 at p 26, citing Pl. Ex. 4, ECF No.68, Att. # 6, "Fish Oil Handling/Processing", Technical Evaluation Report compiled for USDA National Organic Program, (Mar. 5, 2015) at p. 1 (crude fish oil is composed of approximately 90 percent long chain fatty acids, including EPA and DHA).  These fatty acids, now present as ethyl esters rather than triglyceride esters, are the same fatty acids extracted via transesterification from the starting material crude fish oil. SUMF, ECF No. 68, Att. # 1, at ¶ 34.  Therefore, the imported merchandise satisfies the essence test set out in the *Marcor* and *Jedwards* decisions, establishing classification under heading 1603.

B.    *The Defendant's Cross-Motion Must Be
Denied as the Imported Merchandise Is
Specified or Included Elsewhere in Heading 1603.*

The rest of defendant's Cross-Motion goes toward advocating classification under the heading 2106, notwithstanding the goods were liquidated under heading 3824.  Cross-Motion, ECN 71 at pp 23 – 31.  These arguments should be rejected for multiple reasons.

1.    The Goods Are Excluded from Headings 2106
and 3824 Because they are Classifiable in Heading 1603

Defendant's fatal hurdle is that both headings 2106 and 3824 are residual, catch-all provisions.  As discussed in Plaintiff's Motion, those headings, as residual, catch-all provisions, are less specific than heading 1603, and must yield to heading 1603 because the imported products are "[e]xtracts . . . of . . . fish . . ." and thus are "elsewhere specified or included" under heading 1603.  Plaintiff's Motion, ECF No. 68, at 20.

Plaintiff's position is now before the Court.  If the Court agrees that the essence of fish is found in the imported merchandise, then as a matter of law the imported fish oil ethyl ester concentrates must be classified under heading 1603 and excluded from headings 2106 and 3824. *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002) (broad, catch-all basket provisions only apply if the item is not more specifically provided for in an applicable subheading).  The imported products, being specified and included elsewhere in heading 1603, cannot be

classified in either heading 2106 or 3824 as a matter of law.

2.   Note 1(b) to Chapter 38 Does Not Direct
     the Imported Goods into Heading 2106

At page 25 of its Cross-Motion, defendant argues that the imported

merchandise is "excluded from heading 3824 by Note 1(b) to Chapter 38 – which, in

turn, directs classification under heading 2106."  Cross-Motion, ECF 71 at p. 25.

Actually, Note 1(b) to Chapter 38 is defendant 's second hurdle preventing the goods

from being classified in heading 2016.  That note excludes from heading 3824 (the

heading under which CBP originally liquidated the entries): "[m]ixtures of

chemicals with foodstuffs or other substances with nutritive value, of a kind used in

the preparation of human foodstuffs (generally, heading 2106)."  Seizing on this

note, the defendant characterizes the imported merchandise as a "mixture of ethyl

esters, antioxidants, and various organic impurities . . ." to conclude that the goods

are excluded from heading 3824 in favor of heading 2106.

To be a mixture under Note 1(b) and thus excluded from heading 3824, the

substance must contain "chemicals" **that are mixed with** "foodstuffs or other

substances with nutritive value . . .."  Subheading 3824.99.41[10] provides for the

following as a **chemical** product: "[f]atty substances of animal or vegetable origin

and mixtures thereof."  This is important because the imported product is a fatty

substance of animal (*i.e.*, fish) origin.  Those fatty substances of fish origin in the

fish oil ethyl ester concentrates– the ethyl esters, partial glycerides, oligomers, and

_____

[10] Subheading 3824.99.41 (HTSUS 2018) contains the same tariff language as
found in subheading 3824.90.40 (HTSUS 2011) and in 3824.90.41 (HTSUS 2012).

31

triglycerides – would be considered "chemicals" covered by subheading 3824.99.31. In fact, statistical subheading 3824.99.3140 provides for "[m]ixtures of fatty acid esters," meaning the tariff recognizes that mixtures of fatty acid esters, which would include fatty acid ethyl esters, are fatty substance of animal origin.[11]

But Note 1(b) requires that the chemicals of heading 3824 be mixed with a foodstuff or other substance with nutritive value to move the finished product out of the chemical tariff heading and into one for other food preparations. In this case, the only other substance in the imported merchandise is the natural tocopherol. Natural tocopherol, a form of vitamin E, is added in very small amounts (.2 percent for PronovaPure® 150:500 EE, 1 percent for the Omevital® products) as an antioxidant to protect the finished product. SUMF, ECF No. 68, Att. # 1, at¶ 23 It is not added as a foodstuff or to impart nutritive benefits.[12]

Furthermore, defendant's expert characterized the imported merchandise as a mixture consisting of fatty acids – which he identified as both a chemical and a

---

[11] The partial glycerides, oligomers, and triglycerides found in the imported oils are fatty substances of fish origin. Triglycerides are the main constituent of body fat; glycerides are fatty acids esters of glycerol; and, oligomers, in this case, are cross-linked lipids created when triglycerides, when heated, start reacting among themselves to form dimers (two triglycerides connected to each other), trimers (three connected units), or oligomers (several connected units).

[12] The ENs to Chapter 38 recognize that the mere presence within a product of a foodstuff or substance with nutritive value does not exclude the product from Chapter 38: "Substances having a nutritive value that is merely subsidiary to their function as chemical products, e.g., as food additives or processing aids, are not regarded as 'foodstuffs or substances with nutritive value' for the purpose of this Note." *See General Explanatory Note* to Chapter 38. Any nutritive benefit imparted by the natural tocopherol plays at best a subsidiary role to its primary role as an antioxidant. For this reason, the tocopherol cannot be considered either a foodstuff or a substance of nutritive value for purposes of Chapter 38, Note 1(b).

foodstuff -- and maybe some impurities from the crude fish oil. *See* Pl. Ex. 20, Rizvi Dep. pp. 55:21 to 56:13. Those "impurities" would be the glycerides, oligomers, and triglycerides from the fish. SUMF, ECF No. 68, Att. # 1, at¶ 36 (characterizing them as organic impurities occurring naturally in crude fish oil). In other words, Dr. Rizvi's mixture is simply the mixture of all the fatty substances from the fish, which fatty substances of fish origin are provided for in subheading 3824.99.41. He did not identify a second foodstuff or substance with nutritive value mixed with these fatty substances (*i.e.* the chemicals). As plaintiff's expert testified, when asked if the finished products are mixtures: "They are not mixtures in the sense that things have not been mixed, no. These are oils as such." Pl. Ex. 21, Bannenberg Dep, p. 108: 8-12.

Thus, assuming *arguendo* the Court were to reject plaintiff's classification under heading 1603, then Note 1(b) to heading 3824 does not direct the imported merchandise into heading 2106. Defendant's reliance on it is misplaced and the imported merchandise would stay in heading 3824 under this hypothetical.

3.    Note 1(e) to Chapter 21 Directs
the Imported Goods into Heading 1603

Application of Note 1(e) to Chapter 21 is defendant's third fatal hurdle

against its argument for classification under heading 2106.  That note excludes

from Chapter 21 and in favor of Chapter 16, "[f]ood preparations, other than the

products described in heading 2103 or 2104, containing more than 20 percent by

weight of sausage, meat, meat offal, blood, insects, fish or crustaceans, molluscs or

other aquatic invertebrates, or any combination thereof (chapter 16)".  If this Court

finds that the imported merchandise contains more than 20 percent by weight of

fish, then it cannot be classified in heading 2106 by application of this exclusionary

note.[13]

Application of this note requires the Court to revisit the issue of what

constitutes fish for tariff purposes.  *See* Plaintiff's Motion, ECF No. 68 at p. 24;

Response Memorandum at pp. 23 to 25, *supra*.  Plaintiff has established that for

tariff purposes fish consists of "flesh or organic structure of the animal fish."

---

[13] Defendant raises an issue with testimony given by its own Rule 30(b)(6)
witness and cited in plaintiff's Motion at p. 42, who confirmed that the imported
fish oil ethyl ester concentrates were preparations of fish.  *See* Cross-Motion, ECF
No. 71 at 27-28.  Realizing that these statements from its fact witness are party
admissions that can be used against the defendant, it argues that the questions
posed during the deposition went to the legal meaning of a tariff term and that its
witness did not and could not offer testimony on the meaning of a tariff term.  To
the contrary, the question simply asked the witness, who had previously testified
that the imported products were preparations, whether the products were
preparations of fish or something else.  This fact was confirmed on cross-
examination of this witness by defendant's counsel, when the witness confirmed the
importer products are preparations of fish because fish is the raw material for the
fish oil ethyl ester concentrates.  *See* Plaintiff's Motion, ECF No. 68 at p. 42.

*Marcor*, 926 F. Supp. at 1132. Using the "organic structure of fish" criterion, fish oil is fish. *See* Pl. Ex. 23, Mingruo Guo Dr., "Lipids and Lipid Related Functional Foods", *Functional Foods: Principles and Technologies* 161, 180 (2009) (fish oil is derived from the tissues of fatty fish). It is part of the fat tissue of the fish, where it is stored in oil bodies in the cells of fish. Response Memorandum at p. 23, *supra.* Therefore, fish oil is part of the organic structure of fish, just the same way as skin, bones and fins would be considered part of the fish. For tariff purposes, references to fish, like that found in Note 1(e), includes crude fish oil because it is part of the organic structure of the fish.

Plaintiff explained in its Motion how the imported merchandise surpasses the 20 percent threshold set out in 1(e) to Chapter 21. *See* Plaintiff's Motion, ECF No. 68 at p. 43. The only starting material is crude fish oil previously extracted from fish; other substances introduced during production are for processing during the transesterification and subsequent distillation and filtering of the resulting fish oil ethyl esters concentrates. *Id. See also*, Pl Ex. 2, ECF No. 68, Att. # 4, (manufacturing flow charts for the PronovaPure® and Omevital® products). Also, no more than 1 percent of the antioxidant is added to deter the resulting oil from becoming rancid. SUMF, ECF No. 68, Att. # 1, at¶ 23.

The parties agree that the EPA and DHA omega-3 fatty acids found in the imported products are the same EPA and DHA omega-3 fatty acids severed from the triglyceride esters in the crude fish oil starting material. See SUMF, ECF No. 68, Att. # 1, at ¶ 34. Also, the parties agree that the molecular weight of an EPA

ethyl ester is 330.50, of which 285.5 (86%) constitutes EPA fatty acid, and the

molecular weight of a DHA ethyl ester is 365.54, of which 311.5 (87.4%) constitutes

the DHA fatty acid. *Compare* Pl's AUMF, ECF No. 68, Att. # 2, at ¶¶ 7, 8 *with*

Defendant's Response to Plaintiff's Statement of Additional Undisputed Material

Facts, ECF No. 71, Att. # 1, at ¶¶ 7, 8.

From here a simple math equation quantifies that the EPA and DHA fatty

acid content originally extracted from the crude fish oil found in fish contributes

much more than 20 percent of the weight of the imported fish oil ester ethyl

concentrates --multiply the percent EPA and DHA content in one of BASF's

imported products (i.e., Omevital® **33**[%EPA]**22**[%DHA] EE), by the percent of the

weight that each EPA or DHA fatty acid attributes to the EPA and DHA ethyl

esters (EPA 86%; DHA 87.4%), and add those products together.  Using a worst-case

scenario, at least 47 percent of the weight of the imported products is attributable to

just the EPA and DHA fatty acids taken directly from the fish oil from fish. *See*

Plaintiff's Motion, ECF No. 68 at p. 31-32.  That number grows when the other fatty

acids, partial glycerides, triglycerides and oligomers, are includes as they are also

from the fish oil from fish. *Id.*

In turn, BASF communicates allergen information to its customers,

informing them that these products contain "fish and products thereof." *See* Pl's

AUMF, ECF No. 68, Att. # 2, at ¶9; Pl. Ex.14, ECF No.68, Att. # 16.  BASF also

communicates to its customers that its fish oil ethyl ester concentrates are derived

from responsibly-sourced fish. *See* Pl's AUMF, ECF No. 68, Att. # 2, at ¶ 11; Pl.

Ex.15, ECF No. 68, Att. # 17.  The ultimate users of the imported products know of the fish origins of the BASF's fish oil ethyl ester concentrates.

The plain language of Chapter 21, Note 1(e) excludes products like the imported fish oil ethyl ester concentrates because they consist of more than 20 percent fish content.  For this reason, the note has the opposite effect on the classification of this merchandise than that argued by defendant.  Instead, Note 1(e) to Chapter 21 mandates that the imported merchandise be classified in heading 1603.

      4.     The World Customs Organization Opinion
                 is Inapposite for Determining if the
                 Imported Goods are Classified in Headings 1603

Finally, the World Customs Organization's ("WCO") classification opinion cited by defendant in its Cross-Motion carries no weight for addressing the principal issue before this Court, which is whether the imported fish oil ethyl ester concentrates fall within the scope of the tariff term "[e]xtracts . . . of . . . fish" in heading 1603.  The WCO's opinion did not consider heading 1603 as an option for classification of the product before it.  For this reason, the WCO's opinion provides no persuasive value on whether the imported merchandise is classifiable under heading 1603.

Published classification opinions of the WCO are treated in the same manner as the ENs, meaning that while neither legally binding nor dispositive, they provide commentary on the scope of the heading reviewed in the opinion, and are generally indicative of the interpretation of that heading.  *Cummins Inc. v. United States*, 454

F.3d 1361, 1366 (Fed. Cir. 2006) ("[w]hile such an opinion is not given deference by United States courts, it can be consulted for its persuasive value, **if any**) (emphasis added). Like ENs, however, a WCO's opinion has limits to its ability to clarify the scope of a heading, and it is "well established that an Explanatory Note acts only as a guide when the term at issue is specifically included or excluded from the Note." *Winter-Wolff, Inc. v. United States*, 996 F. Supp. 1258, 1261 n.1 (Ct. Int'l Trade 1998). Therefore, where an WCO opinion does not address the heading being construed by a U.S. court, it has no persuasive value for that court on the tariff meaning of that tariff heading. *Cf. Sanchez-Llamas v. Oregon*, 548 U.S. 331, 354 – 55 (2006) (Supreme Court rejecting any notion of deference or obligation to a foreign tribunal's decisions other than respectful consideration if applicable).

That is exactly the situation with the WCO's opinion. The Norwegian delegate asked the WCO to consider classification of the product under headings 1516 and 3824, and then 2106. See Df. Ex. 8, ECF No. 71, Att. # 10, at p 6. As a result, whether heading 1603 provided for the product was never considered by the WCO.

Therefore, the WCO's opinion has no persuasive value in this matter because the issue before this Court was never considered by the WCO. For the same reason the ENs to heading 21.06 have no persuasive impact on the legal meaning of heading 1603, a WCO opinion limited to an analysis of headings 1516, 3824 and 2106 has no bearing on whether fish oil ethyl ester concentrates are "[e]xtracts . . . of . . . fish" for purposes of heading 1603. To suggest otherwise is ungrounded in

the law.  The meaning of the tariff term "[e]tracts . . . of . . . fish" in heading 1603 and whether the imported fish oil ethyl ester concentrates fall within that meaning, remains exclusively within the province and duty of this Court.

        5.   Defendant Has Not Established Authority
              <u>To Assert a Counterclaim in a Classification Case</u>

Plaintiff's Motion established that defendant's asserted counterclaim for classification under subheading 2106.90.98 or 2106.90.99, HTSUS, depending on the year of entry, cannot be sustained as a matter of law in a tariff classification case.  *See* Plaintiff's Motion, ECF No. 68 at pp. 38-41.  Four cases hold that a counterclaim cannot be raised in a tariff classification dispute where the defendant seeks via the counterclaim to challenge CBP's liquidated classification and rate of duty. *See Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (CIT 2022) *("Cyber Power")*; *Second Nature Designs, Ltd. v. United States*, 586 F. Supp. 3d 1334 (CIT 2022) ("*Second Nature I*"); *Maple Leaf Mktg, Inc. United States*, 639 F. Supp. 3d 1363 (CIT 2023) *("Maple Leaf")*; *Second Nature Designs, Ltd. v. United States*, 654 F. Supp. 3d 1301 (CIT 2023) ("*Second Nature II*").  Conceding that the weight of authority is directly against its position, defendant acknowledges that a *statutory* basis authorizing the government to sue for an alternative classification and higher rate of duty does not exist but raises in passing its "new" position that its counterclaim is founded on federal common law.  This position must be rejected, and summary judgment must be issued to plaintiff on this point.

If the defendant wishes to assert a counterclaim, it must identify the law that gives rise to that cause of action. In its pleading, defendant alleged a statutory basis for its counterclaim, stating it is brought "pursuant to 28 U.S.C. § 1583(1) and the provision of the Harmonized Tariff Schedule of the United States, 19 U.S.C. § 1202 *et seq.*, to reclassify the subject merchandise under subheading 2106.990.99, HTSUS (2011 or 2012) . . .." *See* Defendant's Answer to Amended Complaint, Counterclaim, ECF No. 32 at p. 5. Both these jurisdictional grounds were addressed and dismissed in the above cited cases. *See Cyber Power* at 1333 (noting that section 1583 does not confer the United States with statutory authority to challenge a liquidated classification and rate of duty via a counterclaim, as section 1583 gives the CIT jurisdiction to hear counterclaims but does not create a substantive cause of action a defendant could assert as a counterclaims); *Maple Leaf* at 1366-67 ("nothing in the plain, unambiguous terms of Section 1202 permits the United States to challenge CBP's classification via counterclaim").

Now defendant says its claim is based on common law principles, notwithstanding that Congress granted the CIT counterclaim jurisdiction under section 1583 but chose not to change 19 U.S.C. § 1514(a) to override the concept of the finality of liquidation or to provide an exception that would allow defendant to assess and collect more duties on liquidated entries, beyond the existing statutory authorities to do so in certain circumstances. Its argument consists of two case citations and no explanation on how these cases establish a common law right to bring its counterclaim seeking to reclassify goods and to assess additional duties on

liquidated entries.

Easily distinguished is *United States v. Wurts*, which defendant cites for the proposition that no statute is needed for the United States to bring an action to recover funds erroneously paid. 303 U.S. 414, 415 (1938). Defendant's alleged counterclaim, however, does not seek to recover funds erroneously paid; it seeks to assess new duties on liquidated entries. As such, this case has no bearing on the issue of whether defendant can maintain a counterclaim in this case. The other case, *United States v. Bajakajian*, states in a footnote that (at one time) an action in debt was used to recover import duties owed the government. 524 U.S. 321, 344 n. 18 (1998). Today, the government's ability to recover import duties or to challenge or alter its own liquidation is statutory: 19 U.S.C. § 1501 (allowing CBP to reliquidate entries within 90 days of original liquidation, during which CBP can reclassify good and/or rate advance them to different tariff provisions with different duty rates); 19 U.S.C. § 1592 (Allowing CBP to recover lawful duties of which it was deprived, and to seek civil penalties against importers). In turn, the CIT has jurisdiction over these classes of claims when brought by the United States. *See* 28 U.S.C. § 1582 (CIT has exclusive jurisdiction over civil actions commenced by the United States to recover customs duties, civil penalties and to recover on bonds). Congress has legislated away the gaps common law may once have filled.

Plaintiff, by referencing federal common law, is asking this Court to infer a cause of action in favor of its counterclaim notwithstanding the decisions in *Cyber Power* and the related cases. This should be rejected, as courts should tread lightly

on causes of action not expressly created by Congress.  As the U.S. Supreme Court stated, "[w]ith the demise of Federal general common law, a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress . . ." and "[i]n both statutory and constitutional cases, our watchword is caution."  *Hernandez v. Mesa*, 589 U.S. 93, 101 (2020).  For these reasons, this Court cannot entertain defendant' counterclaim or enter a judgment in favor of defendant on its counterclaim.

Finally, defendant raises *Jarvis Clark Inc. v. United States*, 733 F.2d 878 (Fed. Cir. 1984) and the impact that case has on whether this Court can *sua sponte* reclassify the imported merchandise into heading 2106 (or any other heading[14]) if it

---

[14] For example, the *Marcor* court classified the shark fin cartilage and dextrin mixture into heading 0410, which provides for "[i]nsects **and other edible products of animal origin**, not elsewhere specified or included" (emphasis added). As defendant points out in footnote 5 to its Cross-Motion, BASF did not raise this as an alternative classification in this case.  *See* Cross-Motion, ECF No. 71 at p. 25, note 5.  Under *Jarvis Clark*, however, this Court can consider this heading in the same manner it can consider heading 2106 and take necessary steps to allow it to reach the correct decision if it were to hold that the imported merchandise is not classifiable under heading 1603.

One last point on heading 0410.  In its Cross-Motion, defendant states that the heading covers only "edible things that animals themselves have generated but that have not been prepared in any way beyond being preserved."  *Id.*  As per the *Marcor* court, however, the mixture of shark fin cartilage and dextrin was classifiable in heading 0410.  Therefore, heading 0410 captures more than things animals themselves have generated (as per defendant's position) and includes processed products as edible products of animal origin.

were to hold that the imported goods are not "[e]xtracts . . . of . . . fish."  Cross-Motion, ECF No. 71 at 31.  *Jarvis Clark* eliminated the "dual burden of proof" that required a plaintiff to prove the government's as "entered classification" was wrong and plaintiff's argued classification was correct.  In so holding, *Jarvis Clark* recognized a reviewing court's statutory duty under 28 U.S.C. § 2643(b) to find the correct classification, even if that classification was raised by neither party, or, as in this case, is brought to the court's attention via an improperly alleged counterclaim.  *Jarvis Clark* recognized that pursuant to 28 U.S.C. § 2643(b) a reviewing court is empowered to order remand, retrial or other proceedings to determine the correct outcome:

> **(b)** If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision.

While section 2643(b) and *Jarvis Clark* obligate a reviewing court to take steps to find the "correct" result, neither the statute nor the decision establish a cause of action allowing a court to award a money judgment to the United States in a case brought by an importer under 28 U.S.C. § 1581(a) challenging a denied protest.  Further proceedings in the *Jarvis Clark* case substantiated that the expected outcome of the *Jarvis Clark* rule of law would be useful for both importer and Customs on **future transactions**: "[a] judicial decision will now represent a statement of correct law, useful to future importers, rather than simply a narrow

ruling based on the particular circumstances in the case." *Jarvis Clark v. United States*, 739 F.2d 628, 629 (Fed. Cir. 1984). *Jarvis Clark* does not mean that a judgment assessing higher duties against an importer would be entered for the defendant if the "correct result" was a classification carrying a higher duty rate than that assessed at liquidation.

No court, much less the U.S. Court of Appeals for the Federal Circuit, has issued a decision on whether *Jarvis Clark* also authorizes a reviewing court to go beyond finding the correct decision and to increase duties on liquidated entries. Defendant cites *dicta* in a footnote in *Second Nature II* for the proposition that a reviewing court can order payment of increased duties regardless of whether a counterclaim is alleged. *See, Second Nature II*, 654 F. Supp. 3d at 1307 n.6. That footnote cites to 28 U.S.C. § 2643(c)(1) as giving a court wide latitude and discretion to "order any other form of relief that is appropriate in a civil action." *Id.*

This discretion, however, comes with guard rails. Section 2643 authorizes a reviewing court to: 1) enter a money judgment in a civil action brought by an importer against the United States pursuant to 28 U.S.C. §1581 (*i.e.*, a case brought by an importer based on a denied protest, such as this case); 2) enter a money judgment in a civil action brought by the United States against an importer pursuant to 28 U.S.C. §1582 (allowing the government to sue importers or sureties for penalties, customs duties and on bonds); 3) to enter a money judgment "**for** or against **the United States** or any other party in any **counterclaim**, cross-claim, or third-party action" pursuant to 28 U.S.C. §1583; and, in addition to its authority

to award money damages in actions brought pursuant to 28 U.S.C. §§1581, 1582 and 1583, to 4) "order any **other form of relief** that is appropriate in a civil action, including, but not limited to, declaratory judgments, order of remand, injunctions, and writs of mandamus and prohibition." *See* 28 U.S.C. § 2643 (emphasis added).

In other words, 28 U.S.C. § 2643 authorizes a court to award money damages in causes of actions brought pursuant to 28 U.S.C. §§1581, 1582, or 1583, or to award **other forms of relief**, (*i.e.*, other than money damages) including various equitable remedies where appropriate for that civil action. These "other forms of relief" include remands, retrials or other proceedings that could be utilized to determine the correct outcome, as per the *Jarvis Clark* court.

Because this Court's statutory authority to award money damages is limited by section 2643(c)(1)'s references to causes of action arising out of 28 U.S.C. §§ 1581, 1582, or 1583, the defendant's ability to be awarded a money judgment in the form of a rate advance on liquidated entries in this case requires the presence of a legally sustainable cause of action for money damages in its favor. None exists, as defendant's alleged counterclaim cannot proceed as an independent cause of action against the liquidated entries at is in this case. *See Cyber Power*, 586 F. Supp. 3d at 1327; *Second Nature I*, 586 F. Supp. 3d at 1336 - 37; *Maple Leaf*, 639 F. Supp. 3d at 1364; and *Second Nature II*, 654 F. Supp. 3d at 1303.

Notwithstanding Defendant's eleventh-hour attempt to recast its counterclaim as one based on federal common law, in its pleadings it alleged 28 U.S.C. §1583 as the statutory basis for its cause of action to reclassify the imported

45

fish oil ester ethyl concentrates into heading 2106. *See* Defendant's Answer to Amended Complaint, Counterclaim, ECF No. 32 at p. 5. It alleged counterclaim jurisdiction as the statutory basis for this Court to address its proposed cause of action. But the above cited cases have rejected counterclaims under section 1583 where the defendant sought an affirmative cause of action to reclassify and rate advance entries in an action brought by an importer pursuant to section 1581 challenging a denied protest, and this court should follow suit.

Each of the recent decisions on counterclaim jurisdiction recast the alleged counterclaim as an affirmative defense. *See Cyber Power*, 586 F. Supp. 3d at 1327; *Second Nature I*, 586 F. Supp. 3d at 1336 - 37; *Maple Leaf*, 639 F. Supp. 3d at 1364; and *Second Nature II*, 654 F. Supp. 3d at 1303. As a defense, however, no cause of action exists upon which this Court may order reliquidation at a higher duty rate or require plaintiff to pay any difference in duty. *Mitsubishi Int'l Corp. v. United States*, 5 F. Supp. 2d 991 (Ct. Int'l Trade 1998), *aff'd* 182 F. 3d 884 (Fed. Cir. 1999) (as an affirmative defense, defendant raised new tariff classification that the court found correct; but because it was raised as an affirmative defense, no request was before the court for a judgment to reliquidate the entries or to require the plaintiff to pay more duties).

Given that defendant lacks statutory authority to assert a counterclaim seeking a different tariff classification and a duty increase under 28 U.S.C. §1583 in a case where the plaintiff is challenging a denied protest under 28 U.S.C. §1581 such as this one, and that any alleged counterclaim is, at best, deemed an

46

affirmative defense rather than an independent cause of action supporting reliquidation and a duty rate advance, this Court has no authority under section 2643(c)(1) to award money damages to defendant. No independent cause of action exists under 28 U.S.C. §1583 upon which the Court can issue a judgment for money damages in the event it was to determine that the imported fish oil ethyl ester concentrates were classifiable under heading 2106 at a duty rate higher than the rate challenged by plaintiff in its now denied protests.

This does not constrict *Jarvis Clark*'s reading of section 2643(b)'s requirement that a reviewing court find the correct tariff classification. That obligation is statutory. In situations where a court decides an alternative classification to be the correct one, the court can so order, and that "judicial decision will now represent a statement of correct law, useful to future importers . . .." *Jarvis Clark v. United States*, 739 F.2d 628, 629 (Fed. Cir. 1984). The *Mitsubishi Int'l Corp.* case was decided exactly this way: "[t]he Court finds defendant's proposed classification . . . is correct and orders Customs to reclassify [the imported merchandise]" but because the defendant had not raised a valid claim seeking affirmative relief[15], "[t]he court notes plaintiff is not required to pay the difference

---

[15] The *Mitsubishi* court noted that the defendant had not filed a counterclaim, which that court believed was necessary to give it authority to issue a money judgment requiring the importer to pay the difference in duties. When the *Mitsubishi* case was decided, the issue of the government's authority to assert a counterclaim had not been decided, thus explaining why it appears the *Mitsubishi* and other courts seemed to recognize the government's right to counterclaim for excess duties. *See Cyber Power*, 586 F. Supp. 3d at 1333 ("[a]lthough this court has previously sanctioned the government's use of a counterclaim to assert a cause of action for reliquidation under a different classification, it has not squarely faced the

47

as duties as a result of the reclassification . . ..” *Id.* at 1019.

Thus, assuming *arguendo* that defendant's proffered classification of heading 2106, allegedly raised as a cause of action for affirmative relief in a counterclaim but now recast as an affirmative defense, is found to be the correct classification, then this Court can so hold in its opinion and judgment, but then dismiss the case without ordering reliquidation, meaning the importer would not be required to pay the difference in duties. The rule of *Jarvis Clark* is followed, and no new cause of action under 28 U.S.C. §1583 is created allowing judgment to enter in favor of the United States for money damages in the form of duties in excess of those paid as a result of the liquidation of the entries before the court.

---

question of the authority for such a claim’). This issue has now been squarely faced and resolved by *Cyber Power*, *Second Nature I*, *Maple Leaf*, and *Second Nature II*.

### III.   CONCLUSIONS

For the reasons stated herein and in plaintiff's Motion, defendant's Cross-Motion for summary judgment must be denied and Plaintiff's Motion for summary judgment must be granted, with a judgment entered in favor of BASF.  The Court should hold that the imported product -- Omevital® 3322 EE, Omevital® 400200 EE Mix Toc, Omevital® 4510 EE, Omevital® 3426 EE and PronovaPure® 150:500 EE – are classified under subheading 1603.00.90, HTSUS, and order CBP to reliquidate the subject entries with that classification and to refund the excess duties paid by BASF, with interest as provided for by law.


Respectfully submitted,


<u>/s/Frederic D. Van Arnam, Jr.</u>
Frederic D. Van Arnam, Jr.
Ashley J. Bodden
BARNES, RICHARDSON & COLBURN, LLP
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email: rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*


Dated: August 20, 2024
        New York, NY

## CERTIFICATE OF COMPLIANCE

Pursuant to the Standard Chambers Procedures of the U.S. Court of International Trade, this Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment contains 11,644 words, as determined by Microsoft Word. This word count is within the limit of 14,000 words set forth in Rule 2(B).


/s/Frederic D. Van Arnam, Jr.

Frederic D. Van Arnam, Jr.
Ashley J. Bodden
**BARNES, RICHARDSON & COLBURN, LLP**
100 William Street, Suite 305
New York, NY 10038
Tel.: (212) 725-0200, ext. 126
Fax: (212) 889-4135
Email:  rvanarnam@barnesrichardson.com
*Counsel for BASF Corporation*


Dated:  August 20, 2024
New York, NY