UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| Plaintiff, | : |
| v. | : Consol. Court No. 13-00318 |
| UNITED STATES, | : |
| Defendant. | : |

# DEFENDANT'S REPLY IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel:*
Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

LUKE MATHERS
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9236
*Attorneys for Defendant*

Dated: September 13, 2024

**TABLE OF CONTENTS**

ARGUMENT ........................................................................................................................2

    I.      BASF's Merchandise Is Not An "Extract[] … Of … Fish" Of Heading 1603........2

          A.     "Extracts … Of … Fish" Are Savory Flavorings Containing The Essence—The Taste And Aroma—Of Fish.................................................2

          B.     BASF's Merchandise Is Derivatized, Not Extracted, As BASF's Own Evidence Shows ........................................................................................4

          C.     BASF's Merchandise Is A Semi-Synthetic Derivative Of *Fish Oil*, Not An "Extract[] … Of … *Fish*" Or A Preparation "Containing … *Fish*" ............7

    II.     BASF's Merchandise Is Not Classifiable Under Any Heading Of The HTSUS Other Than Heading 2106—Including BASF's Newfound Fallback Headings......8

    III.    The Court Has The Authority To Order Reliquidation Under Heading 2106 .......10

CONCLUSION...................................................................................................................14

# **TABLE OF AUTHORITIES**

**Cases**

*Cormorant Shipholding Corp. v. United States*,
   617 F. Supp. 2d 1270 (Ct. Int'l Trade 2009) .................................................................. 10

*Cyber Power Sys. (USA) Inc. v. United States*,
   586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022) ................................................... 11, 12, 13

*Eastalco Aluminum Co. v. United States*,
   750 F. Supp. 1135 (Ct. Int'l Trade 1990) ....................................................................... 10

*Glowczenski v. Taser Int'l, Inc.*,
   928 F. Supp. 2d 564 (E.D.N.Y. 2013) ............................................................................. 6

*GRK Can., Ltd. v. United States*,
   761 F.3d 1354 (Fed. Cir. 2014) ........................................................................................ 2

*Hernández v. Mesa*,
   589 U.S. 93 (2020) .......................................................................................................... 13

*Interphoto Corp. v. Minolta Corp.*,
   47 F.R.D. 341 (S.D.N.Y. 1969) ....................................................................................... 12

*Jakobovits v. PHL Variable Ins. Co.*,
   645 F. Supp. 3d 95 (E.D.N.Y. 2022) ................................................................................ 7

*Jarvis Clark Co. v. United States*,
   739 F.2d 628 (Fed. Cir. 1984) .......................................................................................... 9

*Jedwards Int'l, Inc. v. United States*,
   161 F. Supp. 3d 1350 (Ct. Int'l Trade 2016) .................................................................. 10

*Jedwards Int'l, Inc. v. United States*,
   161 F. Supp. 3d 1354 (Ct. Int'l Trade 2016) ............................................................... 3, 5

*Maple Leaf Mktg., Inc. v. United States*,
   639 F. Supp. 3d 1363 (Ct. Int'l Trade 2023) .................................................................. 11

*Marcor Dev. Corp. v. United States*,
   926 F. Supp. 1124 (Ct. Int'l Trade 1996) ................................................................ 3, 5, 7

*McCorvey v. Baxter Healthcare Corp.*,
   298 F.3d 1253 (11th Cir. 2002) ......................................................................................... 7

*N. Am. Foreign Trading Corp. v. United States*,
   25 C.I.T. 809 (2001) ....................................................................................................... 12

*Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*,
   451 U.S. 77 (1981) .................................................................................................... 13

*Rollerblade, Inc. v. United States*,
   112 F.3d 481 (Fed. Cir. 1997) ..................................................................................... 3

*Second Nature Designs, Ltd. v. United States*,
   586 F. Supp. 3d 1334 (Ct. Int'l Trade 2022) ............................................................. 11

*Second Nature Designs, Ltd. v. United States*,
   654 F. Supp. 3d 1301 (Ct. Int'l Trade 2023) ........................................... 11, 12, 13, 14

*Sigvaris, Inc. v. United States*,
   211 F. Supp. 3d 1353 (Ct. Int'l Trade 2017) ............................................................... 9

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) ................................................................................... 9

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .................................................................................................. 12

*Tikal Distributing Corp. v. United States*,
   93 F. Supp. 2d 1269 (Ct. Int'l Trade 2000) .............................................................. 10

*Tomoegawa (U.S.A.), Inc. v. United States*,
   763 F. Supp. 614 (Ct. Int'l Trade 1991) ................................................................... 10

*Trijicon, Inc. v. United States*,
   686 F. Supp. 3d 1336 (Ct. Int'l Trade 2024) .............................................................. 2

*UIU Severance Pay Tr. Fund v. Loc. Union No. 18-U, United Steelworkers of Am.*,
   998 F.2d 509 (7th Cir. 1993) .................................................................................... 12

*United States v. Geo. S. Bush & Co.*,
   24 C.C.P.A. 313 (1936) ........................................................................................... 7, 8

*United States v. Republic Steel Corp.*,
   362 U.S. 482 (1960) .................................................................................................. 11

**Statutes**

19 U.S.C. § 1505(b) ........................................................................................................ 11, 12

28 U.S.C. § 1583 ..................................................................................................... 10, 11, 12

28 U.S.C. § 2643 .................................................................................................................. 13

28 U.S.C. § 2643(a)(1) .................................................................................................. 13, 14

28 U.S.C. § 2643(b) ............................................................................................................. 13, 14

28 U.S.C. § 2643(c)(1) ......................................................................................................... 13, 14

Customs Court Act of 1980, Pub. L. 96-417, 94 Stat. 1785 ....................................................... 11

**Harmonized Tariff Schedule of the United States**

Heading 0410 ............................................................................................................................ 8, 9

Heading 1603 ........................................................................................................................ *passim*

Heading 2106 ...................................................................................................................... 8, 9, 10

Heading 3824 ............................................................................................................................ 8, 9

Heading 3826 ................................................................................................................................ 9

Note 1(b) to Chapter 38 ................................................................................................................. 9

Note 1(e) to Chapter 21 .............................................................................................................. 7, 8

**Rules**

Fed. R. Evid. 201(a) ...................................................................................................................... 6

Fed. R. Evid. 702 ........................................................................................................................... 7

Fed. R. Evid. 803(18) .................................................................................................................... 6

USCIT Rule 56.3(c) ...................................................................................................................... 6

**Other Authorities**

6 Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 1411 (3d ed.) ............................ 12

Explanatory Note 16.03 ................................................................................................................. 2

General Explanatory Note to Chapter 38 ...................................................................................... 9

H.R. Rep. No. 96–1235 (1980) .................................................................................................... 10

Ponsak Jairurob *et al.*, *Single Effects of Reaction Parameters in Reactive Extraction of Palm Fruit for Biodiesel Production*,
   40 Chiang Mai J. Sci. 401 (2013) ............................................................................................ 6

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

|   |   |
|---|---|
| BASF CORPORATION, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : Consol. Court No. 13-00318 |
|  | : |
| UNITED STATES, | : |
|  | : |
| Defendant. | : |

**DEFENDANT'S REPLY IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

Fish extracts, like meat extracts, are flavorful, aromatic essences often found in stocks, soups, and sauces. Reliable sources—dictionaries, encyclopedias, and Explanatory Note 16.03—confirm that. BASF's semi-synthetic ethyl esters manufactured from naturally occurring fish oil, however, are not extracts. They are mostly tasteless, odorless compounds, derivatized from fish oil rather than extracted from fish, swallowed in dietary-supplement form rather than savored for flavor. BASF's merchandise is thus not an "[e]xtract[] … of … fish" of heading 1603. It is a "[f]ood preparation[] not elsewhere specified or included" of heading 2106.

In BASF's view, though, fish extracts need not be used the way that reliable sources say they are used; they need not have much of any taste or aroma; they need not even contain what anyone would call "fish." *See* ECF No. 77 (Pl. Resp.). BASF's interpretation contravenes the plain meaning of heading 1603—which perhaps is why BASF raises, for the first time, two different fallback classifications. The Court should deny BASF's motion for summary judgment and grant the Government's cross-motion.

# ARGUMENT

I. **BASF's Merchandise Is Not An "Extract[] … Of … Fish" Of Heading 1603**

  A. **"Extracts … Of … Fish" Are Savory Flavorings Containing The Essence—The Taste And Aroma—Of Fish**

Dictionaries, encyclopedias, and Explanatory Note 16.03 all demonstrate that fish extracts, like meat extracts, are savory flavorings "used for making certain food preparations such as soups … and sauces." Explanatory Note 16.03; ECF No. 71 (Gov't Br.) at 12–15. BASF's mostly tasteless and flavorless merchandise undisputedly is not marketed or designed for such use, confirming that it is not an "[e]xtract[] … of … fish" of heading 1603.

BASF responds by explaining that there are different types of headings—*eo nomine* headings and "principal use" headings—that require different analyses. Consideration of merchandise's use, BASF argues, is proper only when applying principal use headings, whereas heading 1603 is an *eo nomine* heading. BASF therefore contends that the fact its merchandise is used as a dietary supplement, rather than a savory flavoring as heading 1603 suggests it should be, is irrelevant. Pl. Resp. at 6–12.

Heading 1603 may not explicitly contain "use" language, but that makes no difference. Even "[w]hen considering classification under an *eo nomine* provision, the court may, in some circumstances, consider an article's 'physical characteristics, … how it was designed and for what objectives, and how it is marketed.'" *Trijicon, Inc. v. United States*, 686 F. Supp. 3d 1336, 1347 (Ct. Int'l Trade 2024) (quoting *GRK Can., Ltd. v. United States*, 761 F.3d 1354, 1358 (Fed. Cir. 2014)). This is particularly true where, as here, the definition of an operative tariff term "inherently suggest[s] a type of use." *GRK*, 761 F.3d at 1358–59 (quotation omitted). Accordingly, that BASF's merchandise is designed and marketed as a largely tasteless and

odorless dietary supplement, rather than a flavorful essence for soups and sauces, reinforces that it is not an "[e]xtract[] … of … fish" of heading 1603.

This analysis is consistent with *Jedwards International, Inc. v. United States*, 161 F. Supp. 3d 1354 (Ct. Int'l Trade 2016), despite BASF's suggestion otherwise, Pl. Resp. at 10–11. In *Jedwards*, the Court assessed these same factors and concluded that the odorous krill oil at issue, which "*only* contain[ed] substances that are naturally occurring in krill," was an "extract" rather than an "oil" despite its marketing. *Id.* at 1358, 1362. Here, by contrast, BASF's merchandise neither contains only naturally occurring substances nor is marketed or designed as a flavorful essence. *Marcor Dev. Corp. v. United States*, 926 F. Supp. 1124, 1133 (Ct. Int'l Trade 1996) ("Indeed, by plaintiff's own admission, its product is not 'used for making certain food preparations such as soups (whether or not concentrated) and sauces' as contemplated by the Explanatory Notes.").

True, BASF's merchandise is made up of molecules—ethyl esters—that in turn contain omega-3 fatty acids that were at one point part of triglycerides within fish. But to suggest that the omega-3 fatty acid portions of these molecules are the "essence" of fish driving the merchandise's classification, Pl. Resp. at 26–29, fails twice over. The merchandise is not naturally occurring omega-3 fatty acids but rather ethyl esters that cannot be extracted from fish. And it is merchandise itself that must be classified—not its sub-molecules. Gov't Br. at 22, 27 (citing *Rollerblade, Inc. v. United States*, 112 F.3d 481, 487 (Fed. Cir. 1997)). Moreover, "essence" means the flavor and aroma of fish, Gov't Br. at 12–16, 22, not the presence of a sub-molecule of algal origin, once contained within fish in a different chemical form, in the final product. In no sense, then—physical characteristics, design, or marketing—is BASF's merchandise an "[e]xtract[] … of … fish" of heading 1603.

3

### B. BASF's Merchandise Is Derivatized, Not Extracted, As BASF's Own Evidence Shows

Furthermore, BASF's merchandise is a semi-synthetic "derivative" obtained through transesterification of natural fish oil and is therefore not an "[e]xtract[]" of heading 1603. Gov't Br. at 16–20. That BASF's merchandise is a semi-synthetic "derivative" rather than a natural "extract" is not wordplay, Pl. Resp. at 17, but instead faithful interpretation of the HTSUS's plain meaning. The HTSUS understands extracts and derivatives to be two different species of compounds. Gov't Br. at 17–18. Yet heading 1603 covers "[e]xtracts," not "derivatives." BASF has no response to this point. *See* Pl. Resp.

BASF's own expert, Dr. Bannenberg, in fact agrees that "transesterification is a derivatization type reaction," from a chemical perspective. Gov't Ex. 3, ECF No. 71-5 (Bannenberg Dep.) at 100:3–4. It is "not an extraction reaction, but you can use [it] to obtain the EPA and DHA from a molecule that's not suitable into a chemical form that you can use to enrich your EPA and DHA content." *Id.* at 101:8–15. As such, "you cannot extract" a "fatty acid ethyl ester molecule" from triglycerides. *Id.* at 102:17–20. Accordingly, the "fatty acid ethyl ester molecule as a whole" is not what Dr. Bannenberg would call "an extract." *Id.* at 102:4–11. BASF's merchandise, being primarily comprised of fatty acid ethyl esters, is thus a derivative, not an extract classifiable under heading 1603.

Despite what BASF now claims without expert opinion to back it up, Pl. Resp. at 17, derivatization is not used solely to prepare a compound for analysis. It can be used for that purpose, sure. But derivatization in the form of transesterification is also used to create biodiesel, or in "marine oil processing" to create fatty acid ethyl esters like BASF's from triglyceride fish oil. Gov't Ex. 2, ECF No. 71-4 (Rizvi Report) at ¶¶ 20, 30 & n.27. The article upon which BASF relies at some length, Pl. Resp. at 21–22 (citing ECF No. 68-10), agrees:

4

some manufacturers sell omega-3 fatty acid supplements "in triglyceride form, rather than *derivatised as ethyl esters*." ECF No. 68-10 at 4 (emphasis added).

Nor do the words "extract" or "extraction" encompass reactions like transesterification that transform naturally occurring compounds into synthetic ones, Pl. Resp. at 17–19. It is one thing to chemically extract a compound using, for example, solvent extraction. Rizvi Report at ¶¶ 28–29. It is another to use a chemical reaction to create a new compound. *Id.* at ¶¶ 28–31. *Jedwards* recognizes this distinction (even if BASF does not, Pl. Resp. at 18). In *Jedwards*, it was crucial that the krill oil "*only* contain[ed] substances that are naturally occurring in krill," apart from residual solvent in the form of ethanol. 161 F. Supp. 3d at 1358. The same cannot be said of BASF's merchandise. It is made up of semi-synthetic derivatives that cannot be extracted from fish, with ethanol being an integral part of the fatty acid ethyl esters rather than a residual solvent. *See Marcor*, 926 F. Supp. at 1133 (holding that "shark cartilage that is refined, pressurized, treated with an enzyme, and mixed with dextrin," rather than merely "concentrated," is not an "[e]xtract[]" of heading 1603). It thus does not only contain substances that are naturally occurring in fish and cannot be an "[e]xtract[]" as *Jedwards*, *Marcor*, and reliable sources understand the term.

BASF then alludes to something called "reactive extraction," Pl. Resp. at 19–20, but misunderstands the phrase. "Reactive extraction" merely refers to combining extraction and transesterification into a single production step, as Dr. Rizvi explained. *Id.* It does not mean using transesterification as an extraction method—which it is not. "In the reactive extraction process, extraction of oil and transesterification proceed in a single step in which the oil-bearing material contacts with alcohol directly instead of reacting with pre-extracted oil. In other words, alcohol acts both as an extraction solvent and as a transesterification reagent during reactive

5

extraction, … eliminat[ing] the requirement of two separate processes." Ponsak Jairurob *et al.*, *Single Effects of Reaction Parameters in Reactive Extraction of Palm Fruit for Biodiesel Production*, 40 Chiang Mai J. Sci. 401, 402 (2013), available at https://www.thaiscience.info/journals/Article/CMJS/10886448.pdf. The concept of reactive extraction thus reinforces that transesterification is a derivatization reaction *separate* from extraction—in one step, alcohol performs two functions (extraction and reaction), not one. Regardless, BASF has never claimed to use "reactive extraction" to produce its merchandise.

Finally, the article that BASF cites, Pl. Resp. at 21–22 (citing ECF No. 68-10),[1] and Dr. Bannenberg's testimony, *id.* at 20–21 (citing Bannenberg Dep. at 95:10–96:5), are no help to BASF. The article's passing mention of "extracts of high omega-3 concentration," ECF No. 68-10 at 4, is referring to the concentration of particular ethyl esters via molecular distillation after transesterification is performed, *id.* at 4–5. *See* Rizvi Report at ¶ 21. That is likewise what Dr. Bannenberg referred to as "extraction" in his testimony: "the purpose of making fatty [acid] ethyl ester products [through transesterification] is to get the EPA and DHA out of the triglyceride structure" so that it can be "concentrate[d]." Bannenberg Dep. at 95:10–96:5.[2]

---

[1] Publications cited in briefing can be considered for their "legislative fact[s]," Fed. R. Evid. 201(a), but BASF cannot use this article (or any other that it cites) to dispute or "clarify" the Government's statement of material facts. ECF No. 76-1 at ¶¶ 2–6. USCIT Rule 56.3(c) requires that a "statement controverting any statement of material fact" be "followed by citation to evidence which would be admissible." "A published article is hearsay" and inadmissible if, as is the case here, no expert has vouched for it. *Glowczenski v. Taser Int'l, Inc.*, 928 F. Supp. 2d 564, 572–73 (E.D.N.Y. 2013) (citing Fed. R. Evid. 803(18)).

[2] To the extent Dr. Bannenberg could be understood to have opined that he "think[s]" one "can envision" that transesterification "can be viewed" as a "type" of extraction of EPA and DHA (not fish), Bannenberg Dep. at 95:10–96:5, such testimony would be inadmissible. Not only was this equivocal opinion not disclosed in his report, *id.* at 96:2–8 ("Q. And was that disclosed in your expert report? A. Not worded as such."), but it was based solely on "the way that *[he] like[s] to reflect* how to get the EPA and DHA as a manageable fatty acid and be able to concentrate it," *id.* at 96:22–97:11 (emphasis added). Such *ipse dixit* expert testimony is

*(cont'd)*

6

Transesterification's facilitating *subsequent* concentration of ethyl esters of EPA and DHA does not make transesterification itself an extraction process or its product an extract (rather than a derivative) within the meaning of the HTSUS. Preparations of fatty acid ethyl esters like BASF's are thus semi-synthetic derivatives, not flavorful fish "[e]xtracts" of heading 1603.

### C. BASF's Merchandise Is A Semi-Synthetic Derivative Of *Fish Oil*, Not An "Extract[] … Of … *Fish*" Or A Preparation "Containing … *Fish*"

Regardless, BASF's merchandise still falls outside heading 1603's plain language because it is a semi-synthetic derivative of *fish oil* as opposed to an "[e]xtract[] … of … *fish*." The term "fish," for tariff purposes, includes the "flesh or organic structure" of fish, like fish meat, skin, bones, and fins. Gov't Br. at 20–21 (quoting *Marcor*, 926 F. Supp. at 1132). "Fish" does not, however, include "fish oil, which, of course, is not fish." *Id.* (quoting *United States v. Geo. S. Bush & Co.*, 24 C.C.P.A. 313, 315 (1936)). BASF's merchandise accordingly cannot be an "[e]xtract … of … fish," given that it is a concentrated derivative of fish oil. And for similar reasons, it does not "contain[] … fish" within the meaning of Note 1(e) to Chapter 21. Gov't Br. at 26–27.

BASF responds that the crude fish oil from which its merchandise is created comes from fish, Pl. Resp. at 23–25, 34–37,[3] but that misses the point. The point is that the tariff term "fish"

---

inadmissible under Federal Rule of Evidence 702. *See, e.g.*, *Jakobovits v. PHL Variable Ins. Co.*, 645 F. Supp. 3d 95, 110 (E.D.N.Y. 2022) (excluding an expert's "conclusory," "unexplained" opinion); *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256–57 (11th Cir. 2002) (affirming exclusion of an expert who, among other things, "was unable to cite scientific literature in support of his theories").

[3] The "allergen information" that BASF provides its customers "identifies fish and products thereof as an allergen *associated with* the imported merchandise," ECF No. 68–2 at ¶ 9 (emphasis added)—it does not state that the merchandise "*contain[s]* 'fish and products thereof,'" as BASF now claims in briefing, Pl. Resp. at 36 (emphasis added) (citing ECF No. 68-2 at ¶ 9). As BASF acknowledged at deposition, it does not even know whether someone

*(cont'd)*

covers "fish, not the [] processed material made therefrom." *Geo. S. Bush & Co.*, 24 C.C.P.A. at 316. Put simply, BASF's syllogism goes one bridge too far: heading 1603 does not cover "extracts of fish oil," or "derivatives of extracts of fish." It covers "[e]xtracts … of … fish."

This is why Note 1(e) to Chapter 21 references Chapter 16, not Chapter 15 (which covers fish oil), when describing preparations "containing … fish." Gov't Br. at 26–27. A preparation of fish oil is not a preparation "containing … fish" within the meaning of the HTSUS. *Id.* BASF fails to respond to this argument. *See* Pl. Resp. at 34–37. BASF's merchandise, being a derivative of fish oil, is thus not a preparation "of … fish" of heading 1603—or, for much the same reasons, a preparation "containing … fish" within the meaning of Note 1(e) to Chapter 21.

## II. BASF's Merchandise Is Not Classifiable Under Any Heading Of The HTSUS Other Than Heading 2106—Including BASF's Newfound Fallback Headings

Because BASF's merchandise is not classifiable under heading 1603, and is not classifiable under any other heading of the HTSUS, it is properly classified under heading 2106 as a "[f]ood preparation[] not elsewhere specified or included." Gov't Br. at 23–30. BASF does not dispute that its merchandise qualifies as a "[f]ood preparation[]." *See* Pl. Resp. at 30–39. Instead, it argues for the first time that classification under heading 3824 or even heading 0410 is appropriate. *Id.* at 31–33, 42 n.14.

To start, BASF's argument that either of these headings describes its merchandise is untimely. BASF agreed in the first page of its opening brief that heading 3824 was not the "proper tariff classification," ECF No. 68 at 1, and omitted any mention of heading 0410 from that brief, *see id.* "It is 'well established that arguments not raised in the opening brief are waived,'" even in classification cases like this one. *Sigvaris, Inc. v. United States*, 211 F. Supp.

---

allergic to fish would be allergic to its derivatized oil. USCIT Rule 30(b)(6) Deposition of Henrik Fismen, ECF No. 71-3 at 89:24–91:14.

8

3d 1353, 1364 (Ct. Int'l Trade 2017) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)).

Separate and apart from being untimely, the argument fails. As for heading 3824, BASF says that its merchandise is not excluded by Note 1(b) to Chapter 38 because it is not a "[m]ixture[] of chemicals with foodstuffs or other substances with nutritive value … (generally, heading 2106)," Pl. Resp. at 31–33, but that is wrong on two fronts. First, BASF admitted that its merchandise "consists essentially of chemical mixtures of fatty acid ethyl esters and natural mixed tocopherols (vitamin E)" and is "valued for its nutritional qualities." ECF No. 32 at 6 ¶¶ 6, 16; ECF No. 35 at ¶¶ 6, 16. BASF cannot now claim that its merchandise is not a "mixture" lacking "nutritional" value. And second, BASF misreads Note 1(b). The Note describes mixtures that are intended to be ingested for nutrition rather than "function as chemical products." General Explanatory Note to Chapter 38. The fatty acid ethyl esters that make up BASF's merchandise are undisputedly "substances with nutritive value"—they are encapsulated into dietary supplements—that form a mixture with "chemicals" in the form of tocopherols added as antioxidants. Note 1(b) to Chapter 38; Pl. Resp. at 32 (conceding that the tocopherols are added "as an antioxidant to protect the finished product," not "as a foodstuff or to impart nutritive benefits"). Note 1(b) to Chapter 38 thus confirms that BASF's merchandise is classifiable as a "[f]ood preparation[]" of heading 2106—rather than, say, a "chemical product[]" of heading 3824, or "[b]iodiesel" of heading 3826.

Nor is heading 0410 applicable, for the reasons the Government has already explained. Gov't Br. at 25–26 n.5. BASF has no substantive response. And *Jarvis Clark Co. v. United States*, 739 F.2d 628 (Fed. Cir. 1984), cannot save BASF. Pl. Resp. at 42 n.14. *Jarvis Clark* did not overrule the adversary system or require the Court to "boil the ocean" in classification cases,

9

*Jedwards Int'l, Inc. v. United States*, 161 F. Supp. 3d 1350, 1354 (Ct. Int'l Trade 2016), as BASF now asks the Court to do. *Jarvis Clark* merely reaffirmed that the Court should correctly decide cases. The Court should do so here and hold that BASF's merchandise is appropriately classified as a "[f]ood preparation[] not elsewhere specified or included" of heading 2106.

### III.  The Court Has The Authority To Order Reliquidation Under Heading 2106

Finally, BASF argues that, if the Government lacks the authority to bring a counterclaim, the Court is powerless to classify its merchandise under heading 2106 and order a reliquidation that would result in a higher duty bill. Pl. Resp. at 39–48. Not so.

To start, the law provides the Government the authority to bring what 28 U.S.C. § 1583 calls a "counterclaim" in a case like this one. Section 1583 vests this Court with exclusive jurisdiction to hear a counterclaim brought by the Government that "involves the imported merchandise that is the subject matter of" an importer's action.

Historically, when this Court determined that the proper classification of imported merchandise called for an increase in duties, "the court could only dismiss the action, without requiring the plaintiff to pay any additional duties." *Cormorant Shipholding Corp. v. United States*, 617 F. Supp. 2d 1270, 1276 n.17 (Ct. Int'l Trade 2009). Congress "remedied this problem" through § 1583, which, in Congress' words, "permits the [G]overnment to 'assert[ ] a claim that would allow the court to make the proper determination and accordingly would enable the Government to collect the full amount of duties.'" *Id.* (quoting H.R. Rep. No. 96–1235 at 36 (1980)); *see Tikal Distributing Corp. v. United States*, 93 F. Supp. 2d 1269, 1275 n.4 (Ct. Int'l Trade 2000); *Tomoegawa (U.S.A.), Inc. v. United States*, 763 F. Supp. 614, 621 (Ct. Int'l Trade 1991); *Eastalco Aluminum Co. v. United States*, 750 F. Supp. 1135, 1138–40 (Ct. Int'l Trade 1990), *vacated on other grounds*, 995 F.2d 201 (Fed. Cir. 1993). Section 1583 and its legislative

10

history thus demonstrate Congress's intent to permit the Government to recover duties owed as a result of the Court's judgment in a case brought by an importer through a counterclaim. *See* Gov't Br. at 30.

This Court has only recently held that, despite § 1583, its legislative history, and decades of consistent practice immediately following its enactment, the Government has no counterclaim and may only raise a new classification as a defense. *See generally Second Nature Designs, Ltd. v. United States*, 654 F. Supp. 3d 1301 (Ct. Int'l Trade 2023); *Maple Leaf Mktg., Inc. v. United States*, 639 F. Supp. 3d 1363 (Ct. Int'l Trade 2023); *Second Nature Designs, Ltd. v. United States*, 586 F. Supp. 3d 1334 (Ct. Int'l Trade 2022); *Cyber Power Sys. (USA) Inc. v. United States*, 586 F. Supp. 3d 1325 (Ct. Int'l Trade 2022). In redesignating counterclaims as defenses, the Court has held that the cause of action that Congress intended to provide the Government must be spelled out by a statute other than a jurisdictional one. We respectfully disagree.

"Specific authority" is not the test; rather, where "Congress has legislated and made its purpose clear," the Government can enforce Congress's will even if its claim "rest[s] on inferences" drawn from statute. *United States v. Republic Steel Corp.*, 362 U.S. 482, 492 (1960) ("Otherwise we impute to Congress a futility inconsistent with the great design of this legislation."). Here, a non-jurisdictional statute does provide that Customs "shall collect any increased or additional duties and fees due, together with interest thereon, or refund any excess moneys deposited, together with interest thereon, as determined on a liquidation or reliquidation." 19 U.S.C. § 1505(b). This provision, explicitly empowering Customs to "collect any increased or additional duties" due upon "reliquidation," and read in the context of § 1583 and the rest of the Customs Court Act of 1980, Pub. L. 96-417, 94 Stat. 1785, provides the

11

Government a substantive right to revenue that can be vindicated through a counterclaim—as clear congressional intent confirms.

And though it is true that § 1505(b) only comes into play after this Court orders reliquidation, *Cyber Power*, 586 F. Supp. 3d at 1330 n.9; *Second Nature Designs*, 654 F. Supp. 3d at 1306, that does not vitiate the Government's counterclaim. Counterclaims like the one at issue here are more accurately termed "contingent counterclaims." *N. Am. Foreign Trading Corp. v. United States*, 25 C.I.T. 809 (2001). That is, the Government's claim to increased duties is contingent upon the Court first ruling that BASF's merchandise is classifiable under heading 2106. But that the Government does not currently have a claim to these duties is immaterial; "[a] counterclaim is not barred because recovery will depend on the outcome of the main action." *Interphoto Corp. v. Minolta Corp.*, 47 F.R.D. 341, 344 (S.D.N.Y. 1969); *accord* 6 Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 1411 (3d ed.).

Moreover, even if the Government's ability to bring a counterclaim were not authorized by statute (which it is), it can be recognized through federal common law to fill whatever gap Congress left in the statutory framework. *UIU Severance Pay Tr. Fund v. Loc. Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 512 n.10 (7th Cir. 1993) (even if a cause of action cannot be implied from a statute, "[t]he creation of a federal common law cause of action … is appropriate when, as here, it is necessary to effectuate the statutory pattern enacted in the large by Congress" (quotation omitted)). Indeed, if the gap were not filled, § 1583 would, as it relates to the Government, effectively be "stillborn because there could be no claim for relief without a further statute expressly authorizing adoption of causes of action." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) (holding that although a particular statute was jurisdictional, common law provided the cause of action to which the statute referred). And that creation of *private*

12

rights of action by statutory implication or through federal common law is disfavored, *see* Pl. Resp. at 42 (quoting *Hernández v. Mesa*, 589 U.S. 93, 101 (2020)), does not undermine the Court's ability to "fashion federal common law in cases raising issues of uniquely federal concern, such as the definition of rights or duties of the United States," *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 (1981). In other words, this is *the* circumstance where federal common law appropriately supplies a right of action.

In any event, the controversy over the proper procedural vehicle—counterclaim or defense—makes no difference in this case. As BASF framed its argument in its opening brief, it does not matter whether the Government has the authority to bring a counterclaim. The Court can "recharacterize" the counterclaim "as a defense" and "conclude that the appropriate tariff classification carries a higher duty rate than originally assessed." ECF No. 68 at 41 & n.14. And the very cases that BASF relied on in its opening brief hold that "the court's ability to order the payment of increased duties from [an importer] does not depend on whether there is a counterclaim." *Second Nature Designs*, 654 F. Supp. 3d at 1307 n.6; *accord Cyber Power*, 586 F. Supp. 3d at 1332 n.13.

BASF now contends for the first time that the Court lacks the power to order reliquidation at a higher duty rate. Pl. Resp. at 39–48. The tortured interpretation of 28 U.S.C. § 2643 that this new argument rests on, *id.* at 44–45, apart from being waived or forfeited, fails to demonstrate that this Court lacks such power. Section 2643(a)(1) permits this Court to "enter a money judgment … *for or against* the United States in *any* civil action commenced under section 1581 …." And § 2643(c)(1) empowers this Court to "order any other form of relief that is appropriate in a civil action," including "orders of remand" and "injunctions." Ordering Customs to reliquidate BASF's entries to effect the "correct decision," 28 U.S.C. § 2643(b),

13

comfortably fits within these provisions. *See Second Nature Designs*, 654 F. Supp. 3d at 1307 n.6. Yet how § 2643(a)(1), (b), and (c)(1) are all cabined only to relief that benefits importers, despite their plain language, BASF does not say.

## CONCLUSION

For these reasons, the Court should grant the Government's cross-motion for summary judgment, deny BASF's motion for summary judgment, and enter judgment in the Government's favor.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel:*
Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

/s/ Luke Mathers
LUKE MATHERS
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9236

Dated: September 13, 2024        *Attorneys for Defendant*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| Plaintiff, | : |
| v. | : Consol. Court No. 13-00318 |
| UNITED STATES, | : |
| Defendant. | : |

**CERTIFICATE OF COMPLIANCE**

I, LUKE MATHERS, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing reply in support of defendant's cross-motion for summary judgment, relying upon the word count feature of the word processing program used to prepare the reply, certify that this reply complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 4,360 words.

/s/ Luke Mathers
LUKE MATHERS