Slip-Op. 25-54

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BASF CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES <br><br> Defendant. | Before: Joseph A. Laroski, Jr., Judge <br><br> Consol. Court No. 13-00318 |

## <u>OPINION</u>

[In a Customs classification matter, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied.]

Dated: May 2, 2025

<u>Frederic Deming Van Arnam, Jr.</u> and <u>Ashley J. Bodden</u>, Barnes, Richardson & Colburn, LLP, of New York, NY, argued for plaintiff BASF Corporation.

<u>Luke Mathers</u>, Trial Attorney, U.S. Department of Justice, Civil Division, of New York, NY, argued for defendant United States. With him on the brief were <u>Brian M. Boynton</u>, <u>Patricia M. McCarthy</u>, and <u>Justin R. Miller</u>. Of counsel, arguing for defendant, was <u>Michael A. Anderson</u>, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Laroski, Judge: Before the court are cross-motions for summary judgment. Pl. Mot. for Sum. J., ECF No. 68 (April 30, 2024) ("Pl. MSJ"); Def. Mem. in Supp. of Cross-Mot. for Sum. J., ECF No. 71 ("Def. Cross MSJ"). Plaintiff BASF Corporation ("BASF") challenges the U.S. Customs and Border Protection's ("Customs")

classification of fish oil ethyl ester concentrates under heading 3824 of the

Harmonized Tariff Schedule of the United States ("HTSUS").  Contrary to Customs'

initial classification, plaintiff contends that the fish oil ethyl ester concentrates are

extracts of fish under heading 1603.  HTSUS.  Broadly, BASF argues that the

imported merchandise maintains the essence of the fish source, which qualifies it as

an extract of fish.  Pl. MSJ at 45.  The Government, meanwhile, argues that the

imported merchandise is not an extract of fish under heading 1603, Gov. Cross MSJ

at 8; instead, the Government now contends that the imported merchandise belongs

under heading 2106, as "[f]ood preparations not elsewhere specified or included."

Id. at 9; HTSUS.  For the reasons laid out below, the court holds that BASF's fish

oil ethyl ester concentrates maintain the essence of fish and are therefore extracts

of fish classified under HTSUS 1603.

## BACKGROUND

I.    Procedural Background

There are no material facts in dispute in this case.  Pl. MSJ at 2; Def. Cross

MSJ at 9.  The merchandise in question consists of products imported by BASF

under the names Omevital 3322 EE, Omevital 400200 EE Mix Toe, Omevital 4510

EE, Omevital 3426 EE and PronovaPure 150:500 EE (the "imported merchandise").

Joint Statement of Undisputed Material Facts, ECF No. 68-1 (April 30, 2024)

("SUMF") at ¶ 3.  Between December 2011 and May 2012, BASF made five entries

of imported merchandise at the Port of Los Angeles, California, and one entry, on

April 28, 2018, at the Port of Newark, New Jersey.  Id. at ¶ 4.

Customs initially classified the imported merchandise under subheading 3824.90.40 or 3824.90.41, depending on the date of entry.  Id. at ¶ 5; see HTSUS (2011); HTSUS (2012); HTSUS (2018).  The parties agree that the imported merchandise should all be classified under the same provision of the HTSUS.  Id. at ¶ 7.  BASF commenced this action to order reliquidation of the imported merchandise under subheading 1603.00.90.  HTSUS.  The parties agree that the court has jurisdiction over this action under 28 U.S.C. § 1581(a).  SUMF at ¶ 1.

II.    Description of Imported Merchandise

The imported merchandise consists of semi-synthetic fish oil ethyl ester concentrates rich in omega-3 fatty acids that include polyunsaturated omega-3 fatty acids known as eicosapentaenoic acid ("EPA") and docasahexaenoic acid ("DHA").  SUMF at ¶¶ 7, 10.  BASF purchases crude fish oil (the "fish source") produced from ungutted whole fish (typically anchovies, sardines, and mackerel) by physically separating the oil in the fish from the fish solids.  Id. at ¶¶ 11, 12.  The fish source is dark brown in color.  Id. at ¶ 29.  It consists predominantly of triglycerides, which are esters of glycerol.  Id. at ¶¶ 13, 14.  A triglyceride is a structure of three fatty acids bound to a single glycerol backbone; typically, of the three fatty acids in each triglyceride, one is a polyunsaturated omega-3 fatty acid such as EPA or DHA.  Id. at ¶¶ 13–15.  EPA and DHA "are thought to promote good health."  Id. at ¶ 8.  BASF purchases the fish source in bulk for use in the production of the imported merchandise, which it later sells to companies that make human dietary supplements.  Id. at ¶ 9.  BASF's product names – for example, Omevital 3322 EE –

communicate the percentage content of EPA (33 percent) and DHA (22 percent),

respectively, to BASF's customers.  See e.g., id. at¶ 24.

After BASF receives the fish source, it chemically cleaves the fatty acids,

including the EPA and DHA, from the triglyceride's glycerol backbone, esterifies the

fatty acids with ethanol to form semi-synthetic fatty acid ethyl esters, and

concentrates the ethyl esters to create an end product with high concentrations of

EPA and DHA ethyl esters.  Id. at ¶ 17.  A small amount of tocopherol is added to

the end product to prevent oxidation.  Id. at ¶ 23.

The imported merchandise contains glycerides, oligomers, and triglycerides

alongside the EPA and DHA.  Id.  at ¶¶ 24–28.  The imported merchandise is a

light-yellow liquid with a slight fish-like odor and minimal fish oil taste.  Id. at

¶¶ 29–31.  The fatty acid ethyl ester molecules in the imported merchandise are

created through transesterification but include the same EPA and DHA that were

present in the triglyceride molecules prior to transesterification.  Id. at ¶¶ 33–34.[1]

"Glycerides, oligomers, and triglycerides, which are present in the imported

merchandise as organic impurities, occur naturally in crude fish oil."  Id. at ¶ 36.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(a) (2018), which grants the

court "exclusive jurisdiction of any civil action commenced to contest the denial of a

---

[1]  The parties describe transesterification as when "[a] chemical reaction occurs, whereby the three
fatty acids attached to the glycerol backbones of the triglycerides in the semi-finished fish oil are
chemically severed from the glycerol backbones . . . the fatty acids individually bond with one
ethanol molecule each, forming three discrete fatty acid ethyl ester molecules from each triglyceride
molecule.  SUMF at ¶ 19.  The glycerol left over from the chemical reaction is then removed.  Id.

protest, in whole or in part, under section 515" of the Tariff Act of 1930, <u>as</u>
<u>amended</u>, 19 U.S.C. § 1515.  The court will grant summary judgment if "there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."  CIT R. 56(a).  Summary judgment is appropriate in tariff
classification cases where "there is no genuine dispute as to the nature of the
merchandise and the classification turns on the proper meaning and scope of the
relevant tariff provisions."  <u>Deckers Outdoor Corp. v. United States</u>, 714 F.3d 1363,
1371 (Fed. Cir. 2013).  Where, as here, there are no disputed material facts, the
court reviews Customs' classification determinations de novo.  <u>E.g.</u> <u>Marubeni Am.</u>
<u>Corp. v. United States</u>, 35 F.3d 530, 533 (Fed. Cir. 1994).

DISCUSSION

I.    Legal Framework

        In a tariff classification dispute, the court has a statutory mandate to "reach
a correct result."  <u>Jarvis Clark Co. v. United States</u>, 733 F.2d 873, 878 (Fed. Cir.
1984); <u>see</u> 28 U.S.C. § 2643(b).  The court considers whether "the government's
classification is correct, both independently and in comparison with the importer's
alternative."  <u>Jarvis Clark</u>, 733 F.2d at 878.  The plaintiff bears the burden of
demonstrating that the Government's classification of the imported merchandise
was incorrect.  <u>Id.</u> at 876.  After this burden is met, the court undertakes a two-step
analysis to determine the correct result.  <u>Faus Group, Inc. v. United States</u>, 581
F.3d 1369, 1371 (Fed. Cir. 2009).  "The first step addresses the proper meaning of
the relevant tariff provisions, which is a question of law.  The second step involves

determining whether the merchandise at issue falls within a particular tariff provision as construed, which, when disputed, is a question of fact." Id. at 1371–72 (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)). Thus, if "there is no factual dispute regarding the merchandise, its structure and use, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions." Id. at 1372.

To determine the meaning of a tariff term and apply it to the facts, the court applies the General Rules of Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of Interpretation. The court applies the GRIs in numerical order and only continues to a subsequent GRI if "proper classification of the imported goods cannot be accomplished by reference to a preceding GRI." E.g. Irwin Indus. Tool Co. v. United States, 920 F.3d 1356, 1359–60 (Fed. Cir. 2019). GRI 1 requires classification to "be determined according to the terms of the headings and any relative section or chapter notes." GRI 1, HTSUS. GRIs 2 through 5 apply "provided such headings or notes do not otherwise require." Id. Finally, the court determines the correct subheading, each contained within a four-digit heading, by applying GRI 6. GRI 6, HTSUS.

The HTSUS is derived from the Harmonized Commodity Description and Coding System, which "provides a common core language for trade." Marubeni, 35 F.3d at 533. When "a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common or dictionary meaning in the absence of evidence to the contrary." Russell Stadelman & Co. v. United

States, 242 F.3d 1044, 1048 (Fed. Cir. 2001).  When determining the common

meaning of a tariff term, the court "may rely upon its own understanding of the

terms used, and it may consult lexicographic and scientific authorities, dictionaries,

and other reliable information."  Baxter Healthcare Corp. v. United States, 182 F.3d

1333, 1338 (Fed. Cir. 1999).  The court also consults the Explanatory Notes ("ENs")

published by the World Customs Organization ("WCO") in interpreting terms of the

HTSUS.  Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 n.1 (Fed. Cir. 1999).

The ENs "although not controlling – provide interpretive guidance."  E.T. Horn Co.

v. United States, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing Len-Ron Mfg. Co. v.

United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003)).  Among the guidance ENs may

provide are illustrative examples of a tariff term's proper applications.

II.    Competing Tariff Provisions

       GRI 1, HTSUS, requires that the court first consider the terms of the

headings and any relevant section and chapter notes.  Customs classified the fish oil

ethyl esters under heading 3824, HTSUS, at a duty rate of 4.6 percent, ad valorem.

SUMF at ¶ 5.  The relevant portion of Chapter 38 reads:

       **3824 (HTSUS 2011)**
                       Prepared binders for foundry molds or cores; chemical products
                       and preparations of the chemical or allied
                       industries (including those consisting of mixtures of natural
                       products), not elsewhere specified or included:
       3824.90         Other:
       3824.90.40      Fatty substances of animal or vegetable
                       origin and mixtures thereof.

For entries made in 2012 and 2018, this provision is set forth at HTSUS 3824.90.41

(2012) and HTSUS 3824.99.41 (2018).  HTSUS.

BASF contends that the fish oil ethyl ester concentrates should enter under

heading 1603, at a duty-free rate. The relevant portion of Chapter 16 reads:

> **1603 (HTSUS 2011, 2012, and 2018)**
>                 Extracts and juices of meat, fish or crustaceans, molluscs or
>                 other aquatic invertebrates:
> 1603.00.90    Other.

In this litigation, the Government raised a counterclaim proposing

classification under heading 2106, with a duty rate of 6.4 percent, ad valorem, as:

> **2106 (HTSUS 2011 and 2012)** [2]
>                 Food preparations not elsewhere specified or included:
> 2106.90       Other:
> 2106.90.99    Other.

As set forth above, there are three competing tariff provisions at issue. A

tariff subheading is considered a "basket" provision when it is applicable to goods

"not elsewhere specified or included." E.g. id.; see Rollerblade, Inc. v. United States,

282 F.3d 1349, 1354 (Fed. Cir. 2002) (citing EM Indus., Inc. v. United States, 999 F.

Supp. 1473, 1480 (CIT 1998)). The classification of imported merchandise in a

basket provision "is only appropriate when there is no tariff category that covers the

merchandise more specifically." EM Indus., 999 F. Supp. at 1480. Two of the three

tariff headings under consideration include basket provisions: Customs' original

classification, heading 3824, and the Government's proposed heading in its

counterclaim, heading 2106. Because the Government's chosen heading contains

the limiting language "not elsewhere specified or included," by operation of GRI 1

this proposed classification may prevail only if the imported merchandise is not

---

[2] Chapter 21 "does not cover . . . [f]ood preparations, other than the products described in heading
2103 or 2104, containing more than 20 percent by weight of . . . fish." EN 1(e), HTSUS.

elsewhere specified or included under a heading with terms that also describe that good and that do not contain these limiting terms, such as the phrase in heading 1603. See, e.g., id.

III.   The Imported Merchandise Properly Falls under Heading 1603

BASF argues that the imported merchandise should be classified under heading 1603 because the merchandise is an extract of fish. The Government disagrees and contends that the merchandise is neither an extract nor of fish. For the reasons set forth below, the court holds that the imported merchandise is an extract of fish and is therefore classified under HTSUS heading 1603.

A.   The Imported Merchandise is an "Extract"

Both the Government and BASF note that this court previously defined "extract" as "a preparation containing the essence of the substance from which it is derived." Marcor Dev. Corp. v. United States, 926 F. Supp. 1124, 1133 (CIT 1996). BASF defines "essence" as the "substance from which the imported products are derived." Pl. MSJ at 26 (citing common dictionaries). BASF contends that the essence of the fish source "is imparted by the omega-3 fatty acids," noting that long-chain fatty acids make up 90 percent of the crude fish oil. Id. The other factors that BASF argues indicate that the imported merchandise maintains the essence of the fish source include that (i) the health benefits imparted by the omega-3 fatty acids in the imported merchandise are the same health benefits found in the crude fish

oil, id. at 26–27[3], (ii) the imported merchandise is liquid and lipidic, and (iii) it has

"a discernable fishy smell, taste, and color." Id. at 33 (citing SUMF at ¶ 1); id. at 37.

Additionally, BASF highlights that other than tocopherol, which is added in small

amounts (less than 1 percent) to prevent the imported merchandise from spoiling,

all of the imported merchandise is derived from the fish source. Id. at 34 (citing

SUMF at ¶¶ 23–28).

      Throughout its briefing, the Government treats the terms "extract" with

"essence" as interchangeable. E.g., Def. Cross Mot. at 1, 12–13. In contrast to

BASF, however, the Government defines "an extract (an essence)" as "concentrated

flavorings obtained through reduction, distillation, or similar extraction processes."

Id. at 13. The Government references additional dictionary definitions of "extract"

to support its argument, including: "a preparation supposed to possess the virtue of

the original substance in concentrated form"; and "a concentrated preparation of the

essential constituents of a food, flavoring, or other substance; concentrate." Id. at

12 (citing Marcor, 926 F. Supp. at 1132–33).

      The Government contends that EN 16.03 "confirms that the phrase

'extracts . . . of . . . fish' refers to concentrated fish flavorings" because the EN states

"'though obtained from different sources, the extracts of [heading 1603] have very

similar physical characteristic (appearance, odour, flavour, etc.) and chemical

composition.'" Id. at 14 (quoting EN 16.03). The Government refers to two of this

---

[3] BASF's expert witness, Dr. Gerard Bannenberg, testified that "it is important to make clear that the EPA and the DHA that we're discussing today in the [imported merchandise] is exactly the same EPA and DHA found in [the fish source]." Pl. MSJ, Ex. 9 at 17:18–22; see Pl. MSJ at 29.

court's prior cases: <u>Marcor</u>, in which the court concluded that the imported food

grade shark cartilage protein is not an extract of fish, and <u>Jedwards Int'l, Inc., v.</u>

<u>United States</u>, in which the court held that the imported krill oil is an extract of

fish.  <u>Id.</u> at 15; <u>see</u> 926 F. Supp. at 1132–33; 161 F. Supp. 3d 1354, 1357–58.  The

Government states: "[l]ike in Marcor but unlike in Jedwards, BASF's merchandise

lacks the odor, color, and taste of fish . . . BASF's merchandise is thus not the sort of

savory flavoring that heading 1603 describes."  <u>Id.</u> at 15–16.

 The Government further argues that BASF's imported merchandise is not an

extract because it is "derivatized, rather than extracted, from fish oil."  <u>Id.</u> at 16.

Seeking to emphasize the purported simplicity of extraction, the Government

contends that various sources, including dictionaries, encyclopedias, and EN 16.03,

contemplate that extracts are obtained through processes like reduction and

distillation.  <u>Id.</u> at 16 (citations omitted).  Because the fish source goes through

transesterification, the Government argues that this chemical process is not a

typical extraction process.  <u>Id.</u>  ("BASF's merchandise is manufactured not through

simple extraction but rather through complex processing that features

transesterification . . . .").  Further, "transesterification, similar to the processing at

issue in <u>Marcor</u> but unlike the processing in <u>Jedwards</u>, requires a significant

additional ingredient (ethanol) as part of the production process."  <u>Id.</u> at 19.

 The court begins its analysis with GRI 1, which requires classification to "be

determined according to the terms of the headings and any relative section or

chapter notes."  GRI 1, HTSUS.  Heading 1603 is for "[e]xtracts and juices of meat,

fish or crustaceans, molluscs or other aquatic invertebrates."  HTSUS.  The term

"extract" is not defined by heading 1603 or in the relevant section or chapter notes.

Accordingly, the court turns to the common or dictionary meaning of "extract."

As both parties acknowledge, this court explored the common and commercial

meanings of the term "extract" in Marcor.  The Marcor court observed that "the

common thread running through the various dictionary definitions of 'extract' is

that an extract must maintain the essence of the main source."  Marcor, 926 F.

Supp. at 1132; see Jedwards, 926 F. Supp at 1358 ("An 'extract' is 'a preparation

containing the essence of the substance from which it is derived.'") (quoting Marcor,

926 F. Supp. at 1132–33 and observing how it discussed numerous lexicographical

sources and the EN to Chapter 16)).  Thus, whether the imported merchandise is an

extract turns on whether it maintains the essence of the fish source.

What is the essence of fish?  The Government takes a limited view and

focuses on whether the merchandise maintains the color, taste, and aroma of fish.

Def. Reply in Supp. of Cross-Mot. for S.J. ("Def. Reply") at 2 ("'extracts . . .

of . . . fish' are savory flavorings containing the essence—the taste and aroma—of

fish'").  Yet as Marcor and Jedwards make clear, these are not the only

characteristics that indicate whether an end product maintains the essence of its

source.  See Marcor, 926 F. Supp. at 1132–36; Jedwards, 926 F. Supp at 1358–63.

Of course, determining the essence of fish involves considering whether fish color,

taste, and odor remain; but it also involves considering whether other

characteristics of fish remain in the end product.  Marcor and Jedwards both favor a

holistic effort to define the "essence" of a source product, including consideration of the makeup of the product, which means the Government's view is too restrictive. See Marcor, 926 F. Supp. at 1132–36; Jedwards, 926 F. Supp at 1358–63.

Consider Jedwards, where the court held that the imported merchandise did contain the essence of fish, and was, in turn, an extract under heading 1603. 161 F. Supp. 3d. at 1358. The imported merchandise in Jedwards was krill oil marketed as a nutritional supplement. Id. at 1357. The Jedwards court used the same definition of "extract" as the court in Marcor and as the court uses here: "an 'extract' is a 'preparation containing the essence of the substance from which it is derived.'" Jedwards, 161 F. Supp. 3d at 1358 (citing Marcor, 926 F. Supp. at 1132–1133). The Jedwards court reasoned that "there is also no dispute that Plaintiff's krill oil retains the 'essence' of the krill" because "with the exception of residual amounts of ethanol solvent left over from the manufacturing process, Plaintiff's krill oil *only* contains substances that are naturally occurring in krill." Jedwards, 161 F. Supp. 3d at 1358 (citing SUMF at ¶7). Despite the court holding that "[p]laintiff's krill oil is therefore prima facie classifiable under HTSUS subheading 1603.00.90" as an extract of fish, the court's analysis did not refer to the color, taste, or odor as relevant for purposes of inclusion or exclusion of the product under heading 1603. Id. at 1356. Instead, the Jedwards court focused on whether the imported merchandise contained "substances that are naturally occurring" in its source. Id. at 1356–58.

The court in <u>Marcor</u> likewise emphasized factors other than color, taste, and odor in concluding that because food grade shark cartilage protein did not maintain the essence of shark fin it was not an extract thereof. <u>Marcor</u>, 926 F. Supp. at 1132–1133. Notably, the court emphasized how the shark fin cartilage was "mixed with dextrin, which comprises almost half of the final product." <u>Id.</u> at 1133. Additionally, the <u>Marcor</u> court highlighted that the shark fin cartilage was treated with an enzyme, "produced in powdered form, is not concentrated, and does not have the same odor, color or taste as simple shark fin cartilage." <u>Id.</u> Consequently, the court reasoned that "the product has not maintained the essence of the original shark cartilage." <u>Id.</u> Thus, like <u>Jedwards</u>, <u>Marcor</u> looked beyond a subjective comparison of the source product and the end product toward an objective comparison of the content or makeup of the source product and end product.

This court's cases demonstrate that the relevant analysis concerns both whether color, taste, and odor remain in the imported product and whether the imported product is sufficiently similar to the source in objective terms, such as by consisting of predominantly the same substance and form. Here, the imported merchandise maintains the essence of fish because it consists almost entirely of substance (fatty acids, glycerides, oligomers, and triglycerides) found in the fish source, remains in liquid form, continues to bear some resemblance to the fish source in color, taste, and odor, and offers the same health benefits as the fish source. SUMF at ¶ 29–31.

First, the imported merchandise contains no more than 1 percent natural tocopherol, which is added to prevent the finished product from oxidation, rather than to remove or otherwise alter any notably fishy characteristics. Id. at ¶¶ 24–27. Among the imported merchandise are products with as little as 0.2 percent added natural tocopherol. Id. at ¶¶ 23, 28. Otherwise, the final product consists of ethyl esters rich in omega-3 fatty acids, partial glycerides, oligomers, and triglycerides. Id. at ¶¶ 21–28. The glycerides, oligomers, and triglycerides are the same as those which occur naturally in the fish source. Id. at ¶ 36. That the merchandise includes less than 1 percent of additives and otherwise possesses striking similarity to the fish source demonstrates that it is more analogous to the krill oil in Jedwards than to the shark fin protein powder in Marcor.

The parties agree that the fatty acids, EPA and DHA, of the ethyl ester molecules that are found in the imported merchandise are the same that were present in the triglyceride molecules found in the fish source prior to the formation of the ethyl ester molecules through transesterification. Id. at ¶ 34. Where there is contention, however, is whether the transesterification process that concentrates these fatty acids removes the imported product from the proposed HTSUS heading. This process is a chemical reaction that causes the fatty acids that were originally bonded to a glycerol backbone in the fish source to separate and instead bond with ethanol, resulting in "three discrete fatty acid ethyl ester molecules from each triglyceride molecule." Id. at ¶¶ at 19–20. The nature of this chemical process does not remove the imported merchandise from heading 1603, as the fatty acids in the

imported merchandise "are the same EPA and DHA that were present in the triglyceride molecules prior to the creation of the ethyl ester molecules through transesterification." Id. at ¶ 34

Although heading 1603 refers to extract in the form of a noun, definitions of the verb form provide helpful context, particularly those pertaining to food products and chemical substances. BASF proffered the following scientific dictionaries that define the verb "to extract" as: 1. "To remove from or separate; to obtain by some chemical and/or physical process; 2. To obtain from a substance by chemical or mechanical action . . . ." Oxford Dict. of Biochem. and Mol. Bio. 233 (2d. ed. 2006) ("Oxford Dict."). The Government mistakenly frames the issue as a choice between "derivatization," on the one hand, and extraction, on the other hand. Gov. Cross MSJ at 12 ("BASF's merchandise . . . is synthesized through transesterification, which is a *derivatization* process, not an *extraction* process . . . ."). But this ignores the above scientific definitions which facially appear to describe a process like transesterification. See Oxford Dict. at 233. Indeed, that transesterification aims to concentrate the fatty acids contained in the fish source need not remove the imported merchandise from heading 1603 because the same fatty acids that were present in the triglyceride molecules prior to transesterification remain after transesterification, see SUMF ¶ 34, and extraction is commonly understood to involve chemical reactions. See Oxford Dict. at 233.

Further, the makeup of BASF's imported fish oil ethyl ester concentrates is more like the krill oil nutritional supplement, deemed an extract in Jedwards, than

the food grade shark protein powder, deemed not an extract in <u>Marcor</u>.  The krill oil

in <u>Jedwards</u> was a human nutritional supplement where the product was first

heated, cooked, dried, the krill meal was separated from the krill animal, and then

the krill oil was extracted from the krill meal using ethanol.  161 F. Supp. 3d. at

1357.  The finished product still contained "residual amounts of ethanol solvent left

over from the manufacturing process."  <u>Id.</u>  There, the addition of ethanol in the

processing phase to extract the krill oil did not remove the krill oil from heading

1603.  <u>See</u> <u>id.</u>  Here, that the process requires ethanol to concentrate the fatty acids

in the crude fish oil similarly does not remove the fish oil from heading 1603.  In

contrast, the food grade shark protein powder in <u>Marcor</u> consisted of more than 40

percent added dextrin, a product not naturally occurring in the source product,

which contributed to the court's conclusion that shark fin protein powder is not an

extract of fish.  926 F. Supp. at 1128.  In sum, the less than 1 percent tocopherol

contained in the imported merchandise more closely resembles the residual ethanol

of <u>Jedwards</u> than the more than 40 percent added dextrin of <u>Marcor</u>.  <u>Compare</u>

<u>Jedwards</u>, 161 F. Supp. 3d. at 1357, <u>with</u> <u>Marcor</u>, 926 F. Supp. at 1128.

Second, the fish source and the imported merchandise maintain the same

shape and form.  In <u>Marcor</u>, the court noted that the end product was "produced in

powdered form," which was unlike the form of the source product (solid shark fin).

926 F. Supp. at 546.  Here, the source begins as crude fish oil physically removed

from a fish and ends as fish oil ethyl ester concentrates – remaining in liquid form

through the production process.  <u>See</u> SUMF at ¶¶ 12, 29.

Third, the <u>Marcor</u> court also included the fact that the imported product "does not have the same odor, color, or taste" as shark fin cartilage, in its list of reasons why the end product could not be an extract of fish.  926 F. Supp. at 1133. Here, BASF's imported merchandise still has a "slight fish-like odor," which is the same but less pronounced as the odor found in the fish source.  SUMF at ¶ 30.  The parties note that the imported merchandise is a light-yellow liquid and has a "minimal fish oil taste," <u>id.</u> at ¶¶ 29, 31, facts demonstrating fishy continuity from the fish source to the imported merchandise.[4]

Fourth, the fish source also contains EPA and DHA fatty acids, which are polyunsaturated omega-3 fatty acids.  The parties agree that "omega-3 fatty acids are thought to promote good health," SUMF at ¶ 8, and this health benefit is found in both the fish source and the imported merchandise.  <u>See id.</u> at ¶¶ 23–28, 34.  In other words, a consumer seeking health benefits from omega-3 fatty acids can get those benefits by consuming either the fish source or the imported merchandise. That the health benefits of fish oil survive the production process here demonstrates another important throughline from the fish source to the imported merchandise.

In several critical respects, the imported merchandise maintains the essence of the fish source.  From a qualitative perspective, it retains a form, odor, taste, color, and health profile similar to the fish source.  <u>Id.</u> at ¶¶ 29–32.  And from a quantitative perspective, the imported merchandise consists of: fatty acids derived

---

[4] Notably, EN 16.03 states that "extracts of fish are obtained, e.g., by concentrating water extracts of the flesh of . . . fish . . . during the production all or part of the constituents which give the fishy taste . . . may be eliminated."  EN 16.03.

from the source; glycerides, oligomers, and triglycerides that occur naturally in the crude fish oil; and no more than 1 percent added tocopherol to prevent oxidation. Id. at ¶¶ 23–28, 34, 36. These facts uniformly support the conclusion that the imported merchandise maintains the essence of the fish source and, in turn, confirm that it is an extract of fish.

As the foregoing analysis indicates, the imported merchandise maintains the essence of the fish source from which it is derived. Consequently, it belongs under heading 1603.

B.      The Imported Merchandise is an Extract of "Fish"

BASF argues that the imported product is an extract of fish because, as confirmed by reference to prior court rulings and dictionary definitions, "fish" is understood to mean any part of the fish, including fish oil. Pl. MSJ at 24; see e.g., Marcor, 926 F. Supp. at 1130; Jedwards, 161 F. Supp. 3d. at 1358. The Government argues that because BASF's product is an "extract of fish oil," it should be excluded from heading 1603. Def. Cross MSJ at 20 (citing Pl. MSJ at 25).

The Government proposes that "fish" means "the flesh or organic structure of the animal fish," including "skin, bones, and fins." Id. at 20 (citing Marcor, 926 F. Supp at 1132). Yet the Government cites to United States v. Geo. S. Bush to suggest that while the definition of fish includes the organic structure of the fish, the tariff term "fish" does not include "processed material made therefrom." Id. at 20–21 (citing United States v. George S. Bush & Co., 24 C.C.P.A. 313, 316 (1936)). Unlike here, in George S. Bush, the Customs Court addressed whether fish meal

intended for use as fertilizer or animal feed was considered "fish" for purposes of

paragraph 1575 of the Tariff Act of 1922. 24 C.C.P.A. at 313. That inquiry and the

Customs Court's resolution of it are too attenuated from the law and facts at issue

here to form a basis to conclude that the fish source is not part of the "organic

structure of the fish" under heading 1603. See SUMF at ¶ 12 ("Crude fish oil is

produced from ungutted whole fish by physically separating the oil in the fish from

the fish solids.")

Nevertheless, in defining the tariff term "fish," as the "flesh or organic

structure of the animal fish," the court in Marcor consulted "[d]ecisions of both the

Customs Court and the Court of Customs Appeals" and noted that "those few cases

defining fish demonstrate that the term has never been narrowly defined." 926 F.

Supp. at 1131. Caselaw, therefore, does not support the Government's argument

that the term "fish" should be narrowly defined. Nor does common sense: the

Government does not, and cannot, offer any principled distinction between the

"skin, bone, and fins" of a fish, on the one hand, and oil that is physically removable

directly from a fish, on the other.

Additionally, the implied premise of the government's argument is essentially

that classification under heading 1603, HTSUS, requires that extracts of fish be

those obtained directly from fish in the natural state, with no intermediate

processing. The terms of heading 1603, HTSUS, impose no such requirement, and

the intended scope of the internationally-harmonized heading is to the

contrary. See EN 16.03 (indicating that the heading includes fish extracts obtained,

for example, from "concentrating water extracts of the flesh . . . of fish" or "made from fish meal").

The fish oil from which BASF produced the imported merchandise is part of the flesh and organic structure of the fish. SUMF at ¶¶ 11, 12. The crude fish oil is physically separated from the fish body. Id. These facts clearly suggest that crude fish oil is part of the organic structure of the fish. As an extract of crude fish oil, the imported merchandise (which the court has herein referred to as the "fish source") is therefore properly understood as an extract of fish under heading 1603. More specifically, BASF's products belong under HTS subheading 1603.00.90. HTSUS.

Because the imported merchandise belongs under heading 1603, it follows that it cannot be properly classified under the basket provisions proposed by Customs (heading 3824) and the Government (heading 2106). As discussed above, if a product is classified under a non-basket provision like subheading 1603.00.90, then it is unnecessary for the court to evaluate basket provisions that are only to be considered in the alternative. See EM Indus., 22 CIT 156 at 1480.

IV.    It is Unnecessary for the Court to Address the Counterclaim Issue

The Government sought to raise a counterclaim in order to propose a novel classification, heading 2106, and disavow the provision originally chosen by Customs. Gov. Answer and Counterclaim at 5, ECF No. 32 (April 5, 2022) at 5, 8. The Government contends that it may raise counterclaims in this context as of right under 28 U.S.C § 1583 and federal common law. Def. Cross MSJ at 29–31. Because the court determines that heading 1603 is the correct classification, today's

judgment precludes the classification and reliquidation requested by the Government.  It is therefore unnecessary for the court to opine on whether the Government has the right, under these or other circumstances, to raise counterclaims under section 1583 or federal common law.  Whether as an affirmative defense or as a counterclaim, the Government's arguments fail to persuade the court that a tariff provision other than heading 1603 applies to BASF's imported merchandise.  Accordingly, the Government's cross-motion will be denied.

## CONCLUSION

For the reasons stated above, the court grants BASF's motion for summary judgment, denies the Government's cross-motion for summary judgment, and holds that the subject merchandise is properly classified under HTSUS 1603.00.90. Judgment will be entered accordingly.

/s/     Joseph A. Laroski, Jr.
Joseph A. Laroski, Jr., Judge

Dated: May 2, 2025
       New York, New York