UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| Plaintiff, | : |
| v. | : Consol. Court No. 13-00318 |
| UNITED STATES, | : |
| Defendant. | : |

## ORDER

Upon consideration of defendant's motion for reconsideration, and upon consideration of all other papers and proceedings had herein; it is hereby

**ORDERED** that defendant's motion for reconsideration is granted;

**ORDERED** that Slip Opinion 25-54 (ECF No. 85) and the May 2, 2025 judgment (ECF No. 86) are withdrawn;

**ORDERED** that judgment is entered for defendant; and it is further

**ORDERED** that U.S. Customs and Border Protection shall reliquidate the entries of the subject merchandise before the Court under subheading 2106.90.99, Harmonized Tariff Schedule of the United States (HTSUS) (2011 and 2012) or subheading 2106.90.98, HTSUS (2018), depending on the date of entry.

_____
JUDGE

Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| Plaintiff, | : |
| v. | : Consol. Court No. 13-00318 |
| UNITED STATES, | : |
| Defendant. | : |

## DEFENDANT'S MOTION FOR RECONSIDERATION

                        YAAKOV M. ROTH
                        Acting Assistant Attorney General

                        PATRICIA M. McCARTHY
                        Director

                        JUSTIN R. MILLER
                        Attorney-In-Charge
                        International Trade Field Office

*Of Counsel:*
Michael A. Anderson             LUKE MATHERS
Office of the Assistant Chief Counsel   Trial Attorney
International Trade Litigation       Department of Justice, Civil Division
U.S. Customs and Border Protection  Commercial Litigation Branch
                                                      26 Federal Plaza, Room 346
                                                      New York, New York 10278
                                                      (212) 264-9236

Dated: May 30, 2025                *Attorneys for Defendant*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

    I.    Standard of Review: Reconsideration Is Warranted Where Material Points Of Law And Fact Have Been Overlooked ................................................................................. 2

    II.    The Court Overlooked That Fish Extracts Must Be Similar To Meat Extracts—Common Flavoring Additives—Which Resulted In An Unworkable Standard For "Extracts" ................ 3

    III.    Even Assuming The Court's Standard Is Correct, The Court Must Classify BASF's Preparations In Their Imported State, And As Imported, They Consist Of Ethyl Esters—Not Fatty Acids .............................................................................................................. 5

    IV.    BASF's Ethyl Esters Did Not Naturally Occur In Crude Fish Oil—As BASF Stipulated—And Thus Do Not Predominantly Consist Of The Same Substance As Their Crude-Fish-Oil Source ....................................................................................................................... 8

CONCLUSION ..................................................................................................................... 11

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. United States*,
  964 F.3d 1087 (Fed. Cir. 2020) ............................................................................................... 5

*Aromont USA, Inc. v. United States*,
  34 C.I.T. 1014 (2010) ............................................................................................................. 4

*Canadian Solar Int'l Ltd. v. United States*,
  471 F. Supp. 3d 1379 (Ct. Int'l Trade 2020) .......................................................................... 2

*Drygel, Inc. v. United States*,
  541 F.3d 1129 (Fed. Cir. 2008) ............................................................................................... 4

*Ford Motor Co. v. United States*,
  30 C.I.T. 1587 (2006) ............................................................................................................. 3

*Jedwards Int'l Inc. v. United States*,
  161 F. Supp. 3d 1354 (Ct. Int'l Trade 2016) ....................................................................... 2, 9

*Kachurin Drug Co. v. United States*,
  24 Cust. Ct. 264 (1950) ................................................................................................. 7, 8, 9

*Mitsubishi Power Americas, Inc. v. United States*,
  2025 WL 1233625 (Ct. Int'l Trade Apr. 29, 2025) ............................................................. 6, 7

*Rico Import Co. v. United States*,
  12 F.3d 1088 (Fed. Cir. 1993) ................................................................................................. 6

*Rocknel Fastener, Inc. v. United States*,
  267 F.3d 1354 (Fed. Cir. 2001) ............................................................................................... 3

*Shamrock Bldg. Materials, Inc. v. United States*,
  119 F.4th 1346 (Fed. Cir. 2024) ............................................................................................. 9

*StoreWALL, LLC v. United States*,
  644 F.3d 1358 (Fed. Cir. 2011) ............................................................................................... 3

*United States v. George S. Bush & Co.*,
  24 C.C.P.A. 313 (1936) ........................................................................................................ 10

*Wallace Berrie & Co. v. United States*,
  12 C.I.T. 103 (1988) ............................................................................................................... 8

*Worthington v. Robbins*,
   139 U.S. 337 (1891) ............................................................................................... 6

**Harmonized Tariff Schedule of the United States**

Heading 0309 ............................................................................................................... 3

Heading 1504 ............................................................................................................... 3

Heading 1603 ...................................................................................................... 3, 4, 5, 9

Heading 1604 ............................................................................................................... 3

Heading 3826 ............................................................................................................... 3

**Rules**

USCIT Rule 59 ......................................................................................................... 1, 2

**Other Authorities**

Explanatory Note 16.03 ......................................................................................... 1, 4, 5

Nikken Foods, *Seafood Extract Powders*,
   https://nikkenfoods.com/seafood-extracts/ [perma.cc/RGT3-QN7F] ......................... 4

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| Plaintiff, | : |
| v. | : Consol. Court No. 13-00318 |
| UNITED STATES, | : |
| Defendant. | : |

**DEFENDANT'S MOTION FOR RECONSIDERATION**

Pursuant to Rule 59 of the United States Court of International Trade (USCIT), defendant, the United States (the Government), respectfully moves for reconsideration of the Court's May 2, 2025 order granting judgment in plaintiff BASF Corporation's (BASF's) favor.

**INTRODUCTION**

Reconsideration is warranted where the Court has overlooked material points of law and fact. As we explain below, there are two crucial points that require a revisit of the Court's prior analysis.

First, the Court's analysis overlooked that fish extracts must "have characteristics similar to those of meat extracts," Explanatory Note 16.03, and that meat extracts undisputedly are "common flavoring additive[s] for soups, stews, sauces, … and other items where meat flavoring improves the products," Gov't Ex. 5. In overlooking that crucial clarification of the term "extracts," the Court has created a standard that would classify most products derived from fish as an "extract"—including fish meal, fish oil, cans of tuna, frozen fish dinners, and biodiesel made from fish. The structure of the tariff statute shows that is not the intention of the drafters.

And second, the prior classification analysis is at odds with the stipulated fact that BASF's preparations are *not* fatty acids. BASF's preparations instead are ethyl esters—ethanol chemically bonded to fatty acids. Joint Statement of Undisputed Material Facts (JSUMF) ¶¶ 6, 19. Ethanol is not just a processing aid used in making the merchandise. Rather, over 12 percent of the molecular weight of these ethyl esters *is ethanol*. Plaintiff's Statement of Additional Undisputed Material Facts (PSUMF) ¶¶ 7–8. These ethanol-laden ethyl esters, moreover, "do not occur naturally in crude fish oil but are instead created through the transesterification process." JSUMF ¶ 33. In fact, BASF stipulated that *over 93 percent* of its merchandise consists of a substance that did not naturally occur in fish. *Id.* ¶¶ 24–28, 33. Thus, even under the Court's prior interpretation of "extracts," BASF's preparations do *not* "consist[] of predominantly the same substance" as the fish source, Slip Op. 25-54 at 14, because they do not "*only* contain[] substances that are naturally occurring in [fish]," *Jedwards Int'l Inc. v. United States*, 161 F. Supp. 3d 1354, 1358 (Ct. Int'l Trade 2016).

Accordingly, reconsideration is warranted, and we respectfully request that the Court enter judgment in the Government's favor.

## ARGUMENT

I.  **Standard of Review: Reconsideration Is Warranted Where Material Points Of Law And Fact Have Been Overlooked**

USCIT Rule 59 permits the Court to reconsider a final order. "A party may move the court to correct a significant flaw in the original judgment by directing the court to review material points of law or fact previously overlooked." *Canadian Solar Int'l Ltd. v. United States*, 471 F. Supp. 3d 1379, 1382 (Ct. Int'l Trade 2020) (cleaned up). And a motion for reconsideration should be granted where, upon review of those overlooked material points of law

2

and fact, there is a "need to correct a clear factual or legal error." *Ford Motor Co. v. United States*, 30 C.I.T. 1587, 1588 (2006).

## II. The Court Overlooked That Fish Extracts Must Be Similar To Meat Extracts—Common Flavoring Additives—Which Resulted In An Unworkable Standard For "Extracts"

The Court's opinion concludes that the question whether a preparation is an "extract" "concerns both whether color, taste, and odor remain in the imported product and whether the imported product is sufficiently similar to the source in objective terms, such as by consisting of predominantly the same substance and form." Slip Op. 25-54 at 14.

It is unclear, however, what preparations made from fish would not constitute extracts under this standard. Fish meal would be an extract because it still smells like fish and has the same molecules as the fish it came from. *Cf.* heading 0309. So too would a can of tuna, a frozen fish dinner, and natural fish oil—all maintain not just the smell and taste of fish but also the same atoms that made up their piscine starting material. *Cf.* headings 1504 and 1604. In other words, just about anything made of fish—even biodiesel that has the same chemical makeup as BASF's ethyl esters, *cf.* heading 3826—would be an "extract" under the interpretation reflected in the Court's opinion.

But this interpretation cannot be in line with the plain meaning of heading 1603 or the intentions of its drafters. Where a tariff term is not defined in the HTSUS, "the term's correct meaning is its common meaning," which is "presumed to be the same as its commercial meaning." *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001) (quotation omitted). "In order to determine the common commercial meaning of a tariff term, courts may consult dictionaries, encyclopedias, scientific authorities, and other reliable information sources." *StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011).

That includes the World Customs Organization's Explanatory Notes to the Harmonized Tariff Schedule, which, though not binding, "are 'generally indicative' of the proper interpretation of a tariff provision." *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008) (quotation omitted). Courts credit "the unambiguous text of relevant explanatory notes absent persuasive reasons to disregard it." *Id*.

The Explanatory Notes clarify that "[e]xtracts," for purposes of classification under heading 1603, "are used for making certain food preparations *such as soups ... and sauces*." Explanatory Note 16.03 (emphasis added). Under this guidance, fish extracts are, in short, flavoring additives. *See, e.g.*, *Aromont USA, Inc. v. United States*, 34 C.I.T. 1014, 1017 (2010) (describing fish and lobster flavorings that contained "fish extract," "seafood extract," and other ingredients), *aff'd*, 671 F.3d 1310 (Fed. Cir. 2012); Nikken Foods, *Seafood Extract Powders*, https://nikkenfoods.com/seafood-extracts/ [perma.cc/RGT3-QN7F] ("[W]e strictly use simple culinary techniques of steaming, pressing and hot water to extract the essence from whole seafood. … Choose any item below to add clean tasting notes, authentic seafood and umami to your formulations.").

This critical guidance from the Explanatory Note was overlooked in the Court's prior classification analysis. The Court accurately quotes Explanatory Note 16.03 as stating that "during the production all or part of the constituents which give the fishy taste … may be eliminated." Slip Op. 25-54 at 18 n.4. But the Court overlooks the remaining guidance, which goes on to say that "such extracts therefore have characteristics similar to those of meat extracts." Explanatory Note 16.03. And meat extracts are "common flavoring additive[s] for soups, stews, sauces, … and other items where meat flavoring improves the products." Gov't Ex. 5. The Court's opinion did not explain how BASF's preparations "have characteristics

4

similar to those of meat extracts," Explanatory Note 16.03, or otherwise address the Government's arguments on these points.[1]  Moreover, the Court's opinion also overlooks the guidance that "fishy taste" is actually referring to "trimethylamine," Explanatory Note 16.03, which is a foul "degradation product," Gov't Ex. 6, not a savory fish taste.  This omission, together with the standard for "extracts" that presents an unworkable standard for Customs to administer, warrants reconsideration of the Court's opinion.  *See, e.g.*, *Apple Inc. v. United States*, 964 F.3d 1087, 1096 (Fed. Cir. 2020) (rejecting "a faulty reading of" an explanatory note).

III.  **Even Assuming The Court's Standard Is Correct, The Court Must Classify BASF's Preparations In Their Imported State, And As Imported, They Consist Of Ethyl Esters—Not Fatty Acids**

Even under the interpretation of heading 1603 reflected in Slip Op. 25-54, the imported ethyl ester concentrates would not meet the parameters for classification under heading 1603. The Court's opinion stated that BASF's preparations "consist[] almost entirely of substance[s] (*fatty acids*, glycerides, oligomers, and triglycerides) found in the fish source," Slip Op. 25-54 at 14 (emphasis added), and that they had "less than 1 percent of additives" total in the form of tocopherols, *id.* at 15.  The Court also appeared to view ethanol as a processing aid that was "require[d] … to concentrate the fatty acids in the crude fish oil," Slip Op. 25-54 at 17, rather than an integral part of the merchandise.

We respectfully note this description of the merchandise is inconsistent with the stipulated and undisputed facts.  BASF's preparations are comprised of ethyl esters, not fatty

---

[1] That *Jedwards* classified a nutritional supplement under heading 1603 despite the guidance of Explanatory Note 16.03 may be attributable to the fact that the parties never provided the Court with briefing on the issue.  *See* 161 F. Supp. 3d at 1358–62 (classifying the krill oil under heading 1603 *sua sponte* pursuant to *Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984)).

5

acids. Ethyl esters are ethanol chemically bonded to fatty acids. JSUMF ¶¶ 6, 19. Ethanol is an integral part of these ethyl esters, as over 12 percent of their molecular weight consists of ethanol. PSUMF ¶¶ 7–8. And over 93 percent of BASF's merchandise consists of ethyl esters, which "do not occur naturally in crude fish oil but are instead created through the transesterification process." JSUMF ¶¶ 24–28, 33. Moreover, the "glycerides, oligomers, and triglycerides"—the only molecules in BASF's preparations that "occur[red] naturally in crude fish oil"—are present in BASF's preparations merely "as organic impurities." JSUMF ¶ 36.

In other words, the Court's opinion appears to have classified sub-molecular portions of the imported merchandise—fatty acids, rather than ethyl esters—and the unintended leftovers from crude fish oil. But a fundamental rule of tariff classification is that the Court must classify merchandise in "the condition in which it is imported." *Rico Import Co. v. United States*, 12 F.3d 1088, 1090 (Fed. Cir. 1993) (quoting *Worthington v. Robbins*, 139 U.S. 337, 341 (1891)). In overlooking that the merchandise as imported consists of ethyl esters, not fatty acids, the Court unwittingly classified the merchandise in a condition other than that in which it was imported.

Cases both new and old reinforce the importance of this rule. Take, for example, *Mitsubishi Power Americas, Inc. v. United States*, Slip Op. 25-53, 2025 WL 1233625 (Ct. Int'l Trade Apr. 29, 2025). There, the importer argued that its "catalyst blocks," which consisted of meshes coated with a chemical and other components like "a protector, a set of seal bars, and a seal plate," should be classified as if they consisted just of the chemical-coated meshes, which were said to provide the blocks' essential character. *Id.* at *7. This Court rejected that invitation, explaining that the blocks were not "chemical compounds alone," nor such compounds coating a mesh, but rather "assemblies of all these components." *Id.* Accordingly,

6

the Court classified the merchandise in its imported state—not the merchandise broken down into just its most important part. *See id.*

Or consider *Kachurin Drug Co. v. United States*, 24 Cust. Ct. 264 (1950), *aff'd*, 39 C.C.P.A. 36 (1951). There, the issue was whether therapeutic "ammonium ichthosulfonate" was classifiable as a "natural" or "uncompounded" drug of "animal origin." The merchandise was derived from deposits of "bituminous schists," "consisting of comparatively soft brown to black oily material" that contained the remains of "fossilized fishes." 24 Cust. Ct. at 267. Crude oil was extracted from the schists through distillation, which was then "treated with sulfuric acid and neutralized with ammonia, and finally concentrated to proper consistency." *Id.* at 267–68. The Customs Court held that the merchandise was of "animal origin": "As organic sulfur, which imparts therapeutic value to the imported product, is derived from the natural material and remains present throughout the processes discussed, *infra*, the merchandise in question must be regarded basically as of animal origin." *Id.* at 268.

But the Customs Court rejected the argument that the fish-derived merchandise was "natural" or "uncompounded," because the starting material—crude oil extracted from bituminous schists through distillation—had undergone a chemical transformation. The court contrasted the merchandise before it with "beef liver extract," animal hormones, and "concentrated ox gall" previously classified as "natural" products: in those cases, "the imported drug was the same as the substance found in its natural existence." *Id.* at 269. Although the crude oil from which the merchandise was produced was in its natural state, and although the therapeutic sulfur from that crude oil carried over into the merchandise, the court refused "[t]o break down the commodity before" it that way. *Id.* The merchandise before the court was "not crude oil," as it had admittedly undergone "a chemical reaction, which produced a new

7

substance." *Id.* (quotation omitted). In other words, unlike an animal extract that "existed in [an] imported solution *in the form as extracted from its original source*," the merchandise "ha[d] been manufactured" from crude oil into a new substance through a chemical reaction. *Id.* (emphasis added).

Both *Mitsubishi* and *Kachurin* reinforce that the Court must classify BASF's preparations in their imported state. *See also Wallace Berrie & Co. v. United States*, 12 C.I.T. 103, 106 (1988) (explaining that "[c]lassification is determined by the condition of the articles at the time of importation," and that, because the merchandise was imported as "an entirety" rather than "separately," the merchandise had to be classified as an entirety). Thus, the merchandise itself—artificial ethyl esters—must be classified, not the fatty acids and residual organic impurities that only form part of the merchandise. *See Kachurin*, 24 Cust. Ct. at 269 (the court must classify a preparation as a whole, and cannot "break down the commodity before it" into just one sub-molecule obtained from fish).

IV. **BASF's Ethyl Esters Did Not Naturally Occur In Crude Fish Oil—As BASF Stipulated—And Thus Do Not Predominantly Consist Of The Same Substance As Their Crude-Fish-Oil Source**

Because BASF's preparations consist almost entirely of substances that did not occur naturally in fish, they do not predominantly consist of the same substance as their source and cannot be "extracts" under the Court's definition of that term. As noted, over 93 percent BASF's merchandise consists of non-naturally-occurring ethyl esters, which in turn are molecules made up of fatty acids bonded to ethanol in non-residual quantities. JSUMF ¶¶ 6, 19, 24–28, 33; PSUMF ¶¶ 7–8.

Again, consider *Kachurin*. There, the importer argued that its ammonium ichthosulfonate derived from fossilized fish was just a natural extract because it still contained sulfur that had

8

been extracted from those fish. 24 Cust. Ct. at 269. The Customs Court rejected that argument, refusing "[t]o break down the" merchandise that way, and instead held that the merchandise "ha[d] been manufactured" into a new substance because it did not exist "in the form as extracted from its original source." *Id.* The same is true here: BASF's preparations do not exist "in the form as extracted from [their] original source," *id.*, even though their sub-molecular portions carry forward omega-3 fatty acids from fish.

*Jedwards* also proves informative. As the Court noted, the crucial fact in *Jedwards* was that the "krill oil *only* contain[ed] substances that are naturally occurring in krill," Slip Op. 25-54 at 13 (quoting *Jedwards*, 161 F. Supp. 3d at 1358), with the exception of "residual amounts of ethanol solvent left over from the manufacturing process," *id.* at 17 (quoting *Jedwards*, 161 F. Supp. 3d at 1357). BASF's preparations, however, undisputedly contain over 93 percent of substances that *are not naturally occurring in fish* that in turn contain *non-residual amounts of ethanol*. JSUMF ¶¶ 6, 19, 24–28, 33; PSUMF ¶¶ 7–8. *Jedwards* is thus very different from this case—as BASF's own expert testified, when explaining "that in the context of this case, the krill manufacturing is not relevant." Gov't Ex. 3 at 98:21–99:20.

Accordingly, even under the interpretation of heading 1603 reflected in Slip Op. 25-54, the imported ethyl ester concentrates would not meet the parameters for an "extract." They do not predominantly consist of the same substance as their source in the same form. Slip Op. 25-54 at 14.

Nor is the "minimal" fish taste and odor associated with BASF's preparations enough to carry the day. JSUMF ¶¶ 30–31. As the Government pointed out, BASF's merchandise does not have any *commercially significant* aroma or taste of fish. *Shamrock Bldg. Materials, Inc. v. United States*, 119 F.4th 1346, 1353 (Fed. Cir. 2024) (holding that an imported good had to have

9

a "commercially significant" property required by a heading term). Manufacturers of dietary supplements commonly add lemon to *mask* whatever smell or taste of fish remains in BASF's preparations. Gov't Ex. 3 at 50:17–51:11. Nor did BASF produce any evidence that the ethyl esters, rather than the approximately seven percent of naturally occurring organic impurities, were responsible for the preparations' commercially irrelevant aroma and taste. These undisputed facts demonstrate that, at the time of importation, BASF's preparations lack fish aroma and taste in any commercially relevant sense.

In short, BASF's preparations do not predominantly consist of the same substance as their crude-fish-oil source,[2] and fail to retain any commercially significant fish aroma or flavor.

---

[2] In concluding that this fish-oil source constituted "fish," the Court observed that "the Government does not, and cannot, offer any principled distinction between the 'skin, bone, and fins' of a fish, on the one hand, and oil that is physically removable directly from a fish, on the other.'" Slip Op. 25-54 at 20. The distinction, however, comes from the common meaning of "fish." The term "fish" does not include "processed material made therefrom." *United States v. George S. Bush & Co.*, 24 C.C.P.A. 313, 316 (1936). Fish meat, skin, bones, and fins are not "processed material" made from fish; but fish oil, fish meal, and other manufactures of fish are. *Id.*

10

## CONCLUSION

For these reasons, we respectfully ask that the Court grant the Government's motion for reconsideration, enter judgment in the Government's favor, and order reliquidation of the subject entries under subheading 2106.90.99, HTSUS (2011 and 2012) or 2106.90.98, HTSUS (2018), depending on the date of entry.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel:*
Michael A. Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

/s/ Luke Mathers
LUKE MATHERS
Trial Attorney
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9236
*Attorneys for Defendant*

Dated: May 30, 2025

11

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| BASF CORPORATION, | : |
| Plaintiff, | : |
| v. | : Consol. Court No. 13-00318 |
| UNITED STATES, | : |
| Defendant. | : |

**CERTIFICATE OF COMPLIANCE**

    I, LUKE MATHERS, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief, relying upon the word count feature of the word processing program used to prepare the brief, certify that this brief complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 2,949 words.

/s/ Luke Mathers
LUKE MATHERS